UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED

LOCAL 810 AFFILIATED PENSION FUND and LOUIS
SMITH, MICHAEL SMITH, ROY BARNES, and PETER
AJALAT, TRUSTEES OF THE LOCAL 810 AFFILIATED
PENSION FUND

08 Civ.

JAN 1 4 2008

and

UNITED WIRE, METAL & MACHINE PENSION FUND and
LOUIS SMITH, THOMAS FEELEY, DONNA SANTORO,
HARVEY MORGAN, ROBERT ZISKIN, and PETER AJALAT,
TRUSTEES OF THE UNITED WIRE, METAL & MACHINE
PENSION FUND

**COMPLAINT**

**08 CIV. 0421**

Plaintiffs,

**JUDGE COTE**

-against-

PRUDENTIAL FINANCIAL INC., M&R CAPITAL
MANAGEMENT, INC., ALAN STUART FIELDS,
CITIGROUP GLOBAL MARKETS, INC., UBS
INTERNATIONAL, INC. and WACHOVIA SECURITIES, LLC

Defendants.

Plaintiffs, by and through their attorneys, Barnes, Iaccarino, Virginia, Ambinder
& Shepherd, PLLC, as and for their complaint, respectfully allege as follows:

## NATURE OF THE ACTION

1.    This civil action arises from Defendants M&R Capital Management, Inc.'s

("M&R") and Prudential Securities, a division of Prudential Financial, Inc.'s[1] (hereinafter

referred to as "Prudential") unlawful and fraudulent conduct, in violation of Section 10(b)

of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated

---

[1] Prudential Securities was a division of Prudential Financial, Inc. until the combination of Prudential
Securities and Wachovia Securities in July, 2003 to form Wachovia Securities LLC.

thereunder ("Rule 10b-5"), and applicable common law, to benefit themselves at the expense and to the detriment of Plaintiffs, Louis Smith, Michael Smith, Roy Barnes, and Peter Ajalat, as Trustees of the Local 810 Affiliated Pension Fund (hereinafter referred to as the "Local 810 Fund"), and Louis Smith, Thomas Feeley, Donna Santoro, Harvey Morgan, Robert Ziskin and Peter Ajalat, as Trustees of the United Wire, Metal & Machine Pension Fund (hereinafter referred to as the "Wire Fund") (collectively referred to as the "Funds").

2.      Plaintiffs further allege that Defendants also violated Sections 404 and 406 of the Employee Retirement Income Security Act of 1974 as amended, 29 U.S.C. § 1001 et seq. ("ERISA"), to benefit themselves at the expense and to the detriment of Plaintiffs and the participants and beneficiaries of the Funds.

## JURISDICTION & VENUE

3.      This action is brought pursuant to Section 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78(j) and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5. This action also contains pendent common law claims for violations of Defendants' common law duties as agents and fiduciaries of Plaintiffs, and arising out of Defendants' breaches of their contractual obligations to Plaintiffs.

4.      This Court has federal question jurisdiction over this action pursuant to Section 27 of the Exchange Act. Jurisdiction is also conferred upon this court by Sections 502(a)(2) and (a)(3), and 502(f) of the Employee Retirement Income Securities Act ("ERISA"), (29 U.S.C. §§ 1132(a)(2),(a)(3), (f)) and 28 U.S.C. § 1331, 28 U.S.C. §

1332 and 28 U.S.C. § 1337. This Court has jurisdiction over plaintiff's state law claims pursuant to supplemental jurisdiction, see 28 U.S.C. § 1367.

5.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

6.      Many of the acts and transactions alleged and complained of herein, including the entry and execution of trades through Prudential, Citigroup Global Markets, Inc. (hereinafter "Citigroup"), and UBS International, Inc. (hereinafter referred to as "UBS"), occurred or were initiated in New York. In addition, the Funds are administered in and maintained in the State of New York, within this district, and Defendants regularly conduct business with customers within this District.

7.      In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, telephone communications and facilities of national and regional securities exchanges.

## THE PARTIES

8.      Plaintiffs, Louis Smith, Michael Smith, Roy Barnes, and Peter Ajalat, are the trustees of the Local 810 Fund (hereinafter the "Local 810 Trustees") and are fiduciaries within the meaning of Section 3(21) of ERISA. The Local 810 Fund is a multi-employer labor-management Pension Fund, organized and operated pursuant to various collective bargaining agreements in accordance with Section 302(c)(5) of the

Taft-Hartley Act, 29 U.S.C. § 186(c)(5).[2]  The Local 810 Fund is an employee benefit plan within the meaning of ERISA Sections 3(3) and 502(d)(1) and an employee pension benefit plan within the meaning of ERISA Section 3(2).  The Local 810 Fund is a multiemployer plan within the meaning of ERISA Section 3(37).  The Local 810 Fund is administered and maintains its principal place of business at 10 East 15th Street, New York, NY 10003.

9.    Plaintiffs, Louis Smith, Thomas Feeley, Donna Santoro, Harvey Morgan, Robert Ziskin and Peter Ajalat, are the trustees of the Wire Fund (hereinafter the "Wire Find Trustees") and are fiduciaries within the meaning of Section 3(21) of ERISA.  The Wire Fund is a multi-employer labor-management Pension Fund, organized and operated pursuant to various collective bargaining agreements in accordance with section 302(c)(5) of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5).  The Wire Fund is an employee benefit plan within the meaning of ERISA Sections 3(3) and 502(d)(1) and an employee pension benefit plan within the meaning of ERISA Section 3(2).  The Wire Fund is a multiemployer plan within the meaning of ERISA Section 3(37).  The Wire Fund is administered and maintains its principal place of business at 10 East 15th Street, New York, NY 10003.

10.    The Local 810 Trustees, and the Wire Fund Trustees, (collectively referred to hereinafter as the "Trustees") are fiduciaries of the respective Funds and must act in accordance with the documents creating the Funds, including the Trust Agreements and Plan Documents for each Fund.

---

[2]  The Local 810 Fund is the successor in interest to the International Brotherhood of Teamsters Local 875 Pension Fund, which initially entered into an investment management agreement with defendant Prudential.

11.    As the Funds are governed by ERISA, the Taft-Hartley Act, the Internal Revenue Code, and their respective Trust Agreements, the Trustees serve as fiduciaries of ERISA plan assets, which are held in trust on behalf of the Fund beneficiaries – consisting of approximately 10,000 participants.

12.    Under the Taft-Hartley Act, the Funds must have equal employer and employee representation on the Board of Trustees. The Trustees of the Funds generally performed all management activities relevant herein at duly constituted board meetings at which a quorum was present. Included in the decisions made by the Trustees are what entities will serve as the investment consultant, investment manager, and custodian of the Funds' assets. No single Trustee can take action on behalf of either Fund. The better the investment performance of the Funds' assets, the more likely the Trustees can increase pension benefits for the participants and their beneficiaries.

13.    Once the aforementioned investment managers are appointed by the Trustees of the Funds pursuant to ERISA Section 402(c)(3), the Trustees have no role in selecting individual investments, or otherwise directly managing the assets of the Funds. They have a duty to review the investment managers and custodians and do so based upon consultation and recommendations from the Funds' investment consultant.

14.    Non-party Steven Gilman was the Administrative Manager and a trustee of the Wire Fund at all times relevant herein, except that as of July 7, 2005 he ceased being such.

15.    Non-party Steven Gilman was a trustee of the Local 810 Fund for all times relevant herein and served as the Local 810 Fund's Secretary, except that as of July 7, 2005 he ceased being such.

5

16.    Upon information and belief, at all times relevant hereto, Defendant Prudential is a corporation authorized to conduct business in the State of New York and has its principal place of business at 751 Broad Street, Newark, New Jersey 07102. Defendant Prudential is a registered broker/dealer with the NASD and is a registered investment adviser under the Investment Advisers Act of 1940. Defendant Prudential served as an investment manager of the Funds as defined in Section 3(38) of ERISA.

17.    Defendant Prudential at all times relevant herein exercised discretionary authority and control respecting management and disposition of the assets of the Funds, rendered investment advice for a fee with respect to the assets of the Funds and had authority and responsibility to do so, and was a fiduciary to the Funds as defined in Section 3(21) of ERISA.

18.    As an investment manager and service provider to the Funds, Defendant Prudential was a party in interest with respect to the Funds as defined in Section 3(14) of ERISA.

19.    Upon information and belief, Defendant Prudential employed Defendant Alan Stuart Fields, a registered broker with the NASD, from February, 1976 until approximately April, 2000.

20.    Upon information and belief, Defendant Alan Stuart Fields is a resident of the State of New York and maintains his principal place of business at 1285 Avenue of the Americas, New York, New York 10019. Upon information and belief, at all relevant times, Defendant Fields was a registered broker with the NASD. Mr. Fields' NASD disciplinary record indicates that in April 2005 he settled a churning and excessive

6

commission's complaint for $80,000, and in July 26, 1996 he settled a suitability complaint for $111,000.

21.    Upon information and belief, at all relevant times, Defendant Fields was the executing broker on virtually all trades involving assets of the Funds.  As a provider of service to the Funds, Defendant Fields was a party in interest with respect to the Funds as defined in Section 3(14) of ERISA.

22.    Upon information and belief, at all times relevant herein, Defendant Prudential employed non-party Joseph A. Del Vecchio, a registered broker with the NASD, from June 1999 until July 2003.

23.    Defendant Wachovia Securities, LLC ("Wachovia") is a Delaware corporation authorized to conduct business in the State of New York, maintaining its principal place of business at One Liberty Plaza, New York, New York 10006 and is a registered broker/dealer with the NASD and is a registered investment adviser under the Investment Advisers Act of 1940.  Upon information and belief, Defendant Wachovia employed non-party Joseph A. Del Vecchio from on or about July 1, 2003 until on or about February 11, 2005.[3]

24.    Upon information and belief, at all times relevant herein, Defendant Prudential employed non-party Saul Eisenberg, a registered broker with the NASD, from October 1984 until July 2003 as a portfolio manager responsible for the discretionary management of the assets of the Funds. Upon information and belief, at all times relevant herein, Defendant Wachovia employed Mr. Eisenberg from July 2003 until May 2004.

---

[3] Defendant Wachovia Securities, LLC was formed on July 1, 2003 by the combination of Wachovia Securities and the Prudential Securities Division of Prudential Financial Inc.

25.    Upon information and belief, at all times relevant hereto, Defendant M&R is a corporation doing business in the State of New York and maintains its principal place of business at 40 Fulton Street, 21st Floor, New York, NY 10038. Defendant M&R is a registered investment adviser under the Investment Advisers Act of 1940.

26.    Defendant M&R served as an investment manager of the Local 810 Fund as that term is defined in Section 3(38) of ERISA.

27.    Defendant M&R at all times relevant herein exercised discretionary authority and control respecting management and disposition of the assets of the Local 810 Fund rendered investment advice for a fee with respect to the assets of the Local 810 Fund and had authority and responsibility to do so, and was a fiduciary to the Local 810 Fund as defined in Section 3(21) of ERISA.

28.    As an investment manager and service provider to the Local 810 Fund, Defendant M&R was a party in interest with respect to the Local 810 Fund as defined in Section 3(14) of ERISA.

29.    Upon information and belief, at all times relevant herein, Defendant M&R employed non-party John Maloney for a period of approximately twenty years.

30.    Upon information and belief, Defendant Citigroup is a New York corporation doing business in New York with offices at 787 7th Avenue, New York, NY 10019. Defendant Citigroup is a registered broker/dealer with the NASD and is a registered investment adviser under the Investment Advisers Act of 1940. Upon information and belief, at all times relevant herein, Defendant Citigroup employed non-party Joseph A. Del Vecchio a registered broker with the NASD, from February 11, 2005 until at least May 2, 2005.

8

31.    From on or about February 11, 2005 until May 2, 2005, Defendant Citigroup exercised discretionary authority and control respecting management and disposition of the assets of the Funds and was a fiduciary to the Funds as defined in Section 3(21) of ERISA.

32.    As a fiduciary of the Funds, Defendant Citigroup was a party in interest with respect to the Funds as defined in Section 3(14) of ERISA.

33.    From on or about February 11, 2005 until May 2, 2005, Defendant Citigroup executed securities trades with respect to assets of the Funds.

34.    Defendant UBS is a registered broker/dealer with the NASD and a New York Corporation maintaining its principal place of business at 101 Park Avenue, New York, New York 10178. Upon information and belief, defendant Fields left Prudential and became an employee of the entity known as UBS/PaineWebber in or about April 2000. In 2002, UBS/ PaineWebber changed its name to UBS International, Inc (all references hereinafter shall be to "UBS" and shall refer to both entities). Upon information and belief, Fields was employed by UBS/PaineWebber and UBS International, Inc. from April 2000 until at least May 2, 2005. During this time, Defendant UBS executed securities trades with respect to assets of the Funds.

## BACKGROUND

### *General Concepts*

35.    The New York Stock Exchange ("NYSE") is the oldest stock exchange in the United States. Securities listed for trading on the NYSE are typically larger, more

9

seasoned companies than those which are traded on the much smaller American Stock Exchange ("ASE") and otherwise.

36.    The NASD was the voluntary trade association of securities brokers and dealers.

37.    NASDAQ, the acronym for the National Association of Securities Dealers Automated Quotation system, is the fastest growing stock market in America. In 1984, the share volume on NASDAQ was 159 million compared to a volume of 2.3 billion shares traded on the New York Stock Exchange ("NYSE"). By 1993, however, the share volume on NASDAQ was 63.5 billion compared to a volume of 66.9 billion shares traded on the NYSE. Moreover, in 1993, the volume of shares traded on NASDAQ was 15 times greater than the volume on the American Stock Exchange.

38.    Prices for securities traded on the NYSE and ASE are determined on the trading floors of such exchanges. Quotes on the NASDAQ system are entered by approximately 500 market maker firms, including M&R and Prudential, each of which firms trades shares of stock through computer and telephone communication. Stocks quoted on the NASDAQ trades "over-the-counter" or "OTC". NASDAQ price quotes are displayed on the "NASDAQ Level 2 Screen" ("Level 2 Screen"). The Level 2 Screen is not an execution system and the quotes displayed on the Level 2 Screen do not list any quantity of stock available at quoted bid or asked prices.

39.    Defendants Prudential, Wachovia, Citigroup, and UBS (collectively referred to as the "Broker/Dealer Defendants") are brokers and dealers as those terms are defined within 15 U.S.C. §§ 78c(a) (4)-(5). Defendant Fields is a broker as that term is defined in the Securities Exchange Act of 1934.

10

40.    In their capacity as broker/dealers, the Broker/Dealer Defendants assumed a duty to deal fairly with Plaintiffs. Part of that fair dealing obligation is the duty of "best execution." Best execution is the lowest net price, taking into consideration factors such as the size and difficulty of an order, time of trade, market conditions, and commission rates. Pursuant to the affirmative duty to achieve best execution, when the Broker/Dealer Defendants received "market orders" (an order to buy or sell stock at the prevailing "market" price), they were required to obtain the best available market price for that order by checking all relevant sources and, then, provide the most favorable execution.

41.    Defendants Prudential and Wachovia had a fiduciary duty under the Investment Advisors Act of 1940 and a contractual duty to the Funds to obtain best execution. Defendant M&R owed a contractual duty to the Local 810 Fund to obtain best execution.

42.    At all relevant times, Defendants Prudential and Citigroup were fiduciaries of the Funds and at all relevant times, Defendant M&R was a fiduciary of the Local 810 Fund. As fiduciaries, Defendants Prudential, Citigroup, and M&R also owed the Local 810 Fund certain fiduciary duties. Under ERISA Section 404(a)(1), these duties include the duty to act solely in the interests of the participants and beneficiaries of the Funds (a) for the exclusive purpose of providing benefits to the participants and beneficiaries and defraying reasonable expenses of administering the Funds; (b) with the care, skill, prudent, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Prudential and Citigroup were further

11

obligated ERISA Section 404(a)(1)(D) to act in accordance with the documents and instruments governing the Funds.

43.    As fiduciaries, Defendants Prudential, Citigroup, and M&R (with respect to the Local 810 Fund) were also obligated to refrain from engaging in certain transactions expressly prohibited by ERISA Sections 406(a) and (b).

44.    The Broker/Dealer Defendants consistently breached their duty of best execution, violated Section 10(b) and Rule 10b-5 and breached or caused the breach of the contractual obligations of Prudential and M&R to the Funds, by (i) buying and selling stock on behalf of the Funds at prices the Broker/Dealer Defendants knew or recklessly disregarded were inferior to those available from other sources, and (ii) failing to disclose such conduct.  By engaging in such practices, the Broker/Dealer Defendants not only willfully deprived the Funds of the best available prices for their market buy and sell orders but also generated huge undisclosed profits for themselves at the expense and to the detriment of the Funds, their participants and beneficiaries.

45.    Upon information and belief, in or about October 1990, while employed with Prudential, Alan Fields helped to procure an investment management contract between Prudential and the Wire Fund.  Annexed hereto as Exhibit A is a copy of the October 1990 Agreement (referred to hereinafter as the "Prudential Wire Fund Agreement").

46.    Upon information and belief, in or about January 1999, while employed with Prudential, Alan Fields helped to procure an investment management contract between Prudential and the Local 810 Fund.  Annexed hereto as Exhibit B is a copy of

12

this January 1999 Agreement (referred to hereinafter "Prudential Local 810 Fund Agreement").

47.    Upon information and belief, in or about July 2002, while employed with UBS/Paine Webber, Alan Fields helped to procure an investment management contract between M&R and the Local 810 Fund. Annexed hereto as Exhibit C is a copy of this July 2002 Agreement ("M&R Local 810 Fund Agreement"). At the time Fields helped to procure the M&R Local 810 Fund Agreement, Fields was a party in interest to the Funds by virtue of his position with UBS/Paine Webber.

48.    Upon information and belief, Defendant Alan Fields played such a significant role in procuring the aforementioned contracts, that he was paid substantial brokerage and asset management fees by Defendants Prudential, Wachovia, and/or M&R.

### THE PRUDENTIAL/WACHOVIA WIRE FUND AGREEMENT and INVESTMENT GUIDELINES

49.    The    Investment    Guidelines    between    the    Wire    Fund    and Prudential/Wachovia[4], annexed hereto as Exhibit D sets forth the following :

> "In placing portfolio transaction orders on behalf of the Fund, the Manager shall use its best efforts to obtain 'best execution' of orders through responsible brokerage firms at the best prices and at reasonably competitive commission rates which, on an average quarterly basis, shall not exceed six cents per share."

50.    Thus, among other duties and requirements, the Prudential/Wachovia Wire Fund Investment Guidelines explicitly set forth that Prudential/Wachovia owed a duty to achieve "best execution" on all trades made on behalf of the Wire Fund.

---

[4] Defendant Prudential combined with Wachovia Securities in July, 2003 to form Defendant Wachovia Securities LLC. For simplicity, Plaintiffs refer to the Agreement and Investment Guidelines as the "Prudential/Wachovia" Agreement and Guidelines.

51.    The Prudential/Wachovia Wire Fund Investment Guidelines explicitly set forth that Prudential/Wachovia was prohibited from allocating brokerage to itself or its affiliates without the written consent of the Trustees and only if such allocation is consistent with ERISA.

52.    Pursuant to Prohibited Transaction Class Exemption 86-128 issued by the U.S. Department of Labor, certain requirements must be met in order for person who has investment discretion to use its discretion to select itself or an affiliate to provide brokerage services to an ERISA plan in a transaction involving assets of the plan. These requirements include specific disclosures to the plan's fiduciaries and written consent of the fiduciaries. Prudential did not provide the Wire Fund's Trustees with the disclosures required by PTCE 86-128 and did not obtain the Wire Fund's Trustees consent to Prudential or its affiliates executing trades on behalf of the Fund.

53.    At all times relevant herein, Prudential and later Wachovia served as investment manager to the Wire Fund and as an investment manager placed trade orders, directed the nature of such orders, and otherwise managed the Wire Fund's assets, all without direction from the Wire Fund, except as outlined in the Prudential/Wachovia Wire Fund Investment Guidelines.

54.    Upon information and belief, from October 1990 until July 2003, Prudential managed the Wire Fund account. Beginning in July 2003, Wachovia managed the Local Wire Fund account as a result of the combination of Prudential Securities and Wachovia Securities.

55.    By the late 1990's, the Wire Fund represented a significant portion of the assets under management of the Investment Supervisory Group within Prudential.

14

56.    Upon information and belief, at various times relevant herein, both non-parties Saul Eisenberg and Joseph Delvecchio, as Prudential and later Wachovia employees, served as portfolio managers for the Wire Fund account.   The portfolio manager's role is, in part, to decide the particular securities to purchase on behalf of an investment account, given the investment mandate selected by the client.

57.    During this time, however, and for reasons unknown to the Wire Fund, Defendant Alan Fields served as the sole broker and executed all trades for the Wire Fund account as an employee of Prudential until April, 2000, despite the prohibition in the Funds' Investment Guidelines against Prudential or its affiliates executing trades with respect to the Funds.   Upon information and belief, while employed by Prudential, Prudential paid Fields a portion of the brokerage commissions generated by the Funds' trades.

58.    Upon information and belief, after Fields left Prudential, and joined UBS/Paine Webber, an agreement was executed on or about August 1, 2000 between Prudential and Paine Webber which provided that Fields would continue to receive 45% of the asset management fee compensation related to the United Wire and Local 875 accounts managed by Prudential in perpetuity, as he had in the past (hereinafter referred to as a "Solicitation Agreement").

59.    Upon information and belief, during this time, the industry standard for marketer's commissions was 15-20% of the investment management fees the first year, then reduced to 10% the second year and 5% the third year, at which time entitlement to such commissions typically terminates.

60.    Although Steven Gilman may have had knowledge of Mr. Fields' Solicitation Agreement as a marketer and the commission thereunder, neither of these facts were disclosed to the Trustees of the Wire Fund.

61.    Although Steven Gilman may have had knowledge of Prudential and/or Fields being paid brokerage commissions at the rate of $0.06 per share, this fact was not disclosed to the Trustees of the Wire Fund and the Trustees were not aware that term formed a part of the Solicitation Agreement in exchange for the Investment Managers keeping the accounts or that there was no competition for the trades.

62.    Upon information and belief, after Fields left Prudential to work for UBS in April, 2000, Prudential directed all trades for the Wire Fund to be executed by Fields at UBS at a rate of $0.06 per share.

63.    Upon information and belief, on and after July 1 2003, Wachovia continued to direct all trades for the Wire Fund to be executed by Fields at UBS at a rate of $0.06 per share.

64.    Upon information and belief, in or about 2000, Fields entered into a "Solicitation Agreement" with Prudential, wherein the 45% commission described above was continued in perpetuity. At no time did the Board of Trustees of the Wire Fund have knowledge of or agree to this arrangement.

65.    At no time did the Wire Fund Board of Trustees issue instructions to Prudential or Wachovia directing all trades to go through Alan Fields, Prudential or UBS or direct Prudential or Wachovia as to the amount of the brokerage commission, except that the commission could not exceed $0.06 per share.

16

66.    Upon information and belief, Prudential never negotiated over the commission rates on individual trades.

67.    Upon information and belief, Wachovia never negotiated over the commission rates on individual trades.

68.    The $0.06 brokerage commission per share is one of the reasons Prudential and Wachovia did not obtain best execution on the trades for the Wire Fund.

## THE PRUDENTIAL/WACHOVIA LOCAL 810 FUND AGREEMENT and INVESTMENT GUIDELINES

69.    The Investment Guidelines between the Local 810 Fund and Prudential/Wachovia (attached hereto as Exhibit E) sets forth the following :

> "In placing portfolio transaction orders on behalf of the Fund, the Manager shall use its best efforts to obtain 'best execution' of orders through responsible brokerage firms at the best prices and at reasonably competitive commission rates which, on an average quarterly basis, shall not exceed six cents per share."

70.    Thus, among other duties and requirements, the Prudential/Wachovia Local 810 Fund Investment Guidelines explicitly set forth that Prudential/Wachovia owed a duty to achieve "best execution" on all trades made on behalf of the Local 810 Fund.

71.    The Prudential/Wachovia Local 810 Fund Investment Guidelines explicitly set forth that Prudential/Wachovia was prohibited from allocating brokerage to itself or its affiliates without the written consent of the Trustees and only if such allocation is consistent with ERISA.

17

72.    Pursuant to Prohibited Transaction Class Exemption 86-128 issued by the U.S. Department of Labor, certain requirements must be met in order for person who has investment discretion to use its discretion to select itself or an affiliate to provide brokerage services to an ERISA plan in a transaction involving assets of the plan. These requirements include specific disclosures to the plan's fiduciaries and written consent of the fiduciaries. Prudential did not provide the Local 810 Fund's Trustees with the disclosures required by PTCE 86-128 and did not obtain the Local 810 Fund's Trustees consent to Prudential or its affiliates executing trades on behalf of the Fund.

73.    At all times relevant herein, Prudential and later Wachovia served as investment manager to the Local 810 Fund and as an investment manager placed trade orders, directed the nature of such orders, and otherwise managed the Local 810 Fund's assets, all without direction from the Local 810 Fund, except as outlined in the Prudential/Wachovia Local 810 Fund Investment Guidelines.

74.    Upon information and belief, from February 28, 1999 until July 2003, Prudential managed the Local 810 Fund account. Beginning in July 2003, Wachovia managed the Local 810 Fund account as a result of the merging of Prudential Securities and Wachovia Securities.

75.    Upon information and belief, at various times relevant herein, both non-parties Saul Eisenberg and Joseph Del Vecchio, as Prudential and later Wachovia employees, served as portfolio managers for the Local 810 Fund account. The portfolio manager decides the particular securities to purchase on behalf of an investment account, given the investment mandate selected by the client.

18

76.    During this time, however, for reasons unknown to the Local 810 Fund, Alan Fields served as the sole broker and executed all trades for the Local 810 Fund account as an employee of Prudential until April, 2000, despite the prohibition in the Funds' Investment Guidelines against Prudential or its affiliates executing trades with respect to the Funds. Upon information and belief, while employed by Prudential, Prudential paid Fields a portion of the brokerage commissions generated by the Funds' trades.

77.    Upon information and belief, after Fields left Prudential and joined PaineWebber, a Solicitation Agreement was executed August 1, 2000 between Prudential and PaineWebber in order to provide that Fields would continue to receive 45% of the asset management fee compensation related to the United Wire and Local 875 accounts managed by Prudential in perpetuity, as he had in the past.

78.    Upon information and belief, during this time, the industry standard for marketer's commissions was 15-20% of investment management fees the first year, then reduced to 10% the second year and 5% the third year, at which time entitlement to such commissions typically terminates.

79.    Although Steven Gilman may have had knowledge of Defendant Fields' listing as a marketer and the commission thereunder, neither of these facts were disclosed to the Trustees of the Local 810 Fund.

80.    Upon information and belief, after Fields left Prudential to work for UBS in April, 2000, Prudential directed all trades for the Local 810 Fund to be executed by Fields at UBS at a rate of $0.06 per share.

19

81.    Upon information and belief, on and after July 1 2003, Wachovia continued to direct all trades for the Local 810 Fund to be executed by Fields at UBS at a rate of $0.06 per share.

82.    Upon information and belief, in or about 2000, Fields entered into a Solicitation Agreement with Prudential, wherein the 45% commission described above was continued in perpetuity. At no time did the Trustees of the Local 810 Fund have knowledge of or agree to this arrangement.

83.    At no time did the Local 810 Fund Board of Trustees issue instructions to Prudential or Wachovia directing all trades to go through Alan Fields, Prudential or UBS or direct Prudential or Wachovia as to the amount of the brokerage commission, except that the commission could not exceed $0.06 per share.

84.    Upon information and belief, Prudential never negotiated over the commission rates on individual trades.

85.    Upon information and belief, Wachovia never negotiated over the commission rates on individual trades.

86.    The $0.06 brokerage commission per share is one of the reasons Prudential and Wachovia did not obtain best execution on the trades for the Local 810 Fund.

## THE M&R LOCAL 810 FUND AGREEMENT and INVESTMENT GUIDELINES

87.    The Discretionary Investment Management Agreement between the Local 810 plan and M &R Capital Management, Inc. states that the primary objective of the investment manager shall be to obtain best execution taking into account such relevant

20

factors as the price, fees and/or commission, as well as the brokerage's ability to effect the transaction. The Investment Guidelines and Objective for Investment Managers with "Equity" Portfolios executed between M&R Capital and the Fund on July 9, 2002 set forth the following.

> In placing portfolio transaction orders on behalf of the Fund, the Manager shall use its best efforts to obtain 'best execution' of orders through responsible brokerage firms at the best prices and at reasonably competitive commission rates which, on an average quarterly basis, shall not exceed six cents per share.

88.     Thus, among other duties and requirements, the M&R Local 810 Fund Discretionary Investment Management Agreement and the M&R Local 810 Fund Investment Guidelines explicitly set forth that M&R owed a duty to achieve "best execution" on all trades made on behalf of the Local 810 Fund.

89.     At all times relevant herein, M&R served as investment manager to the Local 810 Fund and as an investment manager placed trade orders, directed the nature of such orders, and otherwise managed the Local 810 Fund's assets, all without direction from the Local 810 Fund, except as outlined in the M&R Local 810 Fund Investment Guidelines.

90.     Upon information and belief, from July 8, 2002 until May 2, 2005, M&R managed the Local 810 Fund account.

91.     During this time, however, for reasons unknown to the Local 810 Fund, Defendant Alan Fields served as the sole broker and executed all trades for the Local 810 Fund account as an employee of UBS.

92.    During this time, M&R caused the Local 810 Fund to pay Mr. Fields and/or UBS $0.06 per share for all trades transacted by Fields.

93.    Although Steven Gilman may have had knowledge that M&R was directing all trades to Fields and being paid brokerage commissions at the rate of $0.06 per share, this fact and the impact of such direction on the Fund's securities trading best execution was not disclosed to the Trustees of the Local 810 Fund.

94.    At no time did the Local 810 Fund Board of Trustees issue instructions to M&R directing all trades to go through Alan Fields or UBS or direct M&R as to the amount of the brokerage commission, except that the commission could not exceed $0.06 per share.

95.    Upon information and belief, M&R never negotiated over the commission rates on individual trades.

96.    . The $0.06 brokerage commission per share is one of the reasons M&R did not obtain best execution on the trades for the Local 810 Fund.

## THE BEST EXECUTION STUDY

97.    After Steven Gilman resigned, the Funds hired Abel Noser, a securities brokerage with expertise in best execution studies, to perform a best execution study ("Noser Study"). Annexed as Exhibit F is a copy of the Noser Study.

98.    On the basis of a review of trades executed in 2003 and 2004, the Noser Study found that "trading executions the Fund received, both in terms of explicit (commissions) and implicit (market impact) costs were significantly higher than the median." Noser Study, at 20. That is, the implicit costs were worst than 95% of Abel

22

Noser's universe (which includes approximately 500 institutions and $3.5 trillion in principal) and the explicit costs were worst that 75%. While median implicit cost was negative 2.5 basis points, the Funds' implicit cost was 24.1, or almost ten times as great. While median explicit cost was 12.96 basis points, the Funds' explicit cost was 18.27, or almost 30% higher. $335 million out of $346 million in trades were analyzed for the two year period.

99.    The Noser Study also found that Wachovia commissions to UBS and/or Alan Fields in 2004, which were paid with assets of the Funds, were $182,507, in connection with the Wire Fund, and $37,000 in connection with Local 810. Upon information and belief, this compensation was unreasonable for the services rendered.

100.    The Noser Study also found that, in 2003, Prudential and Wachovia commissions to UBS and/or Alan Fields totaled $276,322 on the Wire Fund and $73,302 on the Local 810 Fund Account. Upon information and belief, this compensation was unreasonable for the services rendered.

101.    The Noser study also concluded that the market impact to the Funds of UBS' and Fields' failure to provide best execution significantly harmed the Wire Fund and the Local 810 Fund.

102.    Specifically, the Noser Study concluded that the Funds were damaged approximately $924,000 by the failure to obtain best execution during the two-year study period.

23

103.    The Noser Study also estimated that the damages owed to the Funds as a result of the long-standing practice of failing to achieve best execution since 1990 was approximately six million dollars ($6,000,000).

104.    The Plaintiffs have made demands to the Defendants in writing. Copies of Plaintiffs' demand letters are annexed hereto collectively as Exhibit G.

## *CITIGROUP*

105.    On or about February 10, 2005, non-party Joseph Delvecchio, who managed the Local 810 Fund and the Wire Fund investment accounts while working at Wachovia, resigned from Wachovia and began working for Citigroup.

106.    The Funds' Trustees did not agree to retain Citigroup an investment manager and, although required under the Investment Advisors Act of 1940, as amended, no investment advisory contract was ever executed between the Funds and Citigroup.

107.    Despite the fact that the Trustees did not agree to its retention, Citigroup, through its employee Joseph Del Vecchio, made unauthorized investment decisions and trades in the Local 810 Fund and the Wire Fund accounts during the period February 11, 2005 through May 2, 2005, thereby exercising discretion and control over assets of the Funds. By exercising such discretion and control, Citigroup was a fiduciary to the Funds.

108.    Apparently, Citigroup, through its employee Joseph Del Vecchio, was able to make the transactions through the custodian account based upon Del Vecchio's knowledge of the necessary codes and information which he obtained while managing the investment accounts as an employee of Wachovia (previously Prudential).

24

109. During this period, Citigroup, without authority of the Trustees, selected itself to provide brokerage services to the Funds and executed trades on an agency basis with respect to assets of the Funds and without an executed investment advisory contract, as required under the federal securities laws.

110. On February 11, 2005, the Wire Fund had $69,165,802.07 in assets and on May 2, 2005 the Wire Fund had $67,266,757.17 and lost $1,899,044.90 during the period in which Citigroup exercised discretion over the account as a fiduciary without authority of the Trustees.

111. Plaintiff Wire Fund was injured as a result of Citigroup's improper actions and is entitled to be compensated for its losses in the amount of $1,899,044.90.

112. On February 11, 2005, the Local 810 Fund had $15,653,381.73 in assets and on May 2, 2005 the Local 810 Fund had $15,113,219.38 and lost $540,162.35 during the period in which Citigroup exercised discretion over the account as a fiduciary without authority of the Trustees.

113. Plaintiff Local 810 Fund was injured as a result of Citigroup's improper actions and is entitled to be compensated for its losses in the amount of $540,162.35.

## COUNT I

### Against the Broker/Dealer Defendants and Fields in their Capacity as Brokers/Dealers for Violation of Section 10(b) and Rule 10b-5

114. Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 113 of this Complaint as if set forth fully herein.

115. By virtue of their position as Brokers/Dealers, and because they accepted market orders to buy or sell shares of stock and/or other securities on behalf Plaintiffs, the

25

Broker/Dealer Defendants and Fields made implicit and explicit representations that they would treat Plaintiffs fairly and execute orders on their behalf only after taking all steps to obtain the best reasonably available transaction prices.

116.    The Broker/Dealer Defendants and Fields were also obligated to disclose to Plaintiffs: (a) all conflicts of interest relating to such Defendants' executions of market orders on behalf of Plaintiffs, such as relationships between Prudential, Wachovia, M&R and Fields; and (b) all profits such Defendants obtained in executing market orders on behalf of Plaintiffs.

117.    In derogation of those duties, and in violation of Section 10(b) and Rule 10b-5, the Broker/Dealer Defendants and Fields knowingly and/or recklessly: (a) employed devices, schemes and artifices to defraud Plaintiffs in connection with the purchase and sale of securities; (b) made untrue statements of material fact and/or omitted to state material facts which, in light of the circumstances, were necessary to make the statements made not misleading; and (c) engaged in acts, practices and conduct which operated as a fraud and/or deceit upon Plaintiffs in connection with the purchase and sale of securities.

118.    The Broker/Dealer Defendants and Fields violated Section 10(b) and Rule 10b-5 by engaging in, and failing to disclose, that they were not fulfilling their duty of "best execution" by failing to check alternate sources of price quotes and execution before executing orders on behalf of Plaintiff.

119.    Plaintiffs reasonably relied upon the Broker/Dealer Defendants' and Fields' false, misleading, and incomplete representations that they would treat Plaintiffs fairly, would obtain "best execution" of their buy/sell orders, and would disclose all

conflicts with Plaintiffs and profits obtained in connection with executing orders on behalf of Plaintiffs.

120.    The Broker/Dealer Defendants' and Fields' false, misleading and deceptive representations were material. If Plaintiffs had known the true facts concealed by these Defendants, they would not have entered into or continued relationships with such Defendants.

121.    Plaintiffs were damaged by the Broker/Dealer Defendants' and Fields' violations of Section 10(b) and Rule 10b-5 as described herein in an amount to be determined at trial

## COUNT II

### Against Defendants Prudential, Wachovia, and Fields
### for Violation of Section 206(4) of the Investment Advisers Act

122.    Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 121 of this Complaint as if set forth fully herein.

123.    Defendant Fields violated Section 206(4) of the Investment Advisers Act and 17 CFR 275.206(4)-3 by failing to provide to the Funds the written solicitor's written disclosure statement required under 17 CRR 275.206(4)-3(b).

124.    Defendants Prudential and Wachovia violated Section 206(4) of the Investment Advisers Act and 17 CFR 275.206(4)-3 by issuing a cash payment to Fields without disclosing such payment to the Funds and without receipt of the Funds' signed acknowledgement of receipt of the solicitor's written disclosure statement required under 17 CRR 275.206(4)-3(b).

27

125.    By reason of Defendants violation of Section 206(4) of the Investment Advisers Act, Defendants are liable to Plaintiffs in an amount to be determined at trial.

## COUNT III

### Against Prudential, Wachovia, and M&R in their Capacity as Investment Managers For Breaches of Fiduciary Duty

126.    Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 125 of this Complaint as if set forth fully herein.

127.    In their capacity as an Investment Manager to the Funds, Defendants Prudential, Wachovia and M&R (with respect to the Local 810 Fund) failed to act solely in the interests of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries in violation of ERISA Section 404(a)(1)(A) and failed to act with care, skill, prudence and diligence that a prudent person would use in the conduct of an enterprise of a like character and with like aims in violation of ERISA Section 404(a)(1)(B) by, *inter alia*, (1) failing to obtain best execution on trades for the Funds' accounts, and (2) causing the Funds to pay Fields and/or UBS excessive commissions, and (3) selecting Fields to execute trades for the Funds' accounts.

128.    In their capacity as an Investment Manager to the Local 810 Fund, Prudential, Wachovia, and M&R violated the Funds' Investment Guidelines by failing to seek and obtain best execution with respect to trades in the Funds' account. By so doing, Prudential, Wachovia, and M&R failed to act in accordance with the plan documents of the Local 810 Fund in violation of ERISA Section 404(a)(1)(D).

129.    In their capacity as an Investment Manager to the Fund, Prudential and Wachovia violated ERISA Sections 404(a)(1)(A) and 404(a)(1)(B) by, *inter alia,* entering into a fee sharing arrangement with Fields under which Prudential and Wachovia paid Fields a percentage of the fees generated by the Funds' business and by failing to disclose such fee arrangement to the Funds' Trustees.

130.    In their capacity as an Investment Manager to the Fund, Prudential and Wachovia violated ERISA Sections 404(a)(1)(A) and 404(a)(1)(B) by, *inter alia,* selecting and retaining themselves as brokers for the Funds' accounts.

131.    In its capacity as an Investment Manager to the Fund, Wachovia violated ERISA Sections (404)(a)(1)(A) and 404(a)(1)(B) by, *inter alia:* (1) failing to monitor activity in the Funds' accounts from on and about February 11, 2005 until on or about May 2, 2005, and (2) failing to notify the Funds of Citigroup's unauthorized trading of the Funds' accounts.

132.    As a result of the foregoing, Plaintiffs have been damages in an amount to be determined at trial.

## COUNT IV

### Prohibited Transactions by Prudential, Wachovia, and M&R in Their Capacity as Investment Managers

133.    Plaintiffs hereby incorporate by reference paragraphs 1 through 132 as if set forth fully herein.

134.    In their capacity as an Investment Manager to the Funds, Prudential, Wachovia, and M&R selected Fields to provide services to the Fund as a party in interest in violation of ERISA Section 406(a)(1)(C), and by causing the Fund to pay Fields and/or

UBS excessive compensation Prudential, Wachovia and M&R engaged in a transaction that constitutes a transfer to or use of Fund assets by a party in interest in violation of ERISA Section 406(a)(1)(D).

135.    In their capacity as an Investment Manager to the Funds, Prudential, Wachovia, and M&R (with respect to the Local 810 Fund) dealt with the assets of the Fund in their own interest in violation of ERISA Section 406(b)(1) by selecting Fields to provide brokerage services in an effort to retain the Funds' business and the fees associated therewith for themselves. By such actions on behalf of Fields and themselves, those Defendants acted in a transaction involving the Funds on behalf of an adverse party in violation of ERISA Section 406(b)(2).

136.    In their capacity as an Investment Manager to the Funds, Prudential and Wachovia, *inter alia*, selected themselves to provide brokerage services to the Funds and received fees or other consideration for such services. By doing so, Prudential and Wachovia (1) dealt with the assets of the Fund in their own interest in violation of ERISA Section 406(b)(1), (2) acted in a transaction involving the Funds on behalf of an adverse party in violation of ERISA Section 406(b)(2), and (3) received consideration for their own accounts in connection with transactions involving the assets of the Funds in violation of ERISA Section 406(b)(3).

137.    As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

30

## COUNT V

### Against UBS and Fields in Their Capacity as a Party in Interest—
### Violation of 29 U.S.C. §406 (a)(1)(c)

138.    Plaintiffs hereby incorporate by reference paragraphs 1 through 137 as if set forth fully herein.

139.    In their capacity as a party in interest to the Funds, UBS and Fields furnished services to the Funds as a party in interest in violation of ERISA Section 406(a)(1)(C) and engaged in a transaction that constitutes a transfer to or use of Fund assets by a party in interest in violation of ERISA Section 406(a)(1)(D) by, *inter alia,* receiving fees that were excessive for the services provided and which were not disclosed to the Funds' Trustees.

140.    As a result of the foregoing, Defendants UBS and Fields are liable to Plaintiffs for damages in an amount to be determined at trial.

## COUNT VI

### Against Prudential, Wachovia, Citigroup and UBS
### in Their Capacity as Broker/Dealers for Unjust Enrichment

141.    Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 140 of this Complaint.

142.    By virtue of their fiduciary relationship and duties to Plaintiffs, the Broker/Dealer Defendants were obligated not to obtain any profits or benefits at the expense of Plaintiffs in connection with executing market orders on their behalf in the manner described herein.

31

143.    As described herein, the Broker/Dealer Defendants were unjustly enriched because they wrongfully appropriated for themselves profits and benefits properly belonging to Plaintiffs by not fulfilling their duty of "best execution."

144.    Plaintiffs have demanded payment from the Broker/Dealer Defendants for the reasonable value owed to Plaintiffs.

145.    As a result of Defendants misconduct, Plaintiffs were injured and are entitled to recover from such Defendants their unjust enrichment, in an amount to be determined at trial.

**COUNT VII**
**Against Prudential, Wachovia and M&R-**
**Breach of Contract**

146.    Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 145 of this Complaint as if set forth fully herein.

147.    Defendants Prudential, Wachovia and M&R each had explicit provisions of their respective contracts with the Local 810 Fund to buy and sell securities on behalf of the Plaintiff Funds to use its best efforts to obtain the "best execution" with respect to trades on behalf of the Funds.

148.    Defendants Prudential, Wachovia, and M&R (with respect to the Local 810 Fund) breached such contractual obligations to Plaintiffs by not seeking and obtaining best execution.

149.    Plaintiffs were injured as a result of Defendants' breach of contract and are entitled to be compensated for their damages.

150.   By reason of the foregoing, Plaintiffs are entitled to damages from Defendants Prudential, Wachovia, and M&R in an amount to be determined at trial.

## COUNT VIII

### Against Citigroup and Prudential for Breach of Fiduciary Duty

151.   Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 150 of this Complaint.

152.   Defendants Citigroup and Prudential, jointly and severally, failed to act solely in the interests of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries of the Funds violation of ERISA Section 404(a)(1)(A) and failed to act with care, skill, prudence and diligence that a prudent person would use in the conduct of an enterprise of a like character and with like aims in violation of ERISA Section 404(a)(1)(B) by, *inter alia*, (1) as to Citigroup, exercising discretion and control over the Funds' assets without authority of the Funds' Trustees, without an executed investment advisory contract, as required under the federal securities laws and (2) selecting itself to provide brokerage services to the Funds, (3) executing agency trades on behalf of the Funds and (4) as to Prudential, by improperly permitting the transfer of the Funds' assets to Citigroup without the requisite authority of the Board of Trustees.

153.   By reason of the foregoing, Citigroup and Prudential have, jointly and severally, breached their fiduciary duties to the Plaintiffs and Plaintiffs have been injured in an amount to be determined at trial.

33

## COUNT IX

### Against Citigroup for Prohibited Transactions

154.    Plaintiffs reallege and restate each and every allegation contained in paragraphs 1 through 153 of this Complaint.

155.    Defendant Citigroup selected itself to provide brokerage services to the Funds and executed agency trades on behalf of the Funds.  By doing so, Citigroup (1) dealt with the assets of the Fund in its own interest in violation of ERISA Section 406(b)(1), (2) acted in a transaction involving the Funds on behalf of an adverse party in violation of ERISA Section 406(b)(2), and (3) received consideration for its own accounts in connection with transactions involving the assets of the Funds in violation of ERISA Section 406(b)(3).

156.    Citigroup's actions constitute "prohibited transactions" as that term is defined in 29 U.S.C. §406(b)(1)(2) and Plaintiffs have sustained injury as a result.

157.    Based on the foregoing, Citigroup is liable to Plaintiffs in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, as follows:

(1)    Declaring that the Broker/Dealer Defendants and Fields violated Section 10(b) and Rule 10b-5 of the Exchange Act;

(2)    Declaring that Defendants Prudential, Wachovia, and Fields violated Section 206(4) of the Investment Advisers Act;

34

(3)    Declaring that Defendants Prudential, Wachovia, M&R, and Citigroup breached their fiduciary duty to Plaintiffs;

(4)    Declaring that Defendants Prudential, Wachovia, and M&R breached their contractual obligations to Plaintiffs;

(5)    Declaring that Defendants Prudential, Wachovia, M&R, UBS, Fields, and Citigroup engaged in prohibited transactions;

(6)    Declaring that Defendants Prudential, Wachovia, Citigroup, and UBS were unjustly enriched at the Plaintiffs' expense;

(7)    Awarding Plaintiffs compensatory damages in an amount to be proven at trial;

(8)    Awarding Plaintiffs punitive and exemplary damages;

(9)    Awarding Plaintiffs pre-judgment and post-judgment interest as well as their reasonable attorneys' fees, expert witness fees and other disbursements and Court costs; and

(10)    Granting such other and further relief as the Court may deem just and proper.

Dated:        New York, New York
              January 10, 2008

                            BARNES, IACCARINO, VIRGINIA,
                            AMBINDER & SHEPHERD, PLLC


                            By: _____
                                Karin Arrospide, Esq. (KA 9319)
                                Riccardo Iaccarino, Esq. (RI 0180)
                                Attorneys for Plaintiffs
                                3 Surrey Lane, Suite 200
                                Hempstead, New York 11550

52523v1

# EXHIBIT A

Prudential

**Jodi M. Hamburger**
Vice President
Investment Supervisory Group
International & Special Accounts

September 11, 1990

Mr. Dennis M. Silverman
Administrator
United Wire, Metal & Machine Pension Fund
10 East 15th Street
New York, NY  10003

Dear Mr. Silverman:

The Prudential-Bache Investment Supervisory Group ("Prudential-Bache") welcomes the opportunity to service the United Wire, Metal & Machine Pension Fund (the "Fund"), and this letter outlines the conditions under which Prudential-Bache will effect or execute securities transactions on behalf of the Fund.

The relationship between the Fund and Prudential-Bache is governed in part by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). That law imposes restrictions on persons who provide services to employee benefit plans. In general, ERISA operates by prohibiting broad categories of transactions between plans and then, through statutory and administrative exemptions, provides exceptions from those broad-based prohibitions. In effecting or executing securities transactions on behalf of the Fund, Prudential-Bache must rely on Prohibited Transaction Class Exemption 86-128, ("PTE-86-128"), a copy of which is attached. Prudential-Bache's compliance with this exemption is required by Prudential-Bache's status as a fiduciary with respect to the Fund within the meaning of Section 3 (38) (B) of the Employee Retirement Income Security Act of 1974 ("ERISA").

In addition, the Prudential-Bache Investment Supervisory Group warrants to you that all information provided to the Fund is to it's best knowledge, accurate and correct.

Prudential-Bache
Securities

Pursuant to PTE 86-128, Prudential-Bache hereby requests that you authorize Prudential-Bache to effect or execute securities transactions on an agency basis for the Fund's account by executing the enclosed copy of this letter and returning it to the Investment Supervisory Group.  You should be aware that the authorization granted herein is terminable at will without penalty to the Fund, upon receipt by Prudential-Bache of written notice of termination. Also enclosed is a form expressly providing an election to terminate this authorization.  You may terminate the authorization at any time by returning an executed copy of this form with appropriate instructions as to its use no less frequently than annually.

You have elected to place all brokerage transactions on behalf of the Fund through Prudential-Bache.  You have authorized Prudential-Bache pursuant to paragraph 2 of the Discretionary Account Agreement to have complete discretion and authority to manage the account, subject to any written guidelines which you may provide from time to time.

As indicated above, please provide the requisite authorization and confirm your understanding of the other matters dealt with in this letter by executing the enclosed copy of this letter in the space provided and returning the executed copy to my attention.  Should you have any questions regarding this arrangement, please feel free to call me. Once again, thank you for selecting the Prudential-Bache Investment Supervisory Group to serve as an Investment Advisor to the United Wire, Metal & Machine Pension Fund.

Sincerely yours,

Jodi M. Hamburger
Vice President
Investment Supervisory Group

Authorized and Agreed to:

Dennis M. Silverman
(Name of Authorizing Fiduciary)

By: _____
(Signature)

Title:  Administrator                    Date: _____

INVESTMENT ADVISORY AGREEMENT
INDEMNIFICATION ENDORSEMENT

Discretionary Account
(Jointly Administered Plan)

A G R E E M E N T, made as of the 1st day of October, 1990 by and between PRUDENTIAL-BACHE INVESTMENT SUPERVISORY GROUP, an investment management services group under PRUDENTIAL-BACHE SECURITIES INC., 100 Gold Street, New York, New York 10292 (the "Investment Manager") and the Trustees of the United Wire Metal and Machine Pension Fund, (the "Trustees"),

## INDEMNIFICATION

1.01 INDEMNIFICATION

(a)   The Investment Manager agrees to indemnify and hold harmless the Fund, its Trustees, its employees, and agents (any and all of whom is/are referred to as "Indemnified Party"), jointly and severally, from and against any and all losses, claims, damages, judgments, or liabilities (any and all of which is/are referred to as "Damages"), joint or several, of every kind and description, to which the Indemnified Party may become subject under any applicable federal or state law, including allegations of negligence or breach of fiduciary duty, insofar as such damages are caused by or arise, directly or indirectly, out of

(1)   actions or omissions of the Investment Manager under this Agreement, or actions or omissions of any appointee, arising from:

(i)   the negligent performance by the Investment Manager of any duty or responsibility pursuant to this Agreement;

(ii)   the breach by the Investment Manager of any representation or warranty contained in this Agreement;

(iii)   the   breach   or   nonfulfillment by
the   Investment   Manager   of   any
covenant or agreement pursuant to
this Agreement;

(iv)   any untrue statement   or   alleged
untrue   statement   of   a material
fact   contained   in   information
furnished to an Indemnified Party
by the Investment Manager  or the
omission or  the alleged omission
to state therein  a material fact
necessary  in  order  to make the
statements therein not misleading
in   light   of   the   circumstances
under which they were made;

(v)    the   breach   by   the   Investment
Manager of any fiduciary  duty or
fiduciary   responsibility   under
ERISA or otherwise;

(vi)   any   act   or   omission   of   the
Investment Manager with regard to
any asset;

(vii)  any conflict   of  interest of the
Investment Manager.

(b)   The   Investment   Manager   shall indemnify and   hold
harmless   an   Indemnified   Party,   jointly   and
severally, for all   costs   and   expenses (including
attorney's fees) incurred by an Indemnified  Party,
in connection with any investigation, claim action,
suit, proceeding, demand, or judgment,  whether   or
not resulting in any liability, which is subject to
the above indemnities.

(c)   Notwithstanding the provisions for   indemnification
for   costs   and   expenses   in Section 1.01 (b), the
Investment Manager shall not be required to pay any
costs and expenses or attorney's  fees  incurred by
the Indemnified Party in connection with any action
or   suit   commenced   by   the   Indemnified Party   as
plaintiff against the Investment Manager.

- 2 -

## 1.02    CONTROL OF SETTLEMENTS AND DISPUTES

The Investment Manager shall, at its sole cost, have control over the defense, payment, settlement or other disposition of, or any action, claim, suit, dispute, or proceeding (any and all of which is/are referred to in this Section 1.02 as "action") involving, any obligation or liability assumed by or imposed upon the Investment Manager pursuant to this Article, and the Investment Manager shall have the right to conduct and control all negotiations and proceedings with respect thereto; provided, however, that (1) the Investment Manager shall fully and promptly keep all Indemnified Parties informed of the status of such action, and (2) no such payment, settlement, or disposition shall be made without the prior express written approval of the Trustees, which approval shall not be unreasonably withheld, and (3) notwithstanding the foregoing, an Indemnified Party shall at all times be entitled to employ counsel separate from counsel for the Investment Manager and from any other party in such action, and in such event, the Indemnified Party and its counsel may participate in such action as it deems necessary, and the reasonable fees and disbursements of such separate counsel shall be paid by the Investment Manager pursuant to Section 1.03 hereof. If, pursuant to this sub-section 3, the Indemnified Parties desire separate counsel, the Indemnified Parties (if more than one) shall elect one counsel separate from counsel to the Investment Manager and from any other party in such action, unless the Investment Manager agrees to the selection of individual counsel by each Indemnified Party in such action, or unless in the reasonable opinion of the separate counsel selected by the Indemnified Parties as above provided, a conflict of interest exist or may exist between or among any Indemnified Parties, in which event those Indemnified Parties with conflicting interests shall be entitled to individual, separate counsel pursuant to this Section 1.02, provided however that each indemnified party shall not be entitled to more than one such separate counsel each.

## 1.03    ADVANCE PAYMENT OF EXPENSES

Upon request by an Indemnified Party, any reasonable expenses in defending or preparing to defend a civil or criminal action, suit, or proceeding which comes or may come within the purview of this Article will be paid by the Investment Manager to such Indemnified Party in a reasonable manner as such costs and expenses are incurred by such Indemnified Party.

## 1.04   NOT EXCLUSIVE RIGHT

The indemnification provided by this Article shall not be deemed exclusive of any other rights or remedies to which an Indemnified Party may be entitled. Any indemnification, whether required under this Article or permitted by statute or otherwise, shall continue as to a Person who has ceased to be an Indemnified Party and shall inure to the benefit of the heirs, executors and administrators of such a Person.

## 1.05   WITNESS FEES AND COMPENSATION

In the event an Indemnified Party appears or is subpoenaed to appear as a witness in any action brought against the Investment Manager in which an Indemnified Party is not named as a defendant, the Investment Manager agrees to reimburse the Indemnified Party for all expenses incurred by it in connection with its appearing as a witness. Each Indemnified Party shall cooperate with the Investment Manager in the defense of any action referred to in this Section 1.06.

## 1.06   ENFORCEMENT

If the Investment Manager rejects any claim by an Indemnified Party under this Agreement, and such Indemnified Party retains legal counsel to enforce any of its rights under this Agreement, and is successful, the Investment Manager shall, in addition to all other sums due the Indemnified Party, reimburse the Indemnified Party for any and all reasonable fees, costs, and expenses incurred by such Indemnified Party in so enforcing its rights.

## 1.07   SUBROGATION

In case of any payment by the Investment Manager to an Indemnified Party pursuant to this Article, the Investment Manager shall be subrogated to the amount of such payment to all rights of the Indemnified Party against any Person as respects the loss or expense which has caused such payment to be made.

## 1.08   ERISA RESPONSIBILITIES

Nothing in this Article shall be continued as relieving any Indemnified Party from responsibility or liability for any responsibility, obligation, or duty under Part 4 of Title I of ERISA.

1.09   NOTICES

Each party shall promptly notify the other of  any event
that  might  lead  to coverage including any claim, lawsuit or
administrative claim that might be covered under this article.
All notices, instructions  and advices with respect to matters
comtemplated by this Agreement shall be deemed duly given when
delivered or when received as evidenced by  a  certified mail
receipt signed by the Fund's agents or at the offices  of  the
Investment Manager.

    (a)   To the Trustees:

        Dennis Silverman
        Administrator
        United Wire, Metal & Machine Pension Fund
        10 East 15th Street
        New York, N.Y. 10003

        with copy to Sidney L. Meyer
        Counsel at 10 East 15th Street
        New York, N.Y. 10003

The  addresses for notices may be changed by serving a  notice
as provided herein.

    (b)   To the Investment Manager:

        Jodi Hamburger, Vice President Supervisory
        Prudential-Bache Investment ~~Advisory~~ Group
        100 Gold Street, 7th Floor
        New York, New York 10292

          PRUDENTIAL-BACHE SECURITIES INC.

          By: _Jodi M. Hamburger_  10/12/9(

             (an authorized signatory)

          UNITED WIRE, METAL AND MACHINE
          PENSION FUND,

          By: _____
             Union Trustee

             Employer Trustee

- 5 -

## PROXIES

The Investment Manager shall vote the proxies on the stock in its portfolio, pursuant to the current guidelines which follow.

## PROXY VOTING POLICY

The proxy voting policy of INVESTMENT MANAGER shall be to vote proxies on security positions we hold on behalf of our discretionary managed funds under the following considerations:

1.  The vote of proxies shall always be directed towards safeguarding and enhancing the investment on behalf of clients' accounts.

2.  All votes shall be directed towards increasing the stability of the corporation, effective management, enhancing its growth and development, and for corporate policies which shall contribute to the financial soundness of the company.

3.  Ultimate decisions with regard to the aforegoing voting policies shall be based upon our company's continuing analytical and fundamental research.

4.  At no time shall proxies be voted to further the individual client's "personal" interests or "persuasions".

5.  At no time shall proxies be voted to further the individual interests of executives of any given corporation.

6.  Unless we expressly receive in writing proxy voting guidelines from the client contrary to the aforegoing, or unless the plan documents provide otherwise, the INVESTMENT MANAGER reserves the exclusive right as a discretionary investment advisor to exercise its sole judgment as set forth above in the voting of proxies.

- 6 -

# EXHIBIT B

**United Wire, Metal & Machine Pension Fund**
**Addendum to Statement of Investment Policy, Objectives, and Guidelines**
**Investment Guidelines for Prudential Investment Supervisory Group**

The investment objectives and guidelines for the assets managed by Prudential Investment Supervisory Group for United Wire, Metal & Machine Pension Fund are defined in this Addendum and the Statement of Investment Policy, Objectives, and Guidelines. The policy items included in the investment policy statement are applicable for the entire Fund, but may not apply to each individual manager. If a policy item in this document is in disagreement with a policy item in the investment policy statement, the item in this document shall apply. The manager is instructed to incorporate these guidelines into the investment policy.

**Approved Exception to Policy**

Prudential Investment Supervisory Group may engage in the *selling* of *covered* equity calls, the *purchase* of equity puts, the *purchase* of call and put options on the S&P 500 Index, as well as *closing transactions* on each of these. *Covered* call writing is limited to writing calls on no more than 15% of the equities in the portfolio. *Purchase* of call and put options on the S&P 500 Index will be limited to a dollar value not to exceed .005 (one half of one percent) of account value. *Selling* naked options is prohibited.

**Specific Investment Goals**

Over the investment horizon established in the investment policy statement, it is the goal of the assets managed by Prudential Investment Supervisory Group to meet or exceed:

The return of the Standard & Poor's 500 Index

**Volatility (Risk)**

Prudential Securities is expected to meet its objectives with a level of risk which is consistent with the risk associated with the index stated above.

**Asset Allocation Guidelines**

| Asset Class | Minimum | Maximum | Preferred |
|---|---|---|---|
| Equities | 80% | 100% | 95% |
| Fixed Income | 0% | 0% | 0% |
| Cash and Equivalents | 0% | 20% | 5% |

I/We understand and accept the Statement of Investment Policy and this Addendum and will manage the United Wire, Metal & Machine Pension Fund assets accordingly.

*MaryLee Duff*          1st V.P.          *Jan. 5, 1999*
Investment Manager (Signature) / Title              Date
*Paul Greenbo*    1 V.P

# **Prudential-Bache**
## Investment Supervisory Group

M499

Investment Supervisory Group

# Prudential-Bache
Securities

## Discretionary Account

# Investment Supervisory Agreement

| | |
|---|---|
| **Investment Manager** | The Prudential-Bache Investment Supervisory Group is a divison of Prudential-Bache Securities Inc. ("Prudential-Bache"), which maintains its principal place of business at One Seaport Plaza, New York, New York 10292 |
| **Registered Investment Adviser** | Prudential-Bache is registered as an Investment Adviser with the Securities and Exchange Commission in accordance with the provisions of the Investment Advisers Act of 1940, as amended (the "Advisers Act"). Accordingly, this Agreement is between Prudential-Bache and Client. It is made with the understanding that The Investment Supervisory Group will act as Investment Manager , pursuant to Section 3 (38) of the Employee Retirement Act of 1974 ("ERIS |
| **Client** | The Client party to this Agreement is: |

Name UNITED WIRE, METAL & MACHINE PENSION FUND

Address 10 East 15th Street

New York, New York    10003

Telephone No. (212) 691-4100

Terms and Conditions of this Agreement:

| | |
|---|---|
| **1. Investment Account** | The Investment Account shall consist of a portfolio of cash and/or securities which Client places under the supervision of The Investment Supervisory Group, as described in a Schedule included with this Agreement, or which shall become part of the Account as a result of transactions therein. The term "securities" includes, but is not restricted to, stocks, bonds, options (where permissible), warrants and other negotiable instruments. Client may make capital additions to or withdrawals from the Account, in such amounts as Client may determine, on any business day by communicating directly with The Investment Supervisory Group. |
| **2. Authorization** | The Investment Supervisory Group shall serve Client in accordance with the Advisers Act and other applicable laws and regulations. Under this Agreement, The Investment Supervisory Group shall have complete discretion and authority to manage the Account, subject to any written guidelines which Client may provide from time to time, and is hereby appointed Client's agent and attorney-in-fact for that purpose. As such, the Investment Supervisory Group (and its authorized representatives) are authorized to perform the following, at Client's expense, without further approval from Client, except as required by law, and as fully, in the same manner and in the same force and effect as Client: (a) to make all investment decisions; (b) to buy, sell and otherwise trade in securities; (c) to invest, reinvest or hold any cash; (d) to issue instructions to the custodian of the Account; (e) to select brokers or dealers to execute securities transactions; (f) to take whatever further steps The Investment Supervisory Group deems appropriate to manage the Account. Saul Eisenberg and Linda Krouner are the auth |

**J. Investment of Temporary Cash Balances**

Consistent with the terms of this Agreement, Client understands that The Investment Supervisory Group may temporarily invest cash balances of Client's Investment Account in money market funds affiliated with Prudential-Bache without offsetting any portion of advisory or administrative fees payable to Prudential-Bache or to any of its affiliates. Client understands that Prudential-Bache, under such circumstances, may receive advisory and administrative fees from both the Client and the affiliated fund.

**4. Brokerage**

In the absence of specific instructions by Client to the contrary, all orders for portfolio transactions shall be placed with Client's designated broker/custodian. Client is under no obligation to designate Prudential-Bache as it broker/custodian. If Client's designated broker/custodian is Prudential-Bache, Client understands that commissions may be charged in accordance with commission rates generally being charged by Prudential-Bache from time to time for accounts comparable to Client's Account without regard to whether such commission are higher or lower than those being charged by other broker-dealers. Client undertstands that Prudential-Bache shall be under no obligation to determine whether other broker-dealers are offering lower commission rates or to place orders for Client's account with any other broker-dealers.

**5. Principal and Agency Cross Transactions**

Client understands that, in certain transactions, Prudential-Bache may act as principal or as broker for Client's Account and for another person on the other side of the transaction ("Principal and Agency Cross Transaction"). Client understands that in connection with such transactions Prudential-Bache may receive mark-ups or commissions that could lead to a potentially conflicting divison of loyalties and responsibilities. Consistent with the terms of this Agreement and the Advisers Act, Client authorizes Prudential-Bache to effect Principal and Agency Cross Transactions with Client's Investment Account. This consent may be revoked at any time by written notice to Prudential-Bache.

**6. Account Statements**

Prudential-Bache will send to Client (a) confirmation of purchases and sales in the Investment Account; (b) monthly statements reflecting the positions and activity in the Investment Account; (c) quarterly statements showing the market value of the Investment Account.

**7. Liability and Indemnification**

Without waiving any rights under applicable Federal securities laws or applicable State laws, Client agrees that in the performance of services under this Agreement, Prudential-Bache shall not be liable for any error in judgement in connection with any investment decision made by it pursuant to this Agreement or any failure to purchase or sell any security on Client's behalf on the basis of any informatiom known to Prudential-Bache or any of its officers or employees where the use of such information might, in the opinion of Prudential-Bache, constitute a violation of Federal or State law, rule or regulation or a breach of any fiduciary or confidential relationship.

Client represents, warrants and convenants that Client is, and will be during the term of this Agreement, the owner of all securities delivered to Prudential-Bache and further, that there are, and, during the term of this Agreement there will be, no restrictions on the public distribution or ownership by Client or the Investment Account of any such securities. Client shall hold harmless and indemnify Prudential-Bache against any and all liabilities, losses, costs and expenses that Prudential-Bache may incur or suffer as a result of the incorrectness of the preceding representations, warranties and convenants.

**8. Investment Supervisory Fee**

Client Agrees to pay a quarterly fee for the investment supervisory services of The Investment Supervisory Group in accordance with the schedule of rates set forth in the Annual Supervisory Fee Schedule, which is included with the Agreement and incorporated herein. The fee shall be based upon the market value of the net assets in the Client's Investment Account on the last business day of the preceding calendar quarter ("quarter").

The investment supervisory fee for each quarter is due at the beginning of each quarter and The Investment Supervisory Group shall receive the fee or instruct the custodian to debit the Client's Account the appropriate amount computed in accordance with the Agreement.

**9. Termination of Agreement**

Client may terminate the Agreement, without penalty, within five business days after having signed it.

This Agreement shall be effective for one year from the date of its execution by Prudential-Bache and shall be automatically renewed for successive one-year periods unless terminated by either party. This Agreement may be terminated at any given time by either party upon thirty days prior written notice to the other. In the event this Agreement is terminated as of any date other than the end of a quarter, a pro-rated portion of any fee previously paid by Client for the period shall be refundable.

**10. Non-assignability**

No assignment of this Agreement may be made by either party without the written consent of the other party.

**11. Entire Agreement**

This Agreement contains the entire agreement between the parties. It may not be amended or modified in any respect without the written concurrence of both parties. In the event that any provision of this Agreement is subsequently declared invalid, such invalidation shall have no effect on any other provision of this Agreement.

This Agreement shall be governed by and construed under the laws of the State of New York and any controversy arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the New York Stock Exchange, Inc.

**12. SEC Form ADV**

By signing this Agreement, Client acknowledges receipt of Securities and Exchange Commission Form ADV Part II, and Schedule F, completed by Prudential-Bache and filed with the Securities and Exchange Commission.

**Signature of Agreement**

The parties having read and carefully considered the foregoing terms and conditions of this Agreement, and intending to be bound by it, hereby assent to this Agreement by writing their signatures in the places provided immediately below.

DATED AS OF:   OCTOBER 1, 1990
UNITED WIRE, METAL & MACHINE PENSION FUND

By: _____
       Trustee

By: _____
       Trustee


PRUDENTIAL-BACHE SECURITIES INC.
(Acting through the Prudential-Bache
 Investment Supervisory Group)

By: _____Jodi M. Hamburger_____

Its: _____VICE PRESIDENT_____

nvestment Supervisory Group

# Prudential-Bache
Securities

## Confidential Investment Profile

Name _____

Home Address _____

City _____ State _____ Zip

Home Phone (____) _____

Age _____ No. of Dependents _____

Resident of _____

Citizen of _____

Social Security No._____

Occupation _____

Business Name _____

Business Address _____

City _____ State _____ Zip

Business Phone (____) _____

Spouse's Occupation _____

Bank Reference _____

Bank's Address _____

### Assets

Current value of
  Securities Held          $_____
Life Insurance in Force    $_____
Emergency Funds
  Maintained Apart
  from Investment
  Funds                    $_____
Approximate Value of
  Real Estate in Which
  You Have an Interest     $_____
Approximate Annual
  Income Before Taxes
                           $_____
Cash Available
  for Immediate
  Investment
                           $_____

### Investment Objectives
(Indicate your preferences)

☐ Maximum income without undue risk of capital

☐ Growth of capital with only a modest need for
  income

☐ Growth of capital with no regard for current
  income
☐ Other (please explain)

_____

_____

_____

Approximate Annual
  Investment Income
  Required               $_____

Estimated Cash Needs
  From Investment
  Principal Within 12
  Months                 $_____

### Additional Information

Are you Covered by a Retirement Plan of Your Employer?        ☐ Yes        ☐ No

Anticipated Annual Benefits From such Plan                    $_____

When are you planning to Retire?                             _____

Do you Expect Any Changes in Your Overall Financial Picture in the          _____
  Near Future? Please describe.                              _____

Do You Have Any Securities Not Under Our Supervision? Please list.          _____

_____        _____

Other Pertinent Information or Securities with Special Considerations       _____

_____        _____

_____        Date _____

Investment Supervisory Group

**Prudential-Bache**
Securities

## Current Securities Holdings
List of securities and cash to be managed.

| No. Shares | Name of Security | Common or Pref. Stock or Bond | Date Acquired | Cost | Current Market Value |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | SEE ATTACHED | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Value of Securities $_____

Cash $_____

Total Assets in Portfolio $_____

Investment Supervisory Group



# Prudential-Bache
Securities

## Annual Supervisory Fee Schedule

### Equities

1/2 Of 1 % On The First $5 Million Of Assets
4/10 Of 1 % On The Next $5 Million Of Assets
3/10 Of 1 % Thereafter

### Fixed Income

1/4 Of 1 %

FEES ARE PAYABLE QUARTERLY BASED UPON MARKET VALUE OF ASSETS AT THE END OF EACH QUARTER

# Prudential-Bache

## Investment Supervisory Group

M499

Investment Supervisory Group

# Prudential-Bache
Securities

## Discretionary Account

# Investment Supervisory Agreement

**Investment Manager**

The Prudential-Bache Investment Supervisory Group is a divison of Prudential-Bache Securities Inc. ("Prudential-Bache"), which maintains its principal place of business at One Seaport Plaza, New York, New York 10292

**Registered Investment Adviser**

Prudential-Bache is registered as an Investment Adviser with the Securities and Exchange Commission in accordance with the provisions of the Investment Advisers Act of 1940, as amended (the "Advisers Act"). Accordingly, this Agreement is between Prudential-Bache and Client. It is made with the understanding that The Investment Supervisory Group will act as Investment Manager , pursuant to Section 3 (38) of the Employee Retirement Act of 1974 ("ERIS

**Client**

The Client party to this Agreement is:

Name UNITED WIRE, METAL & MACHINE PENSION FUND

Address 10 East 15th Street

New York, New York    10003

Telephone No. (212) 691-4100

Terms and Conditions of this Agreement:

**1. Investment Account**

The Investment Account shall consist of a portfolio of cash and/or securities which Client places under the supervision of The Investment Supervisory Group, as described in a Schedule included with this Agreement, or which shall become part of the Account as a result of transactions therein. The term "securities" includes, but is not restricted to, stocks, bonds, options (where permissible), warrants and other negotiable instruments. Client may make capital additions to or withdrawals from the Account, in such amounts as Client may determine, on any business day by communicating directly with The Investment Supervisory Group.

**2. Authorization**

The Investment Supervisory Group shall serve Client in accordance with the Advisers Act and other applicable laws and regulations. Under this Agreement, The Investment Supervisory Group shall have complete discretion and authority to manage the Account, subject to any written guidelines which Client may provide from time to time, and is hereby appointed Client's agent and attorney-in-fact for that purpose. As such, the Investment Supervisory Group (and its authorized representatives) are authorized to perform the following, at Client's expense, without further approval from Client, except as required by law, and as fully, in the same manner and in the same force and effect as Client: (a) to make all investment decisions; (b) to buy, sell and otherwise trade in securities; (c) to invest, reinvest or hold any cash; (d) to issue instructions to the custodian of the Account; (e) to select brokers or dealers to execute securities transactions; (f) to take whatever further steps The Investment Supervisory Group deems appropriate to manage the Account. Saul Eisenberg and Linda Krouner are
the author**

**u. Investment of Temporary Cash Balances**

Consistent with the terms of this Agreement, Client understands that The Investment Supervisory Group may temporaily invest cash balances of Client's Investment Account in money market funds affiliated with Prudential-Bache without offsetting any portion of advisory or administrative fees payable to Prudential-Bache or to any of its affiliates. Client understands that Prudential-Bache, under such circumstances, may receive advisory and administrative fees from both the Client and the affiliated fund.

**4. Brokerage**

In the absence of specific instructions by Client to the contrary, all orders for portfolio transactions shall be placed with Client's designated broker/custodian. Client is under no obligation to designate Prudential-Bache as it broker/custodian. If Client's designated broker/custodian is Prudential-Bache, Client understands that commissions may be charged in accordance with commission rates generally being charged by Prudential-Bache from time to time for accounts comparable to Client's Account without regard to whether such commission are higher or lower than those being charged by other broker-dealers. Client undertstands that Prudential-Bache shall be under no obligation to determine whether other broker-dealers are offering lower commission rates or to place orders for Client's account with any other broker-dealers.

**5. Principal and Agency Cross Transactions**

Client understands that, in certain transactions, Prudential-Bache may act as principal or as broker for Client's Account and for another person on the other side of the transaction ("Principal and Agency Cross Transaction"). Client understands that in connection with such transactions Prudential-Bache may receive mark-ups or commissions that could lead to a potentially conflicting divison of loyalties and responsibilities. Consistent with the terms of this Agreement and the Advisers Act, Client authorizes Prudential-Bache to effect Principal and Agency Cross Transactions with Client's Investment Account. This consent may be revoked at any time by written notice to Prudential-Bache.

**6. Account Statements**

Prudential-Bache will send to Client (a) confirmation of purchases and sales in the Investment Account; (b) monthly statements reflecting the positions and activity in the Investment Account; (c) quarterly statements showing the market value of the Investment Account.

**7. Liability and Indemnification**

Without waiving any rights under applicable Federal securities laws or applicable State laws, Client agrees that in the performance of services under this Agreement, Prudential-Bache shall not be liable for any error in judgement in connection with any investment decision made by it pursuant to this Agreement or any failure to purchase or sell any security on Client's behalf on the basis of any informatiom known to Prudential-Bache or any of its officers or employees where the use of such information might, in the opinion of Prudential-Bache, constitute a violation of Federal or State law, rule or regulation or a breach of any fiduciary or confidential relationship.

Client represents, warrants and convenants that Client is, and will be during the term of this Agreement, the owner of all securities delivered to Prudential-Bache and further, that there are, and, during the term of this Agreement there will be, no restrictions on the public distribution or ownership by Client or the Investment Account of any such securities. Client shall hold harmless and indemnify Prudential-Bache against any and all liabilities, losses, costs and expenses that Prudential-Bache may incur or suffer as a result of the incorrectness of the preceding representations, warranties and convenants.

**8. Investment Supervisory Fee**

Client Agrees to pay a quarterly fee for the investment supervisory services of The Investment Supervisory Group in accordance with the schedule of rates set forth in the Annual Supervisory Fee Schedule, which is included with the Agreement and incorporated herein. The fee shall be based upon the market value of the net assets in the Client's Investment Account on the last business day of the preceding calendar quarter ("quarter").

The investment supervisory fee for each quarter is due at the beginning of each quarter and The Investment Supervisory Group shall receive the fee or instruct the custodian to debit the Client's Account the appropriate amount computed in accordance with the Agreement.

**9. Termination of Agreement**

Client may terminate the Agreement, without penalty, within five business days after having signed it.

This Agreement shall be effective for one year from the date of its execution by Prudential-Bache and shall be automatically renewed for successive one-year periods unless terminated by either party. This Agreement may be terminated at any given time by either party upon thirty days prior written notice to the other. In the event this Agreement is terminated as of any date other than the end of a quarter, a pro-rated portion of any fee previously paid by Client for the period shall be refundable.

**10. Non-assignability**

No assignment of this Agreement may be made by either party without the written consent of the other party.

**11. Entire Agreement**

This Agreement contains the entire agreement between the parties. It may not be amended or modified in any respect without the written concurrence of both parties. In the event that any provision of this Agreement is subsequently declared invalid, such invalidation shall have no effect on any other provision of this Agreement.

This Agreement shall be governed by and construed under the laws of the State of New York and any controversy arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the New York Stock Exchange, Inc.

**12. SEC Form ADV**

By signing this Agreement, Client acknowledges receipt of Securities and Exchange Commission Form ADV Part II, and Schedule F, completed by Prudential-Bache and filed with the Securities and Exchange Commission.

**Signature of Agreement**

The parties having read and carefully considered the foregoing terms and conditions of this Agreement, and intending to be bound by it, hereby assent to this Agreement by writing their signatures in the places provided immediately below.

DATED AS OF:    OCTOBER 1, 1990
UNITED WIRE, METAL & MACHINE PENSION FUND

By: _____
        Trustee

By: _____
        Trustee


PRUDENTIAL-BACHE SECURITIES INC.
(Acting through the Prudential-Bache
Investment Supervisory Group)

By: _____

Its:    VICE PRESIDENT

Investment Supervisory Group

# Prudential-Bache
Securities

## Confidential Investment Profile

Name _____

Home Address _____

_____
City            State            Zip

Home Phone ( ___ ) _____

Age _____ No. of Dependents _____

Resident of _____

Citizen of _____

Social Security No._____

Occupation _____

Business Name _____

Business Address _____

_____
City            State            Zip

Business Phone ( ___ ) _____

Spouse's Occupation _____

Bank Reference _____

Bank's Address _____

### Assets

Current value of
Securities Held        $_____

Life Insurance in Force  $_____

Emergency Funds
Maintained Apart
from Investment
Funds                  $_____

Approximate Value of
Real Estate in Which
You Have an Interest   $_____

Approximate Annual
Income Before Taxes
                       $_____

Cash Available
for Immediate
Investment             $_____

### Investment Objectives
(Indicate your preferences)

☐ Maximum income without undue risk of capital

☐ Growth of capital with only a modest need for income

☐ Growth of capital with no regard for current income

☐ Other (please explain)

_____

_____

_____

Approximate Annual
Investment Income
Required               $_____

Estimated Cash Needs
From Investment
Principal Within 12
Months                 $_____

### Additional Information

Are you Covered by a Retirement Plan of Your Employer?     ☐ Yes     ☐ No

Anticipated Annual Benefits From such Plan                 $_____

When are you planning to Retire?                           _____

Do you Expect Any Changes in Your Overall Financial Picture in the
Near Future? Please describe.                              _____
                                                           _____

Do You Have Any Securities Not Under Our Supervision? Please list. _____

_____

Other Pertinent Information or Securities with Special Considerations  _____

_____

_____ Date _____

Investment Supervisory Group

# Prudential-Bache
Securities

## Current Securities Holdings
List of securities and cash to be managed.

| No. Shares | Name of Security | Common or Pref. Stock or Bond | Date Acquired | Cost | Current Market Value |
|---|---|---|---|---|---|
| | | | | | |
| | | SEE ATTACHED | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Value of Securities $_____

Cash $_____

Total Assets in Portfolio $_____

Investment Supervisory Group



# **Prudential-Bache**
Securities

## **Annual Supervisory Fee Schedule**

### **Equities**

1/2 Of 1 % On The First $5 Million Of Assets
4/10 Of 1 % On The Next $5 Million Of Assets
3/10 Of 1 % Thereafter

### **Fixed Income**

1/4 Of 1 %

**FEES ARE PAYABLE QUARTERLY BASED UPON MARKET VALUE OF ASSETS AT THE END OF EACH QUARTER**

# EXHIBIT C

DISCRETIONARY INVESTMENT MANAGEMENT AGREEMENT

By and Between

THE BOARD OF TRUSTEES

OF THE

TRUST FUND OF THE LOCAL 810 AFFILIATED PENSION PLAN

And

M&R CAPITAL MANAGEMENT, INC.

Discretionary Investment Management Agreement by and between the
Board of Trustees of the TRUST FUND OF THE LOCAL 810 AFFILIATED
PENSION PLAN and M&R CAPITAL MANAGEMENT, INC.

## TABLE OF CONTENTS

Paragraph:                                                              Page:

1.    APPOINTMENT ............................................... 1
2.    INVESTMENT ACCOUNT ASSETS................................. 2
3.    DUTIES AND POWERS OF INVESTMENT MANAGER. ................. 3
4.    STANDARD OF CARE. ........................................ 10
5.    PROCEDURES. .............................................. 11
6.    REPORTS; MEETINGS; ACCOUNTING. ........................... 11
7.    CONFIDENTIAL RELATIONSHIP. ............................... 13
8.    SERVICES TO OTHER CLIENTS. ............................... 13
9.    FEES. .................................................... 14
10.   VALUATION. ............................................... 15
11.   REPRESENTATIONS OF INVESTMENT MANAGER. ................... 16
12.   REPRESENTATIONS OF THE TRUSTEES. ......................... 19
13.   AMENDMENT AND TERMINATION. ............................... 20
14.   NON-ASSIGNABILITY. ....................................... 21
15.   NOTICES. ................................................. 21
16.   ENTIRE AGREEMENT. ........................................ 22
17.   CONSTRUCTION AND SEVERABILITY. ........................... 22
18.   TITLES. .................................................. 23
19.   INUREMENT. ............................................... 23
20.   APPLICABLE LAW. .......................................... 23
21.   SUCCESSOR LAWS. .......................................... 23
22.   RESOLUTION OF DISPUTES. .................................. 23
23.   COUNTERPARTS. ............................................ 24

EXHIBIT A  INVESTMENT GUIDELINES ................................ 25
EXHIBIT B  INVESTMENT ACCOUNT ASSETS ............................ 26
EXHIBIT C  FEE SCHEDULE ......................................... 27

## DISCRETIONARY INVESTMENT MANAGEMENT AGREEMENT

INVESTMENT MANAGEMENT AGREEMENT (the "Agreement"), made as of the _____ day of _____, 2002, by and between M&R CAPITAL MANAGEMENT, INC., 40 Fulton Street, 8th Floor, New York, New York 10038(the "Investment Manager") and the BOARD OF TRUSTEES OF THE TRUST FUND OF THE LOCAL 810 AFFILIATED PENSION PLAN, 10 East 15th Street, New York, New York 10003(the ``Trustees'').

### W I T N E S S E T H:

WHEREAS, the Trustees desire to retain the Investment Manager to maintain under investment supervision and management certain assets (the "Investment Account Assets") of the trust (the "Trust") pursuant to the Trust Fund of the Local 810 Affiliated Pension Plan, dated November 8, 2001, as amended and restated, (the "Trust Agreement"), establishing the Local 810 Affiliated Pension Plan, as from time to time amended (the "Plan"), which assets are to be deposited with Fleet Bank as custodial agent (the "Custodian"), or such other custodian or sub-custodians as may be designated by the Trustees, in accordance with the terms and conditions hereinafter set forth and the Investment Manager desires to accept such retention in accordance with such terms and conditions.

NOW, THEREFORE, in consideration of the premises and mutual promises contained in this Agreement, and other good and valuable consideration the receipt of which is hereby acknowl- edged, the parties hereto agree as follows:

1.   APPOINTMENT.

(a)   Pursuant to the authority granted under the Trust Agreement, and Section 402(c)(3) of the Employee Retirement Income Security Act of 1974, as from time to time amended ("ERISA"), the Trustees hereby appoint the Investment Manager to have full discretion and authority to manage, invest and reinvest the Investment Account Assets (as that term is defined in Subparagraph 2(a), hereof).

(b)   As a result of this appointment, the Trustees shall not be liable for any acts or omissions of the Investment Manager or be under any obligation to invest or otherwise manage the Investment Ac- count Assets.

(c)   The Investment Manager hereby accepts this
      appointment and agrees to provide such advice and
      to supervise and direct the investment of the
      Investment Account Assets in accordance with and
      subject to:  (i) the terms and conditions of this
      Agreement, including any written investment
      guidelines or directions, which from time to time
      may (but need not) be promulgated by the Trustees
      and delivered to the Investment Manager, express-
      ing the investment objectives, restrictions and
      policies of the Trustees, to which the Investment
      Manager does not object in writing within five (5)
      days of its receipt thereof (the "Investment
      Guidelines," attached hereto as Exhibit A and made
      a part hereof); provided, however, that the
      issuance of any Investment Guidelines or other
      directions to the Investment Manager shall not in
      any manner be construed as an acceptance by the
      Trustees of any investment management or
      supervisory responsibility with respect to the
      Investment Account by the Trustees (and the
      Trustees shall not, as a result of issuing
      Investment Guidelines or other directions, be
      liable for any acts or omissions of the Investment
      Manager with respect to any Investment Account
      Assets); (ii) compliance with ERISA and other
      applicable law; and (iii) the current funding
      policy and method that have been established to
      carry out the objectives of the Trust and Plan.

(d)   By execution of this Agreement, the Investment
      Manager hereby accepts the Investment Guidelines
      referred to in Subparagraph 1(c)(i) and any
      amendments thereto which may be promulgated by the
      Trustees and agrees to be bound thereby in
      connection with the performance of its duties
      under this Agreement.

2.   INVESTMENT ACCOUNT ASSETS.

(a)   The Investment Account Assets shall initially
      consist of the investments or property of any
      nature whatever of the Trust listed or otherwise
      identified on Exhibit B (attached hereto and made
      a part hereof), plus all investments,
      reinvestments and proceeds of the sale thereof,
      including (without limitation) all dividends,
      interest and earnings on investments, and all
      appreciation thereof and additions thereto (the
      "Investment Account"). The Trustees will give the
      Investment Manager reasonable prior notice of any
      additions they make to, or any withdrawals they

make from, the Investment Account.  Such notice
shall be given in writing prior to or as soon as
practicable after the making of such additions or
withdrawals.  The Investment Account shall consist
of assets of an employee benefit plan subject to
Part 4 of Title I of ERISA.

(b)   The Trustees shall direct the Custodian to act in
accordance with the instructions of the Investment
Manager.  The Investment Manager shall under no
circumstances act as custodian of the Investment
Account Assets or otherwise have custody or physi-
cal control of the Investment Account Assets.  The
physical possession of all securities, funds and
other property which constitute the Investment
Account Assets shall at all times (except when
securities are held by a seller pending delivery
to or in the hands of a transfer agent) be held,
controlled and administered by the Custodian and
all such securities, funds and other property
shall be held on the books and records of the
Custodian, or sub-custodian, in a manner so as to
establish clearly that they are held as part of
the Investment Account Assets provided for in this
Agreement.

(c)   The Investment Account Assets shall remain a part
of, and subject to, the terms and conditions of
the Trust Agreement and the Plan, and shall be
held at all times exclusively for the purposes for
which the Trust and Plan were established.  All
advisory and management powers, duties and respon-
sibilities shall be exercised exclusively by, and
circumscribed by, the Investment Manager pursuant
to the provisions of the Trust Agreement relating
to such powers, duties and responsibilities, and
which are incorporated herein by reference (as if
fully set forth herein).

(d)   Notwithstanding anything herein to the contrary,
the investment of Investment Account Assets shall
be limited to equities, except for temporary
investment of Investment Account assets in short
term money market instruments and/or funds in
accordance with the Investment Guidelines
furnished by the Trustees.

3.    DUTIES AND POWERS OF INVESTMENT MANAGER.

During the term of its appointment, the Investment
Manager shall, subject to its fiduciary obligations referred to
in Paragraph 4, hereof, ERISA, and other applicable law, and in a

manner consistent with the objectives, restrictions and other policies of the Trustees which may be expressed in any Investment Guidelines delivered to the Investment Manager by the Trustees (pursuant to Subparagraph 1(c)(i), hereof):

(a)   have the power and obligation to manage the securities, funds and other property which constitute the Investment Account Assets in its sole and absolute discretion, subject to its fiduciary obligations referred to in Paragraph 4, hereof, ERISA, and other applicable law, and in a manner consistent with the objectives, restrictions and other policies of the Trustees which may be expressed in any Investment Guidelines delivered to the Investment Manager by the Trustees (pursuant to Subparagraph 1(c)(i), hereof);

(b)   provide investment advice and recommendations with respect to the Investment Account Assets;

(c)   establish and implement an ongoing investment program and provide continuous investment advice, with respect to the Investment Account Assets, seeking the highest rate of total investment return consistent with the preservation of principal and consistent with the applicable Investment Guidelines, if any; and

(d)   have the following additional duties and powers:

(i)   The Investment Manager shall have complete discretion in the investment and reinvestment of the Investment Account Assets, without distinction between principal and income, in such property and securities, with full power and authority to effect (or to authorize, direct and supervise the Custodian, or a broker-dealer selected by the Investment Manager, to effect) such purchases, sales, exchanges, conversions, and otherwise trade in any and all securities or other property or interests therein as the Investment Manager may deem prudent and appropriate, consistent with the Investment Guidelines.

(ii)  Subject to the limitations of any Investment Guidelines delivered to the Investment Manager by the Trustees, the Investment Manager may invest, in accordance with ERISA, a portion of the Investment Account Assets in any common, collective, commingled or group trust or mutual fund qualified under Section 401 of the Internal Revenue Code of 1986, as

amended (the "Code") and exempt from federal income taxation under Section 501 of the Code ("collective trust"), including without limitation the use of "money market" (or other short-term investment) funds and may maintain any cash or cash balances in such collective trust (including, to the extent permitted by ERISA, a collective trust maintained for this purpose by the Investment Manager or the Custodian, or any affiliate thereof); provided that the use of such investment shall be permissible only if the securities held within such funds meet the general quality constraints set forth in this Agreement and any Investment Guidelines promulgated by the Trustees in accordance with Subparagraph 1(c)(i) of the Agreement and, in the Investment Manager's opinion, such use is prudent.

(iii) The Investment Manager shall periodically appraise and review the securities, funds and other property that constitute the Investment Account Assets, including any additional funds deposited to the Investment Account from time to time and the income from such securities, funds and other property.  The Investment Manager shall collect information pertaining to investments, securities, the economy, and other matters pertinent to making the determinations required of it herein. Such review shall be conducted to determine, in the Investment Manager's sole discretion based on the information available to it (including any information or advice given to it by the Trustees pursuant to any Investment Guidelines), the advisability of:

(2)   retaining some or all of such securities, funds and other property constituting the Investment Account;

(3)   selling, exchanging, redeeming, liquidating or disposing of some or all of the Investment Account Assets;

(4)   investing some or all of the proceeds from such sale, exchange, redemption, liquidation or disposition in other securities, funds or property;

    (5)   investing some or all of the Investment
Account Assets in other securities or
property; or

    (6)   taking such other action or actions as
the Investment Manager shall consider
prudent under the circumstances.

(iv)   The Investment Manager shall have complete
discretion and authority in the selection of
broker-dealers to effectuate acquisitions or
dispositions of Investment Account Assets,
and the terms and conditions on which such
acquisitions or dispositions shall be made,
except as otherwise instructed by the
Trustees.  Where the Investment Manager
places orders for the execution of portfolio
transactions for the Investment Account, the
Investment Manager may allocate such
transactions to such broker-dealers (includ-
ing the Investment Manager itself or an
affiliate of the Investment Manager; provided
the Trustees, Investment Manager and af-
filiate, if any, have executed a written
agreement permitting an affiliate of
Investment Manager to perform brokerage tran-
sactions), for execution on such markets, at
such prices and at such commission rates as
in the good faith judgment of the Investment
Manager is prudent; provided such execution
is consistent with this Agreement, any
Investment Guidelines promulgated by the
Trustees, any applicable securities laws,
ERISA and other laws, and rules and
regulations thereunder.

(v)   In the selection of broker-dealers with whom
to place orders for the purchase or sale of
securities for the Investment Account, the
primary objective of the Investment Manager
shall be to obtain the best execution of the
brokerage transaction for the Investment
Account.  In making such selection, the In-
vestment Manager may take into account such
relevant factors as:

    (1)   price, fees and/or commission, provided
however, that such price or commission
is determined by the Investment Manager
to be reasonable in relation to the
value of the brokerage services being
provided to the Investment Account;

    (2)   the broker-dealer's facilities, reliability and financial responsibility;

    (3)   the ability of the broker-dealer to effectuate securities transactions, particularly with respect to such aspects as timing, order size, execution of orders and the ability to complete a transaction through clearance, settlement and delivery; and

    (4)   the research and other services provided by such broker-dealer to the Investment Manager which are expected to enhance the management capabilities of the Investment Manager generally.

The Investment Manager's selection of such broker-dealers shall be in accordance with ERISA, the Investment Advisers Act of 1940 and any applicable securities laws, rules and regulations. If the Investment Manager itself (or its affiliate) is used as a broker-dealer, the execution of all such securities transactions must be in compliance with ERISA (including, without limitation, United States Department of Labor Prohibited Transaction Class Exemption 86-128 and any successor class exemptions), such transactions must be at a rate that is reasonable and does not exceed the rate that the broker-dealer charges comparable accounts for the effectuation of comparable transactions, and such transactions shall not be excessive, under the circumstances, in either amount or frequency.

(vi)   When the Investment Manager places orders directly with brokers, dealers or other persons to purchase, acquire, sell, exchange, redeem, liquidate or dispose of any Investment Account Assets, the Investment Manager shall instruct the broker-dealer or other appropriate party to promptly furnish the Trustees and the Custodian (as appropriate) with confirmations or other records of all transactions, and with quarterly statements of the Investment Account valued at fair market value (in accordance with Paragraph 10, hereof).

(vii)  Subject to the restrictions of this Agreement, and the restrictions contained in the Investment Guidelines, if any, the

Investment Manager is authorized and em-
powered to, and shall exercise (as it deems
prudent and solely in the interest of Plan
participants and beneficiaries), any conver-
sion privilege or subscription right and any
other right to make an investment decision
with respect to the Investment Account Assets
(including, without limitation, the voting of
proxies, if any, and exercise of all other
rights appurtenant to Investment Account
Assets) as from time to time the Investment
Manager in its discretion deems prudent.  The
Investment Manager shall give the Custodian
(as appropriate) such instructions or direc-
tions as may be necessary, and thereupon
execute and complete all such certificates,
proxies, consents and other documents neces-
sary or appropriate to effectuate the powers
of the Investment Manager under this Agree-
ment.  However, no person other than the
Investment Manager may make a decision with
respect to the voting of proxies, if any,
appurtenant to Investment Account Assets.

(viii)  The Investment Manager shall have the power
to make, execute, acknowledge and deliver any
and all documents of transfer and conveyance
and any and all other documents or instru-
ments that may be necessary or appropriate to
carry out the powers granted to it under this
Agreement.

(ix)  The Investment Manager shall have the power
to compromise or settle any claim, debt or
obligation due to the Trust where immediate
action is necessary to prevent a loss to the
Investment Account Assets.

(x)  The Investment Manager shall from time to
time certify to the Trustees and the
Custodian the name or names of the person or
persons authorized to act on the Investment
Manager's behalf hereunder, if any, and shall
furnish the Trustees and the Custodian with a
specimen of their signatures.  Any individual
so certified shall be deemed to be the
Investment Manager's authorized represen-
tative.  When any individual so certified
shall cease to have authority to act on the
Investment Manager's behalf, the Investment
Manager shall promptly give written notice of
that fact to the Trustees and the Custodian.
However, until such notice is received by

the Trustees and the Custodian (pursuant to the procedures set forth in Paragraph 15, hereof), the Trustees and the Custodian may continue to treat such person as an authorized representative of the Investment Manager.

(xi) The Trustees shall from time to time certify to the Investment Manager the name or names of the person or persons authorized to act on the Trustees' behalf hereunder, if any, and shall furnish the Investment Manager with a specimen of their signatures. Any individual so certified shall be deemed to be the Trustees' authorized representative. When any individual so certified shall cease to have authority to act on the Trustees' behalf, the Trustees shall promptly give written notice of that fact to the Investment Manager. However, until such notice is received by the Investment Manager (pursuant to the procedures set forth in Paragraph 15, hereof), the Investment Manager may continue to treat such person as an authorized representative of the Trustees.

(xii) The Investment Manager shall have power to:

(1) exercise any option, conversion or subscription rights appurtenant to any securities or other property of the Investment Account, or to sell any such rights;

(2) join in, dissent from, and oppose the reorganization, consolidation, recapitalization, liquidation, merger, sale, mortgage, pledge or lease of any securities or other property in which the Investment Account may have an interest;

(3) deposit any securities or other property of the Investment Account with any protective, reorganization or similar committee, and to pay or agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to any securities or other property so deposited; and

(4) exercise all other ancillary rights or duties in connection with the Investment

Account necessary to implement any of the powers contained herein.

(e)    Except with the prior written consent of the Trustees (which consent may be given pursuant to any Investment Guidelines promulgated by the Trustees and delivered to the Investment Manager by the Trustees), under no circumstances shall the Investment Manager invest Investment Account Assets in any investments or strategies specifically prohibited under the Investment Guidelines.

(f)    The Investment Manager shall perform its obligations under this Agreement consistent with the Investment Guidelines (pursuant to Subparagraph 1(c)(i), hereof) and to the extent that any provision of this Agreement is inconsistent with the provisions of any Investment Guidelines, the Investment Guidelines shall be controlling.

4.    STANDARD OF CARE.

(a)    The Investment Manager shall perform its duties hereunder with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and in such manner as to comply with Section 404(a)(1)(B) of ERISA and any regulations promulgated pursuant thereto.

(b)    The Investment Manager shall diversify the Investment Account Assets so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and in such manner as shall comply with the requirements of Section 404(a)(1)(C) of ERISA and any regulations promulgated pursuant thereto; provided, however, that the Investment Manager shall have no responsibility for the overall diversification of assets of the Fund that are not subject to the Investment Manager's supervision under this Agreement.

(c)    The Investment Manager shall discharge its duties hereunder with respect to the Investment Account solely in the interest of, and for the exclusive purpose of providing benefits for, the participants in the Plan and their beneficiaries, in accordance with the Plan and Trust Agreement (and

other documents and instruments governing the Plan), any Investment Guidelines, ERISA and other applicable law.

(d)    The Investment Manager shall not effectuate any investment transaction that directly or indirectly shall cause the Plan, or any fiduciary thereof (including the Investment Manager, or any affiliate thereof), to violate Sections 406 through 408 of ERISA, or Section 4975(c) of the Code.

(e)    Notwithstanding anything herein to the contrary, in the event that the Trustees have permitted the Investment Manager to purchase shares of an open-end investment company registered under the Investment Company Act of 1940 for which the Investment Manager (or an affiliate thereof) is the investment advisor, the Investment Manager shall comply in all respects with United States Department of Labor Prohibited Transaction Class Exemption 77-4, or any successor class exemption thereto.

5.    PROCEDURES.

All transactions in the Investment Account authorized by this Agreement shall be consummated by payment to, or delivery by, the Custodian, or such other sub-custodian as may be designated by the Trustees, of all funds, securities, or other property due to or from the Investment Account. Instructions of the Investment Manager to the Custodian or, or such other sub-custodian, shall be made in writing, sent by first-class mail, or at the option of the Investment Manager, orally and confirmed in writing as soon as practicable thereafter, and the Investment Manager shall instruct all brokers or dealers executing orders on behalf of the Investment Account to forward to the Trustees and the Custodian, or such other sub-custodian, copies of all brokerage confirmations promptly after execution of transactions.

6.    REPORTS; MEETINGS; ACCOUNTING.

(a)    The Investment Manager shall provide the Trustees with quarterly reports concerning the status of the Investment Account. However, at the request of the Trustees, the Investment Manager shall provide such reports more often and shall also provide such other information in connection with the Investment Account as the Trustees may reasonably request from time to time.

(b)    The reports required by Subparagraph 6(a), hereof, shall include (but shall not necessarily be limited to) a detailed description of each Investment Account Asset, setting forth both its fair market value and cost value (as determined pursuant to Paragraph 10, hereof) as of the date of the report.

(c)    Representatives of the Investment Manager shall meet with the Trustees at such times as the Trustees may reasonably request.

(d)    The Trustees shall instruct the Custodian or sub-custodian to provide the Investment Manager with periodic reports concerning the status of the Investment Account.

(e)    The Investment Manager shall keep accurate and detailed accounts of all investments, receipts, disbursements, the voting of proxies, if any, and other transactions relating to the Investment Account hereunder, and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any person designated by the Trustees.  On at least a quarterly basis, and within thirty (30) days after the effective date of the removal or resignation of the Investment Manager (as provided in Subparagraphs 13(c) and (d), hereof), the Investment Manager shall file with and deliver to the Trustees a written account setting forth all investments, receipts, disbursements, and other transactions effected by it in connection with the Investment Account (including, without limitation, the information required by Subparagraph 6(b), hereof), and other information as the Trustees may reasonably request and certifying as to the accuracy of the information set forth therein.  Such account may incorporate by reference any and all schedules and other statements setting forth investments, receipts, disbursements, and other transactions effected during the period for which such account is rendered and which the Investment Manager has furnished to the Trustees prior to the filing of such account.  The Investment Manager shall furnish the Trustees such financial statements, and other information, as the Trustees may reasonably request from time to time with respect to the assets held under the Investment Account.

7.    CONFIDENTIAL RELATIONSHIP.

(a)   The Investment Manager shall regard as
      confidential all information concerning the af-
      fairs of the Plan, Trust and Fund.

(b)   Provided that the Investment Manager promptly
      provides prior notice to the Trustees (except
      where such prior notice is prohibited by law), it
      may disclose confidential information with respect
      to the Investment Account, the Investment Account
      Assets, the Plan or the Trust if required by law,
      regulation or other binding authority, including
      (without limitation) requirements under ERISA, the
      Securities and Exchange Act of 1934 and the In-
      vestment Advisers Act of 1940.  In the event that
      the Investment Manager is requested (by oral ques-
      tions, interrogatories, subpoena duces tecum or
      similar process) to disclose any confidential
      information, the Investment Manager shall provide
      the Trustees with prompt notice of such request.
      In the event that the Investment Manager discloses
      confidential information in accordance with this
      Subparagraph 7(b) without prior notice to the
      Trustees (because such disclosure is required by
      law and prior notification thereof to the Trustees
      is prohibited by law), the Investment Manager
      shall notify the Trustees concerning such disclo-
      sure as soon as practicable and permissible by
      law.


8.   SERVICES TO OTHER CLIENTS.

(a)   It is understood that the Investment Manager per-
      forms investment advisory services for various
      clients.   The Trustees agree that the Investment
      Manager may give advice and take action with re-
      spect to any of its other clients which may differ
      from action taken with respect to the Investment
      Account, or the timing or nature of action taken
      with respect to the Investment Account, provided
      that it continues to be the policy and practice of
      the Investment Manager not to favor or disfavor
      consistently or consciously any client or class of
      clients in the allocation of investment opportuni-
      ties that the Investment Manager believes would be
      suitable for such client or class of clients, so
      that, to the extent practical, such opportunities
      will be allocated among clients over a period of
      time on a fair and equitable basis and in confor-
      mity with this Agreement and ERISA.

(b)     Nothing in this Agreement shall impose upon the
        Investment Manager any obligation to purchase or
        sell, or to recommend for purchase or sale, for
        the Investment Account any security which the
        Investment Manager, its principals, affiliates or
        employees, may purchase or sell for its or their
        own accounts or for the account of any other cli-
        ent, if, subject to the standards for discharge of
        the Investment Manager's fiduciary duties, in the
        reasonable opinion of the Investment Manager such
        investment would be unsuitable for the Investment
        Account or if the Investment Manager determines in
        the best interest of the Investment Account it
        would be impractical or undesirable.

(c)     The Investment Manager's exercise of its duties to
        buy and sell securities pursuant to this agreement
        shall be given priority over the Investment
        Manager's buying or selling of same securities for
        his personal account, and the Investment Manager
        agrees to abide by Professional Standards of
        conduct (internally and from industry associations
        such as AIMR) with respect to Priority of
        Transactions (as defined by AIMR).

9.      FEES.

(a)     The sole compensation of the Investment Manager
        for its services rendered hereunder shall be
        calculated and payable quarterly in arrears based
        on the fair market value of the Investment Account
        Assets (computed in accordance with Paragraph 10
        hereof) as of the close of business on the last
        day of the immediately preceding quarter (and pro-
        rated with respect to the first quarter in which
        this Agreement is effective). The annual rate
        shall be as set forth in Exhibit C (attached
        hereto and made a part hereof).

(b)     All quarterly payments shall be at one quarter of
        the annual rate, and shall constitute the sole
        compensation due and owing by the Trustees to any
        person by reason of the Investment Manager's
        services under this Agreement.

(c)     The Investment Manager shall not accept any fees
        or compensation from any third-party (whether
        directly or indirectly) in connection with or
        relating to its services hereunder without the
        express written consent of Trustees. The
        Investment Manager shall disclose to the Trustees
        any compensation paid or payable to the Investment

Manager from any source, whether directly or indirectly, in connection with this Agreement or the services provided by the Investment Manager hereunder.

(d) Notwithstanding anything herein to the contrary, in the event that the Investment Manager purchases shares of an open-end investment company registered under the Investment Company Act of 1940, or otherwise invests Fund assets in a collective investment vehicle for which the Investment Manager (or an affiliate thereof) is the investment advisor, the fees otherwise payable to the Investment Manager under this Paragraph 9 shall be reduced by the pro rata share of the investment advisory fees or other fees paid by the investment company or other collective investment vehicle to the Investment Manager (or an affiliate thereof).

10.    VALUATION.

For all purposes of this Agreement, including without limitation the computation of the Investment Manager's compensation hereunder and any accounting as hereinabove provided, the fair market value of the Investment Account Assets on any date shall be computed as follows without accrued interest, dividends or disbursements not yet under the direct control of the Investment Manager:

(a) In computing the market value of the Investment Account Assets, securities listed on a national exchange shall be valued, as of the valuation date, at the closing price on the principal exchange on which they are traded.

(b) Any Investment Account Asset, that (i) the Investment Manager determines in good faith is imprudent or impractical to value under the foregoing principles based on its normal practice for valuing client assets, or (ii) cannot be valued in accordance with the foregoing principle, shall, upon written notice to the Trustees and the Custodian, be valued in such commercially reasonable manner as determined with prudence and in good faith by the Investment Manager to reflect its fair market value, based upon values supplied by a nationally recognized pricing or quotation service, or quotations furnished by one or more reputable and generally recognized sources (such as securities brokers, dealers or investment bankers, values of comparable property, appraisals and similar commercially acceptable sources).

11.    REPRESENTATIONS OF INVESTMENT MANAGER.

The Investment Manager expressly acknowledges, repre-
sents, warrants and agrees that:

(a)   it is an "investment manager" (as that term is
defined in Section 3(38) of ERISA) of the Trust
with respect to the assets of the Trust at any
time constituting the Investment Account, and it
will maintain that status as long as this Agree-
ment shall remain in effect;

(b)   it is a "fiduciary" (as that term is defined in
Section 3(21)(A) of ERISA) of the Trust with re-
spect to the Plan and the assets of the Trust at
any time constituting the Investment Account, and
it is not subject to any of the disqualifications
described in Section 411 of ERISA;

(c)   it is registered in good standing as an investment
advisor under the Investment Advisers Act of 1940
and will continue to be so registered during the
term of this Agreement;

(d)   it will notify the Trustees immediately in writing
if it ever ceases to be registered as an
investment advisor under the Investment Advisers
Act of 1940;

(e)   it has completed, obtained or performed (and, when
required, will complete, obtain or perform) all
registrations, filings, approvals, authorizations,
consents or examinations required by ERISA or
other applicable law (or any government or govern-
mental authority) for the performance of the acts
contemplated by this Agreement and, during the
term of this Agreement, it shall comply with all
existing, new or amended statutes of the United
States (and any other government or governmental
authority having jurisdiction over its activities)
which are applicable to its performance under this
Agreement;

(f)   it has, by appropriate action, duly authorized the
execution and implementation of this Agreement;
such authorization or execution does not violate
any obligation by which the Investment Manager is
bound or any applicable law; and this Agreement
has been executed on behalf of the Investment
Manager by a person (or persons) authorized to
transact business on behalf of the Investment
Manager and shall be binding upon the Investment
Manager in accordance with its terms;

(g) the personnel of the Investment Manager who will be responsible for carrying out the terms of this Agreement are individuals experienced in the making of investments of the nature contemplated by this Agreement and one or more bonds have been obtained by the Investment Manager, in accordance with and in an amount not less than the amount required by Section 412 of ERISA, which provides the Trust protection against fraud or dishonesty (either directly or through connivance with others) on the part of the Investment Manager, its officers, directors, employees and agents;

(h) it shall defend and hold the Trustees harmless from, and indemnify the Trustees against, any and all claims, liability, loss, damages, court costs or reasonable expenses (including reasonable attorneys' fees and court costs) which the Trustees may incur or suffer as a result of any breach by the Investment Manager of (i) its fiduciary responsibilities under ERISA (including, without limitation, those set forth in Paragraph 4 of this Agreement) with respect to the assets of the Plan at any time constituting the Investment Account, (ii) any of the acknowledgments, representations, warranties or agreements made in this Paragraph 11; or (iii) any other provision of this Agreement.  Notwithstanding the foregoing, nothing in this Subparagraph 11(h) is intended to or shall limit any rights that the Trustees may otherwise have against the Investment Manager under ERISA or other applicable law;

(i) there currently exists in full force and effect an insurance policy protecting the Investment Manager (and its officers, directors and employees) against liability or loss for a breach of fiduciary responsibility, and the coverage limitations of such policy equal or exceed ONE MILLION DOLLARS ($1,000,000); and the Investment Manager warrants that such insurance policy shall be maintained at all times while this Agreement is in effect;

(j) where the Trustees have permitted the Investment Manager to invest in, and the Investment Account Assets consist of, foreign securities, the Investment Manager shall comply with all requirements of Section 404(b) of ERISA and any regulations promulgated pursuant thereto (including, without limitation, 29 C.F.R. § 2550.404b-1) in the event that it invests or reinvests any portion of the Investment Account Assets in (1) securities of a corporation, company or other entity or person which is not organized under the laws of the United States or a State, or

the principal trading market for which is outside
the jurisdiction of the district courts of the
United States; (2) securities issued by a
government other than the government of the United
States or of a State (or any political subdivi-
sion, agency or instrumentality of such a govern-
ment); (3) currency issued by a government other
than the government of the United States; or (4)
other foreign securities or property.

(k)     the Investment Manager shall promptly advise the
Trustees in the event of any material change in
control of the Investment Manager, in the general
partners of the Investment Manager or in the
personnel involved in the management of the
Investment Account Assets;

(l)     except as disclosed in writing to the Trustees,
neither the Investment Manager, any of its subsid-
iaries, divisions or other affiliates, nor any of
their officers, directors or employees, ever has
been (i) convicted of or pleaded guilty (or nolo
contendere) to a felony or misdemeanor involving
(1) an investment or investment-related business,
(2) fraud, false statements or omissions, or (3)
the wrongful taking of property, bribery, forgery,
counterfeiting or extortion; (ii) found by a court
to be in violation of any federal or state invest-
ment (or investment-related) statutes or regula-
tions; (iii) found by the U.S. Securities and
Exchange Commission, or any other federal or state
regulatory agency or self-regulating organization,
to have (1) made a false statement or omission,
(2) been involved in a violation of its regula-
tions or statutes, or (3) been a cause of an in-
vestment-related business having its authorization
to do business denied, suspended, revoked or re-
stricted; or (iv) found to be in violation of
Section 411 of ERISA; nor is any claim, proceeding
or litigation that might lead to the foregoing
presently pending;

(m)     except as disclosed in writing to the Trustees,
neither the Investment Manager, any of its subsid-
iaries, divisions or other affiliates, nor any of
their officers, directors or employees ever has
(i) had an insurance or bonding company deny, pay
out on or revoke a fidelity bond or fiduciary
liability insurance policy; (ii) filed a bankrupt-
cy or insolvency petition (or been declared bank-
rupt) or had a trustee appointed under the Securi-
ties Investor Protection Act; or (iii) had its
registration revoked or its activities restricted;
nor is any claim, proceeding or litigation that
might lead to the foregoing presently pending;

(n)   true and complete copies of (i) the Investment Manager's Form ADV (and any existing supplements thereto), (ii) the bond obtained in accordance with Subparagraph 11(g) hereof or a certificate in lieu thereof, and (iii) the insurance policy described in Subparagraph 11(i) hereof have been delivered to the Trustees as of the effective date of this Agreement.  True and complete copies of any changes, modifications, interpretations or new, revised or replacement issuances of such documents (including, without limitation, any annual supplements to Form ADV) will be delivered to the Trustees as promptly as practicable after the adoption, execution or submission thereof;

(o)   the foregoing acknowledgments, representations, warranties and agreements are understood to be relied upon by the Trustees and shall be continuing in nature; and

(p)   it shall promptly notify the Trustees in the event that any of the foregoing acknowledgments, representations, warranties or agreements shall no longer be true.

12.   <u>REPRESENTATIONS OF THE TRUSTEES</u>.

The Trustees expressly acknowledge, represent, warrant and agree that:

(a)   the Trustees are the "named fiduciaries" of the Plan with respect to the management or disposition of Plan assets and are authorized by the Trust Agreement to appoint an investment manager to manage (including the power to acquire and dispose of) assets of the Plan;

(b)   true and complete copies of the Plan and Trust Agreement have been delivered to the Investment Manager;

(c)   the Trustees have by appropriate action duly authorized the appointment of the Investment Manager and the execution and implementation of this Agreement, which has been executed on behalf of the Trustees by a person (or persons) authorized to do so and, at the request of the Investment Manager, shall deliver such evidence of such authority as the Investment Manager shall reasonably request;

(d)   in the event the Trustees adopt any Investment Guidelines (other than those set forth in Exhibit

A) or any amendment to previously issued
Investment Guidelines, true and complete copies of
each will be delivered to the Investment Manager
as promptly as practicable after the adoption
thereof; and

(e) if another entity should be substituted as the
Custodian or sub-custodian of the Investment
Account Assets, the Investment Manager shall be
notified of such substitution and the substituted
entity will thereafter be deemed to be the Cus-
todian or sub-custodian (as the case may be) for
purposes of this Agreement.

13. AMENDMENT AND TERMINATION.

(a) This Agreement may be modified or amended by the
Trustees or the Investment Manager, at any time
and from time to time and in whole or in part, by
the mutual written agreement of the Trustees and
the Investment Manager.

(b) This Agreement shall continue in full force and
effect from the day and year first above written,
unless terminated as hereinafter provided.  Within
thirty (30) days of the termination of this Agree-
ment (in accordance with either Subparagraph 13(c)
or 13(d), hereof), the Investment Manager shall
transfer to the Trustees (or their duly authorized
representatives) all books, records, accounts,
securities (and other evidences of ownership) and
all other property of the Trustees and the Plan in
the Investment Manager's possession, along with
the documents and information set forth in
Subparagraph 6(e) hereof.  The Investment Manager
shall continue to cooperate with the Trustees to
facilitate the transition of the Investment
Account to the management of the Trustees, another
investment manager appointed by the Trustees, or
any other duly appointed representative of the
Trustees.

(c) This Agreement may be terminated at any time by
the Trustees without penalty by giving the Invest-
ment Manager written notice of such termination
date.

(d) The Investment Manager may terminate this Agree-
ment upon at least thirty (30) days prior written
notice to the Trustees of such termination date.
Notwithstanding the foregoing, in the event of
termination of this Agreement by the Investment
Manager, the Investment Manager agrees that, if
requested by the Trustees, it will continue to act

as Investment Manager until the earlier of (i) the
selection by the Trustees of its successor or (ii)
the expiration of the six (6) month period com-
mencing with the date on which this Agreement is
scheduled to terminate in accordance with the
Investment Manager's notice.

(e)    Any termination notice given by either party shall
not affect or preclude the consummation of any
transaction initiated prior to the receipt by one
party of the other's termination notice (or, if
the Investment Manager continues to act until the
selection of a successor in accordance with Sub-
paragraph 13(d), hereof, any transaction initiated
during the period in which the Investment Manager
so continues to act, in which case all of the
terms and conditions of this Agreement shall apply
to such transaction).

(f)    Any fees paid to the Investment Manager hereunder
will be prorated to the date as of which termina-
tion of this Agreement is effective, and any un-
earned portion thereof will be refunded to the
Trustees.

## 14.  NON-ASSIGNABILITY.

No assignment (including, without limitation, any
assignment as defined in the Investment Advisers Act of 1940) of
this Agreement shall be made, or purported to be made, by the
Investment Manager without the express written consent of the
Trustees.  If an assignment without the written consent of the
Trustees occurs, this Agreement shall automatically terminate as
of the date of the assignment, and the provisions of
Subparagraph 13(f), hereof, shall become operative.

## 15.  NOTICES.

Unless otherwise specified herein, all notices, in-
structions and advices with respect to security transactions (or
any other matters) contemplated by this Agreement, shall be
deemed duly given to or received by the appropriate party as of
the date on which it is personally or electronically delivered
(or, if mailed, on the third business day after the date on which
it is deposited in the United States mail, postage prepaid) if
delivered or mailed to the attention of the person at the address
set forth below:

(a)    To the Trustees:

Board of Trustees of the Trust Fund of the Local
810 Affiliated Pension Plan
10 East 15th Street

                    New York, NY 10003
                    Attn: Steven Gilman

                    With a copy to:

                    Proskauer Rose LLP
                    1585 Broadway
                    New York, NY 10036
                    Attn: Neal Schelberg, Esq.


          (b)    To the Investment Manager:

                    M&R Capital Management, Inc.
                    40 Fulton Street, 8th Floor
                    New York, NY 10038

                    Attn:      Mr. John Maloney
                               President


or to such other address or addresses as any of the parties shall
subsequently furnish to the other in writing.


## 16.    ENTIRE AGREEMENT.

          This Agreement (including any agreements incorporated
herein by reference) sets forth the entire understanding of the
parties hereto and is intended to be the complete and exclusive
statement of the terms hereof.  This Agreement may not be modi-
fied or amended except by a writing signed by the parties hereto.
 This Agreement supersedes and cancels any and all prior
agreements between the parties, whether written or oral, relating
to investment management of assets of the Trust.


## 17.    CONSTRUCTION AND SEVERABILITY.

          If, at any time subsequent to the date hereof, any
provision of this Agreement shall be held by any court of compe-
tent jurisdiction to be illegal, void or unenforceable, such
provision shall be of no force and effect, but the illegality or
unenforceability of such provision shall have no effect upon and
shall not impair the enforceability of any other provision of
this Agreement.  Anything in this Agreement, or any amendment
hereof, to the contrary notwithstanding, no provision of this
Agreement shall be construed so as to violate the applicable
provisions of the Plan, the Trust Agreement, ERISA (or any
regulations promulgated pursuant thereto), the Investment
Advisers Act of 1940 (or any rule, regulation or order of the
Securities and Exchange Commission).  In the event of any
inconsistency between this Agreement and the Trust Agreement, the
provisions of the Trust Agreement shall govern.

## 18.  TITLES.

The titles set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect, nor shall they in any way affect the substance of any provisions contained in this Agreement.

## 19.  INUREMENT.

This Agreement shall inure to the benefit of the Trustees and their successors and assigns.  The execution of this Agreement shall impose no personal liability on the Trustees and in the event of breach, non-performance or other default, the Investment Manager agrees not to seek personal judgment against the Trustees, their heirs, executors or administrators, but to look only to the assets of the Plan for satisfaction of any claim it may have against the Trustees.

## 20.  APPLICABLE LAW.

Except to the extent otherwise provided in ERISA or other applicable federal law, this Agreement shall be governed by, construed, and enforced in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in the State of New York (without giving effect to the principles thereof relating to the conflict of laws).

## 21.  SUCCESSOR LAWS.

Any references in this Agreement to a section of ERISA or the Code (or other applicable law), or to any regulations or administrative pronouncements thereunder, shall include a reference to any successor provision of ERISA or the Code (or other applicable law), or to any successor regulations or administrative pronouncements thereunder.

## 22.  RESOLUTION OF DISPUTES.

Any dispute arising under this Agreement may, at the discretion of the Fund, be resolved by arbitration of the American Arbitration Association in the City of New York.  If arbitration is selected by the Fund, the arbitrator shall be selected by the parties from a panel of persons qualified and experienced with respect to jointly-trusteed pension funds and investments on their behalf.

## 23.  COUNTERPARTS.

This Agreement may be executed in counterpart copies, each of which shall be deemed an original, but all of which shall be considered the same instrument.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.


M&R CAPITAL MANAGEMENT, INC.

By: _____

_President_
(Title)

BOARD OF TRUSTEES OF THE TRUST FUND OF THE LOCAL 810 AFFILIATED PENSION PLAN

By: _____

_____
(Title)

## EXHIBIT A

### INVESTMENT GUIDELINES

The attached constitute the initial Investment
Guidelines for the Trust Fund of the Local 810 Affiliated Pension
Plan

## EXHIBIT B

### INVESTMENT ACCOUNT ASSETS

The following list of investments or property, transferred to the management and supervision of the Investment Manager in connection with this Agreement, shall constitute the initial Investment Account Assets (referred to in Paragraph 2 of this Agreement):

## EXHIBIT C

### FEE SCHEDULE

The compensation of the Investment Manager shall be in accordance with the following schedule:

1/2% of Investment Account assets

~~1% of the first $5 million of Investment Account assets;~~
~~1/2% of the next $5 million of Investment Account assets; and~~
~~1/4% of any amounts over $10 million of Investment Account~~
~~assets.~~

Fees to be billed quarterly in arrears

The Investment Manager expressly acknowledges, represents, warrants and agrees that: (a) the fee schedule set forth above will not result in payment by the Trust of fees exceeding those that would be payable for management of assets approximately equal in value to the Investment Accounts by any of the Investment Manager's other clients for whom it provides the same or similar services and (b) in the event the Investment Manager (i) has already entered, or (ii) in the future enters into an agreement with another client to provide the same or similar services pursuant to a fee schedule that would produce a lower fee for investing assets approximately equal in value to the Investment Account, said fee schedule shall automatically apply to this Agreement and shall supersede the fee schedule set forth above.

# EXHIBIT D

DISCRETIONARY INVESTMENT MANAGEMENT AGREEMENT

By and Between

THE BOARD OF TRUSTEES

Of The

UNITED WIRE, METAL AND MACHINE PENSION FUND

And

PRUDENTIAL SECURITIES

Discretionary Investment Management Agreement by and between the United Wire, Metal and Machine Pension Fund and Prudential Securities

## TABLE OF CONTENTS

Paragraph:                                                                Page:

Field result goes here  APPOINTMENT.     1
Field result goes here   INVESTMENT ACCOUNT ASSETS.     2
Field result goes here   DUTIES AND POWERS OF INVESTMENT MANAGER.     3
4.    STANDARD OF CARE.     10
5.    PROCEDURES. 10
6.    REPORTS; MEETINGS; ACCOUNTING.     11
7.    CONFIDENTIAL RELATIONSHIP.     12
8.    SERVICES TO OTHER CLIENTS.     12
9.    FEES.    13
10.    VALUATION.    13
11.    REPRESENTATIONS OF INVESTMENT MANAGER.    15
12.    REPRESENTATIONS OF THE TRUSTEES.     17
13.    AMENDMENT AND TERMINATION.     18
14.    NON-ASSIGNABILITY.    19
15.    NOTICES.    19
16.    ENTIRE AGREEMENT.    20
17.    CONSTRUCTION AND SEVERABILITY. 21
18.    TITLES.    21
19.    INUREMENT.    21
20.    APPLICABLE LAW. 21
21.    SUCCESSOR LAWS.     22
22.    COUNTERPARTS.  22
SCHEDULE A     23

(ii)

## DISCRETIONARY INVESTMENT MANAGEMENT AGREEMENT

INVESTMENT MANAGEMENT AGREEMENT (the "Agreement"), effective as of the 1st day of July, 2003, by and between Prudential Securities, 405 Lexington Avenue, 3rd Floor, New York, New York 10174 (referred to hereinafter as the "Investment Manager"), and the BOARD OF TRUSTEES OF THE UNITED WIRE, METAL AND MACHINE PENSION FUND, 10 East 15th Street New York, New York 10003 (collectively, the "Trustees").

### W I T N E S S E T H:

WHEREAS, the Trustees desire to retain the Investment Manager to maintain under investment supervision and management certain assets (the "Investment Account Assets") of the trust (the "Trust") established pursuant to an Agreement and Declaration of Trust Amending and Restating the United Wire, Metal and Machine Pension Fund, as amended and restated effective January 1, 1995, and as from time to time thereafter amended (the "Trust Agreement"), establishing the United Wire, Metal and Machine Pension Plan, as amended from time to time (the "Plan"), which assets are to be deposited with, Fleet National Bank, 1185 Avenue of the Americas, 24th Floor, New York, New York, 10036, as custodial agent (the "Custodian"), or such other custodian or subcustodians, as may be designated by the Trustees or the Custodian, in accordance with the terms and conditions hereinafter set forth and the Investment Manager desires to accept such retention in accordance with such terms and conditions.

NOW, THEREFORE, in consideration of the premises and mutual promises contained in this Agreement, and other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. APPOINTMENT.Field result goes here  APPOINTMENT.

      (a)    Pursuant to the authority granted under Article VIII, Section 8.1 of the Trust Agreement, and Section 402(c)(3) of the Employee Retirement Income Security Act of 1974, as from time to time amended ("ERISA"), the Trustees hereby appoint the Investment Manager effective on the date of this Agreement to have full discretion and authority to manage, invest and reinvest the Investment Account Assets (as that term is defined in Subparagraph 2(a), hereof).

(b)     As a result of this appointment, the Trustees shall not be liable for any acts or omissions of the Investment Manager or be under any obligation to invest or otherwise manage the Investment Account Assets.

(c)     The Investment Manager hereby accepts this appointment and agrees to provide such advice and to supervise and direct the investment of the Investment Account Assets in accordance with and subject to: (i) any written investment guidelines or directions, which from time to time may (but need not) be promulgated by the Trustees and delivered to the Investment Manager, expressing the investment objectives, restrictions and policies of the Trustees, to which the Investment Manager does not object in writing within ten (10) days of its receipt thereof (the "Investment Guidelines"); provided, however, that the issuance of any Investment Guidelines or other directions to the Investment Manager shall not in any manner be construed as an acceptance by the Trustees of any investment management or supervisory responsibility with respect to the Investment Account by the Trustees (and the Trustees shall not, as a result of issuing Investment Guidelines or other directions, be liable for any acts or omissions of the Investment Manager with respect to any Investment Account Assets); (ii) compliance with ERISA and other applicable law; and (iii) the current funding policy and method that have been established to carry out the objectives of the Trust and Plan.

2.     INVESTMENT ACCOUNT ASSETS.Field result goes here          INVESTM

(a)     The Investment Account Assets shall initially consist of the cash, certificates of deposit, stocks and all other forms of bonds, securities, funds and other investments or property of any nature whatever of the Trust listed or otherwise identified on Schedule A (attached hereto and made a part hereof), plus all investments, re-investments and proceeds of the sale thereof, including (without limitation) all dividends, interest and earnings on investments, and all appreciation thereof and additions thereto (the "Investment Account"). The Trustees will give the Investment Manager reasonable prior notice of any additions they make to, or any withdrawals they make from, the Investment Account. Such notice shall be given in writing prior to or as soon as practicable after the making of such additions or withdrawals. The Investment Account shall consist of assets of an employee benefit plan subject to Part 4 of Title I of ERISA.

(b)     The Investment Account Assets shall remain a part of, and subject to, the terms and conditions of the Trust Agreement and the Plan, and shall be held at all times exclusively for the purposes for which the Trust and Plan were established. All advisory and management powers, duties and responsibilities shall be exercised exclusively by, and circumscribed by,

2

the Investment Manager pursuant to the provisions of the Trust Agreement relating to such powers, duties and responsibilities, and which are incorporated herein by reference (as if fully set forth herein).

3.   DUTIES AND POWERS OF INVESTMENT MANAGER Field result goes here        DUTIES AND POWERS OF INVESTMENT MANAGER.

During the term of its appointment, the Investment Manager shall, subject to its fiduciary obligations referred to in Paragraph 4, hereof, ERISA, and other applicable law, and in a manner consistent with the objectives, restrictions and other policies of the Trustees which may be expressed in any Investment Guidelines delivered to the Investment Manager by the Trustees (pursuant to Subparagraph 1(c)(i), hereof):

(a)   have the power and obligation to manage the securities, funds and other property which constitute the Investment Account Assets in its sole and absolute discretion;

(b)   provide investment advice and recommendations with respect to the Investment Account Assets;

(c)   establish and implement an ongoing investment program and provide continuous investment advice, with respect to the Investment Account Assets, seeking the highest rate of total investment return consistent with the preservation of principal and consistent with the applicable Investment Guidelines, if any; and

(d)   have the following additional duties and powers:

(i)   The Investment Manager shall have complete discretion in the investment and reinvestment of the Investment Account Assets, without distinction between principal and income, in such property and securities, with full power and authority to effect (or to authorize, direct and supervise the Custodian, or a broker-dealer selected by the Investment Manager, to effect) such purchases, sales, exchanges, conversions, and otherwise trade in any and all:

(2)   certificates of deposit of banks and bankers' acceptances;

(3)   commercial paper;

3

       (4)     with the written consent of the Trustees (which consent may be given pursuant to any Investment Guidelines delivered to the Investment Manager by the Trustees), evidences of indebtedness of foreign governments or any instrumentalities thereof (including, without limitation, foreign currencies), corporations or other enterprises and evidences of ownership in foreign corporations or other enterprises (all subject to the provisions of Subparagraph 11(i), hereof); and

       (5)     with the written consent of the Trustees (which consent may be given pursuant to any Investment Guideline delivered to the Investment Manager by the Trustees), such other securities, property or interests therein as the Investment Manager may deem prudent and appropriate.

  (ii)     The Investment Manager may invest a portion of the Investment Account Assets in any common, collective, commingled or group trust fund qualified under Section 401 of the Internal Revenue Code of 1986, as amended (the "Code") and exempt from federal income taxation under Section 501 of the Code ("collective trust"), including without limitation the use of "money market" (or other short-term investment) funds and may maintain any cash or cash balances in such collective trust (including, to the extent permitted by ERISA, a collective trust maintained for this purpose by the Custodian, or any affiliate thereof); provided that the use of such investment shall be permissible only if, the securities held within such funds meet the general quality constraints set forth in subparagraphs 3(d)(i) and 3(e) of the Agreement and any Investment Guidelines promulgated by the Trustees in accordance with subparagraph 1(c)(i) of the Agreement and, in the Investment Manager's opinion, such use is prudent.

  (iii)  The Investment Manager shall periodically appraise and review the securities, funds and other property that constitute the Investment Account Assets, including any additional funds deposited to the Investment Account from time to time and the income from such securities, funds and other property. The Investment Manager shall collect information pertaining to investments, securities, the economy, and other matters pertinent to making the determinations required of it herein. Such review shall be conducted to determine, in the Investment Manager's sole discretion based on the information available to it (including any information or advice

given to it by the Trustees pursuant to any Investment Guidelines), the advisability of:

(1)    retaining some or all of such securities, funds and other property constituting the Investment Account;

(2)    selling, exchanging, redeeming, liquidating or disposing of some or all of the Investment Account Assets;

(3)    investing some or all of the proceeds from such sale, exchange, redemption, liquidation or disposition in other securities, funds or property;

(4)    investing some or all of the Investment Account Assets in other securities or property; or

(5)    taking such other action or actions as the Investment Manager shall consider prudent under the circumstances.

(6)    The Investment Manager is authorized to invest and reinvest all or a portion of the Investment Account Assets in shares of any open-ended investment fund or company, including but not limited to, any such fund or company which is managed by an affiliate of the Investment Manager. The Trustees acknowledges the receipt of a prospectus describing the investment portfolios established pursuant to a Declaration of Trust under the name "Galaxy Fund" (the Galaxy "Funds"). Based upon this prospectus, the Trustees consent to the investment of Investment Account Assets in the Galaxy Funds under those circumstances under which the Bank would otherwise, in the exercise of its discretion under this Agreement (including the investment objectives which the Trustees have established for the Investment Account Assets), invest Investment Account Assets in investments similar or comparable to those represented by the Galaxy Funds. The Trustees may revoke this consent by written notice to the Investment Manager. The Trustees understand that the Galaxy Funds are advised by Wachovia Investment Advisors, Inc., an affiliate of the Investment Manager, which receives a management fee therefore as disclosed in the prospectus. Where the Investment Manager has investment authority and responsibility, either a) the Investment Account Assets' pro rata share of any

investment advisory fees paid to Wachovia Investment advisors, Inc. by the Galaxy Funds shall be rebated to the Investment Account Assets, or b) the fees paid by the Investment Account Assets to the Investment Manager shall be reduced by an amount equal to any investment advisory fees which have been paid by the Investment Account by virtue of its participation in the Galaxy Funds.

(iv)    The Investment Manager shall have complete discretion and authority in the selection of broker-dealers to effectuate acquisitions or dispositions of Investment Account Assets, and the terms and conditions on which such acquisitions or dispositions shall be made, except as otherwise instructed by the Trustees. Where the Investment Manager places orders for the execution of portfolio transactions for the Investment Account, the Investment Manager may allocate such transactions to such broker-dealers (including the Investment Manager itself or an affiliate of the Investment Manager; for execution on such markets, at such prices and at such commission rates as in the good faith judgment of the Investment Manager is prudent; provided such execution is consistent with this Agreement, any applicable securities laws, ERISA and other rules and regulations thereunder.

(v)    In the selection of broker-dealers with whom to place orders for the purchase or sale of securities for the Investment Account, the primary objective of the Investment Manager shall be to obtain the best execution of the brokerage transaction for the Investment Account. In making such selection, the Investment Manager may take into account such relevant factors as:

(1)    price and/or commission, provided however, that such price or commission is determined by the Investment Manager to be reasonable in relation to the value of the brokerage services being provided to the Investment Account;

(2)    the broker-dealer's facilities, reliability and financial responsibility;

(3)    the ability of the broker-dealer to effectuate securities transactions, particularly with respect to such aspects as timing, order size, execution of orders and the ability to complete a transaction through clearance, settlement and delivery; and

(4)    the research and other services provided by such broker-dealer to the Investment Manager which are expected to enhance the management capabilities of the Investment Manager generally.

The Investment Manager's selection of such broker-dealers shall be in accordance with ERISA, the Investment Advisers Act of 1940 and any applicable securities laws, rules and regulations. If the Investment Manager itself (or its affiliate) is used as a broker-dealer, the execution of all such securities transactions must be in compliance with ERISA (including, without limitation, United States Department of Labor Prohibited Transaction Class Exemption 86-128), such transactions must be at a rate that is reasonable and does not exceed the rate that the broker-dealer charges comparable accounts for the effectuation of comparable transactions, and such transactions shall not be excessive, under the circumstances, in either amount or frequency.

(vi)    When the Investment Manager places orders directly with brokers, dealers or other persons to purchase, acquire, sell, exchange, redeem, liquidate or dispose of any Investment Account Assets, the Investment Manager shall instruct the broker-dealer or other appropriate party to promptly furnish the Custodian with confirmations or other records of all transactions, and with monthly statements of the Investment Account valued at fair market value (in accordance with Paragraph 10, hereof).

(vii)    The Investment Manager is authorized and empowered to, and shall exercise (as it deems prudent and solely in the interest of Plan participants and beneficiaries), any conversion privilege or subscription right, and any other right to make an investment decision with respect to the Investment Account Assets (including, without limitation, the voting of proxies and exercise of all other rights of shareholders appurtenant to Investment Account Assets) as from time to time the Investment Manager in its discretion deems prudent. The Investment Manager shall issue to the Plan and to the Plan's counsel a set of policy guidelines explaining the Investment Manager's positions and likely voting pattern pertaining to proxies. The Investment Manager shall also issue a report to the Trustees, at least annually, indicating the proxies that were voted on the Trusts behalf, all securities held under the Investment Account Assets, and an explanation as to why they were voted in such manner. Such reports shall also reflect decisions made and actions taken by the Investment Manager with

7

regard to the voting of proxies appurtenant to Investment Account
Assets in sufficient detail to enable the trustees to monitor the
activities of the Investment Manager in accordance with Section
404(a)(1)(B) of ERISA, including, without limitation, a detailed
description of (i) how proxies were voted and the reason(s)
therefor, and (ii) all proxies not voted and the reason(s) therefor in
accordance with this Section. The Investment Manager shall give
the Custodian (as appropriate) such instructions or directions as
may be necessary, and thereupon execute and complete all such
certificates, proxies, consents and other documents necessary or
appropriate to effectuate the powers of the Investment Manager
under this Agreement. However, no person other than the
Investment Manager may make a decision with respect to the
voting of proxies appurtenant to Investment Account Assets.

(viii)  The Investment Manager shall have the power to make, execute,
acknowledge and deliver any and all documents of transfer and
conveyance and any and all other documents or instruments that
may be necessary or appropriate to carry out the powers granted to
it under this Agreement.

(ix)  The Investment Manager shall have the power to compromise or
settle any claim, debt or obligation due to the Trust where
immediate action is necessary to prevent a loss to the Investment
Account Assets.

(x)  The Investment Manager shall from time to time certify to the
Trustees and the Custodian the name or names of the person or
persons authorized to act on the Investment Manager's behalf here-
under, if any, and shall furnish the Trustees and the Custodian with
a specimen of their signatures. Any individual so certified shall be
deemed to be the Investment Manager's authorized representative.
When any individual so certified shall cease to have authority to
act on its behalf, the Investment Manager shall promptly give
written notice of that fact to the Trustees and the Custodian.
However, until such notice is received by the Trustees and the
Custodian (pursuant to the procedures set forth in Paragraph 15,
hereof), the Trustees and the Custodian may continue to treat such
person as an authorized representative of the Investment Manager.

(xi)  The Trustees shall from time to time certify to the Investment
Manager the name or names of the person or persons authorized to
act on the Trustees' behalf hereunder, if any, and shall furnish the
Investment Manager with a specimen of their signatures. Any

8

individual so certified shall be deemed to be the Trustees' authorized representative. When any individual so certified shall cease to have authority to act on the Trustees' behalf, the Trustees shall promptly give written notice of that fact to the Investment Manager. However, until such notice is received by the Investment Manager (pursuant to the procedures set forth in Paragraph 15, hereof), the Investment Manager may continue to treat such person as an authorized representative of the Trustees.

(xii) The Investment Manager shall have power to:

(1) exercise any option, conversion or subscription rights appurtenant to any securities or other property of the Investment Account, or to sell any such rights;

(2) join in, dissent from, and oppose the reorganization, consolidation, recapitalization, liquidation, merger, sale, mortgage, pledge or lease of any securities or other property in which the Investment Account may have an interest;

(3) deposit any securities or other property of the Investment Account with any protective, reorganization or similar committee, and to pay or agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to any securities or other property so deposited; and

(4) exercise all other ancillary rights or duties in connection with the Investment Account necessary to implement any of the powers contained herein.

(e) To the extent not inconsistent with any Investment Guidelines delivered to the Investment Manager (pursuant to Subparagraph 1(c)(i), hereof), the Investment Manager shall observe the following guidelines in purchasing securities or other obligations for the Investment Account:

(1) Securities of any single issuer shall represent no more than five (5%) percent of the aggregate fair market value of the Investment Account, and equities of a single issuer held in the Investment Account shall not exceed five (5%) percent of the issuer's total out-standing equity;

In the event that any Investment Guideline is inconsistent with any guideline set forth in this subparagraph 3(e) the Investment Guidelines shall be controlling.

4.      STANDARD OF CARE. 4.    STANDARD OF CARE.

(a)    The Investment Manager shall perform its duties hereunder with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and in such manner as to comply with Section 404(a)(1)(B) of ERISA and any regulations promulgated pursuant thereto.

(b)    The Investment Manager shall diversify the Investment Account Assets so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and in such manner as shall comply with the requirements of Section 404(a)(1)(C) of ERISA and any regulations promulgated pursuant thereto; provided, however, that the Investment Manager shall have no responsibility for the overall diversification of assets of the Fund that are not subject to the Investment Manager's supervision under this Agreement.

(c)    The Investment Manager shall discharge its duties hereunder with respect to the Investment Account solely in the interest of, and for the exclusive purpose of providing benefits for, the participants in the Plan and their beneficiaries, in accordance with the Plan and Trust Agreement (and other documents and instruments governing the Plan), any Investment Guidelines, ERISA and other applicable law.

(d)    The Investment Manager shall not effect any investment transaction that directly or indirectly shall cause the Plan, or any fiduciary thereof (including the Investment Manager, or any affiliate thereof), to violate Sections 406 through 408 of ERISA, or Section 4975(c) of the Code.

5.      PROCEDURES. 5.    PROCEDURES.

All transactions in the Investment Account authorized by this Agreement shall be consummated by payment to, or delivery by, the Custodian, or such other sub-custodian as may be designated pursuant to Subparagraph 2(b), hereof, of all funds, securities, or other property due to or from the Investment Account. Instructions of the Investment Manager to the Custodian, or such other sub-custodian, shall be made in writing, sent by first-class mail, or at the option of the Investment Manager, orally and confirmed in writing (or, where appropriate and prudent,

by such other means of confirmation as may be approved, from time to time, by the New York Stock Exchange) as soon as practicable thereafter, and the Investment Manager shall instruct all brokers or dealers executing orders on behalf of the Investment Account to forward to the Trustees and the Custodian, or such other sub-custodian, copies of all brokerage confirmations promptly after execution of transactions.

6.    REPORTS; MEETINGS; ACCOUNTING.6.    REPORTS; MEETINGS; ACCOUNTING.

(a)    The Investment Manager shall provide the Trustees with quarterly reports concerning the status of the Investment Account. However, at the request of the Trustees, the Investment Manager shall provide such reports more often and shall also provide such other information in connection with the Investment Account as the Trustees may reasonably request from time to time.

(b)    The reports required by Subparagraph 6(a), hereof, shall include (but shall not necessarily be limited to) a detailed description of each Investment Account Asset, setting forth both its fair market value and book value (as determined pursuant to Paragraph 10, hereof) as of the date of the report. Where the Trustees have permitted the Investment Manager to invest in, and the Investment Account Assets consist of, a security or interest in a security that is not regularly traded on a national securities exchange or over-the-counter and reported on NASDAQ, the report also shall include a detailed description of the financial condition of the issuer of such security (including applicable financial statements).

(c)    Representatives of the Investment Manager shall meet with the Trustees at such times as the Trustees may reasonably request.

(d)    The Trustees shall instruct the Custodian to provide the Investment Manager with periodic reports concerning the status of the Investment Account.

(e)    The Investment Manager shall keep accurate and detailed accounts of all investments, receipts, disbursements, and other transactions relating to the Investment Account hereunder, and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times by any person designated by the Trustees. On at least a quarterly basis, and within thirty (30) days after the effective date of the removal or resignation of the Investment Manager (as provided respectively in Subparagraphs 13(c) and (d), hereof), the Investment Manager shall file with and deliver to the Trustees a written account setting forth all

11

investments, receipts, disbursements, and other transactions effected by it in connection with the Investment Account (including, without limitation, the information required by Subparagraph 6(b), hereof), and certifying as to the accuracy of the information set forth therein. Such account may incorporate by reference any and all schedules and other statements setting forth investments, receipts, disbursements, and other transactions effected during the period for which such account is rendered and which the Investment Manager has furnished to the Trustees prior to the filing of such account. The Investment Manager shall furnish the Trustees such financial statements, and other information, as the Trustees may reasonably request from time to time with respect to the assets held under the Investment Account.

7.    CONFIDENTIAL RELATIONSHIP.7.    CONFIDENTIAL RELATIONSHIP.

(a)    All information and recommendations furnished by the Investment Manager to the Trustees shall be regarded as confidential by the Trustees. The Investment Manager shall regard as confidential all information concerning the affairs of the Plan and Trust not otherwise made public by the Trustees.

(b)    Provided that the Investment Manager promptly provides prior notice to the Trustees (except where such prior notice is prohibited by law), it may disclose confidential information with respect to the Investment Account, the Investment Account Assets, the Plan or the Trust if required by law, regulation or other binding authority, including (without limitation) requirements under ERISA, the Securities and Exchange Act of 1934 and the Investment Advisers Act of 1940. In the event that the Investment Manager is requested (by oral questions, interrogatories, subpoena duces tecum or similar process) to disclose any confidential information, the Investment Manager shall provide the Trustees with prompt notice of such request. In the event that the Investment Manager discloses confidential information in accordance with this subparagraph 7(b) without prior notice to the Trustees (because such disclosure is required by law and prior notification thereof to the Trustees is prohibited by law), the Investment Manager shall notify the Trustees concerning such disclosure as soon as practicable and permissible by law.

8.    SERVICES TO OTHER CLIENTS.8.    SERVICES TO OTHER CLIENTS.

12

(a)    It is understood that the Investment Manager performs investment advisory services for various clients. The Trustees agree that the Investment Manager may give advice and take action with respect to any of its other clients which may differ from action taken with respect to the Investment Account, or the timing or nature of action taken with respect to the Investment Account, provided that it continues to be the policy and practice of the Investment Manager not to favor or disfavor consistently or consciously any client or class of clients in the allocation of investment opportunities that the Investment Manager believes would be suitable for such client or class of clients, so that, to the extent practical, such opportunities will be allocated among clients over a period of time on a fair and equitable basis and in conformity with this Agreement and ERISA.

(b)    Nothing in this Agreement shall impose upon the Investment Manager any obligation to purchase or sell, or to recommend for purchase or sale, for the Investment Account any security which the Investment Manager, its principals, affiliates or employees, may purchase or sell for its or their own accounts or for the account of any other client, if in the reasonable opinion of the Investment Manager such investment would be unsuitable for the Investment Account or if the Investment Manager determines in the best interest of the Investment Account it would be impractical or undesirable.

9.    FEES.9.    FEES.

The compensation of the Investment Manager for its services rendered hereunder shall be calculated and payable quarterly in arrears based on the fair market value of the Investment Account Assets (as determined pursuant to Paragraph 10, hereof) as of the close of business on the last day of the immediately preceding quarter. The annual rate shall be fifty (50) basis points on the first five (5) million dollars of Investment Account Assets, forty (40) basis points on the value of Investment Account on the next five (5) million dollars up to ten (10) million dollars and thirty (30) basis points on the value of Investment Account above ten (10) million. All quarterly payments shall be at one-quarter of the annual rate, and shall constitute the sole compensation due and owing by the Trustees to any person by reason of the Investment Manager's services under this Agreement.

10.    VALUATION.10.    VALUATION.

For all purposes of this Agreement, including without limitation the computation of the Investment Manager's compensation hereunder and any accounting as hereinabove provided, the fair market value of the Investment Account Assets on any date shall be computed as follows:

13

(a)     as to debt obligations or other securities of (or guaranteed as to principal and interest by) the United States of America or any State (or any agencies or instrumentalities thereof), the bid and asked prices or which are published on a regular basis in The Wall Street Journal or The New York Times (or such other publication or reporting service selected by the Investment Manager in good faith to best reflect the fair market value of such debt obligations or other securities), the bid price for such debt obligations or other securities so published (or reported) on, or most recently prior to, such date;

(b)     as to debt obligations or other securities of (or guaranteed as to principal and interest by) the United States of America or any State (or any agencies or instrumentalities thereof), the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times (or such other publication or reporting service selected by the Investment Manager in good faith to best reflect the fair market value of such debt obligations or other securities), the average bid price on such date for such debt obligations or other securities as reported by any two of the recognized dealers at the time making a market in such debt obligations or other securities;

(c)     as to all other debt obligations and common or preferred stock traded on a national securities exchange, the last sale price on such date on the principal national securities exchange on which such securities are traded or, if there has not been any sale on such date, the closing bid quotation on such exchange on such date;

(d)     as to all other debt obligations and common or preferred stock which are traded over-the-counter and reported on NASDAQ, the closing bid quotation on such date as reported by NASDAQ;

(e)     as to all other debt obligations and common or preferred stock neither traded on a national securities exchange nor quoted by NASDAQ, the average of the bid prices on such date for such securities as quoted by any two recognized dealers at the time making a market in such securities; and

Any Investment Account Asset, that (i) the Investment Manager determines in good faith is impractical to value under the foregoing principles based on its normal practice for valuing client assets, or (ii) cannot be valued in accordance with the foregoing principles, shall be valued in such commercially reasonable manner as determined with prudence and in good faith by the Investment Manager to reflect its fair market value, based upon values supplied by a nationally recognized pricing or quotation service, or quotations furnished by one or more reputable and generally recognized sources (such as securities brokers, dealers or investment

14

bankers, values of comparable property, appraisals and similar commercially acceptable sources).

11.    REPRESENTATIONS OF INVESTMENT MANAGER.11.
          REPRESENTATIONS OF INVESTMENT MANAGER.

The Investment Manager expressly acknowledges, represents, warrants and agrees that:

it is an "investment manager" (as that term is defined in Section 3(38) of ERISA) of the Trust with respect to the assets of the Trust at any time constituting the Investment Account, and it will maintain that status as long as this Agreement shall remain in effect;

(b)    it is a "fiduciary" (as that term is defined in Section 3(21)(A) of ERISA) of the Trust with respect to the Plan and the assets of the Trust at any time constituting the Investment Account, and it is not subject to any of the disqualifications described in Section 411 of ERISA;

(c)    it has completed, obtained or performed (and, when required, will complete, obtain or perform) all registrations, filings, approvals, authorizations, consents or examinations required by ERISA or other applicable law (or any government or governmental authority) for the performance of the acts contemplated by this Agreement and, during the term of this Agreement, it shall comply with all existing, new or amended statutes of the United States (and any other government or governmental authority) having jurisdiction over its activities which are applicable to its performance under this Agreement;

(d)    it has, by appropriate action, duly authorized the execution and implementation of this Agreement; such authorization or execution does not violate any obligation by which the Investment Manager is bound or any applicable law; and this Agreement has been executed on behalf of the Investment Manager by a person (or persons) authorized to transact business on behalf of the Investment Manager and shall be binding upon the Investment Manager in accordance with its terms;

(e)    the personnel of the Investment Manager who will be responsible for carrying out the terms of this Agreement are individuals experienced in the making of investments of the nature contemplated by this Agreement and, unless the Investment Manager is exempt under ERISA, a bond has been obtained, in accordance with and in an amount not less than the amount required by Section 412 of ERISA, which provides the Trust protection against fraud or dishonesty (either directly or through conniv-

15

ance with others) on the part of the Investment Manager, its officers, directors, employees and agents;

(f)    it shall defend and hold the Trustees harmless from, and indemnify the Trustees against, any and all liability, loss, damages, court costs or reasonable expenses (including reasonable attorneys' fees and court costs) which the Trustees may incur or suffer as a result of any breach by the Investment Manager of (i) its fiduciary responsibilities under ERISA (including, without limitation, those set forth in Paragraph 4 of this Agreement) with respect to the assets of the Plan at any time constituting the Investment Account; or (ii) any other provision of this Agreement (including, without limitation, the provisions of this Paragraph 11);

(g)    there currently exists in full force and effect an insurance policy protecting the Investment Manager (and its officers, directors and employees) against liability or loss for a breach of fiduciary responsibility, and the coverage limitations of such policy equal or exceed FIVE MILLION ($5,000,000) DOLLARS; and the Investment Manager warrants that such insurance policy shall be maintained at all times while this Agreement is in effect;

(h)    where the Trustees have permitted the Investment Manager to invest in, and the Investment Account assets consist of, foreign securities, the Investment Manager shall comply with all requirements of Section 404(b) of ERISA and any regulations promulgated pursuant thereto (including, without limitation, 29 C.F.R. § 2550.404b-1) in the event that it invests or reinvests any portion of the Investment Account Assets in (1) securities of a corporation, company or other entity or person which is not organized under the laws of the United States or a State, or the principal trading market for which is outside the jurisdiction of the district courts of the United States; (2) securities issued by a government other than the government of the United States or of a State (or any political subdivision, agency or instrumentality of such a government); or (3) currency issued by a government other than the government of the United States;

(i)    it shall promptly advise the Trustees in the event of any material change in control of the Investment Manager or in the individuals employed by the Investment Manager in charge of investing the Investment Account Assets;

(j)    except as disclosed in writing to the Trustees, neither the Investment Manager, any of its subsidiaries, divisions or other affiliates, nor any of their officers, directors or employees, ever has been (i) convicted of or pleaded guilty (or nolo contendere) to a felony or misdemeanor involving (1) an investment or investment-related business, (2) fraud, false

16

statements or omissions, or (3) the wrongful taking of property, bribery, forgery, counterfeiting or extortion; (ii) found by a court to be in violation of any federal or state investment (or investment-related) statutes or regulations; (iii) found by the U.S. Securities and Exchange Commission, or any other federal or state regulatory agency or self-regulating organization, to have (1) made a false statement or omission, (2) been involved in a violation of its regulations or statutes, or (3) been a cause of an investment-related business having its authorization to do business denied, suspended, revoked or restricted;

(k) except as disclosed in writing to the Trustees, neither the Investment Manager, any of its subsidiaries, divisions or other affiliates, nor any of their officers, directors or employees ever has (i) had an insurance or bonding company deny, pay out on or revoke a fidelity bond or fiduciary liability insurance policy; (ii) filed a bankruptcy or insolvency petition (or been declared bankrupt) or had a trustee appointed under the Securities Investor Protection Act; or (iii) had its registration revoked or its activities restricted;

(l) true and complete copies of (i) the Investment Manager's statement of policy and procedures for the voting of proxies (if any such written statement exists), the fidelity bond described in paragraph 11(e) hereof, and (ii) the insurance policy described in paragraph 11(g) hereof have been delivered to the Trustees as of the effective date of this Agreement. True and complete copies of any changes, modifications, interpretations or new, revised or replacement issuances of such documents will be delivered to the Trustees as promptly as practicable after the adoption, execution or submission thereof;

(m) the foregoing acknowledgments, representations, warranties and agreements are understood to be relied upon by the Trustees and shall be continuing in nature; and

(n) it shall promptly notify the Trustees in the event that any of the foregoing acknowledgments, representations, warranties or agreements shall no longer be true.

12.     REPRESENTATIONS OF THE TRUSTEES.12.
        REPRESENTATIONS OF THE TRUSTEES.

The Trustees expressly acknowledge, represent, warrant and agree that:

17

(a)     the Trustees are the "named fiduciaries" of the Plan with respect to the management or disposition of Plan assets and are authorized by the Trust Agreement to appoint an investment manager to manage (including the power to acquire and dispose of) assets of the Plan;

(b)     true and complete copies of the Plan and Trust Agreement have been delivered to the Investment Manager;

(c)     the Trustees have by appropriate action duly authorized the appointment of the Investment Manager and the execution and implementation of this Agreement, which has been executed on behalf of the Trustees by a person (or persons) authorized to do so and, at the request of the Investment Manager, shall deliver such evidence of such authority as the Investment Manager shall reasonably request;

(d)     if Investment Guidelines are delivered to the Investment Manager by the Trustees (in accordance with Subparagraph 1(c)(i), hereof), true and complete copies of each amendment to the Investment Guidelines will be delivered to the Investment Manager as promptly as practicable after the adoption thereof; and

(e)     if another entity should be substituted as the Custodian of the Investment Account Assets, the Investment Manager shall be notified of such substitution and the substituted entity will thereafter be deemed to be the Custodian for purposes of this Agreement.

13.     AMENDMENT AND TERMINATION. 13. AMENDMENT AND TERMINATION.

(a)     This Agreement may be modified or amended by the Trustees or the Investment Manager, at any time and from time to time and in whole or in part, by the mutual written agreement of the Trustees and the Investment Manager.

(b)     This Agreement shall continue in full force and effect from the day and year first above written, unless terminated as hereinafter provided. Within thirty (30) days of the termination of this Agreement (in accordance with either Paragraph 13(c) or 13(d), hereof), the Investment Manager shall transfer to the Trustees (or their duly authorized representatives) all books, records, accounts, securities (and other evidences of ownership) and all other property of the Trustees and the Plan in the Investment Manager's possession, along with the documents and information required by Paragraph 6(e), hereof. The Investment Manager shall continue to cooperate

18

with the Trustees to facilitate the transition of the Investment Account to the management of the Trustees, another investment manager appointed by the Trustees, or any other duly appointed representative of the Trustees.

(c)     This Agreement may be terminated at any time by the Trustees without penalty by giving the Investment Manager prior written notice of such termination date.

(d)     The Investment Manager may terminate this Agreement upon at least thirty (30) days prior written notice to the Trustees of such termination date. Notwithstanding the foregoing, in the event of termination of this Agreement by the Investment Manager, the Investment Manager agrees that, if requested by the Trustees, it will continue to act as Investment Manager until the earlier of the selection by the Trustees of its successor or the expiration of the three (3) month period commencing with the date on which this Agreement is scheduled to terminate in accordance with the Investment Manager's notice.

(e)     Any termination notice given by either party shall not affect or preclude the consummation of any transaction initiated prior to the receipt by one party of the other's termination notice (or, if the Investment Manager continues to act until the selection of a successor in accordance with Subparagraph 13(d), hereof, any transaction initiated during the period during which the Investment Manager so continues to act, in which case all of the terms and conditions of this Agreement shall apply to such transaction).

(f)     Any fees paid to the Investment Manager hereunder will be prorated to the date as of which termination of this Agreement is effective, and any unearned portion thereof will be refunded to the Trustees.


14.     NON-ASSIGNABILITY.14. NON-ASSIGNABILITY.

No assignment (including, without limitation, any assignment as defined in the Investment Advisers Act of 1940) of this Agreement shall be made, or purported to be made, by the Investment Manager without the express written consent of the Trustees. If an assignment without the written consent of the Trustees occurs, this Agreement shall automatically terminate as of the date of the assignment, and the provisions of Subparagraph 13(f), hereof, shall become operative.


15.     NOTICES.15. NOTICES.

19

Unless otherwise specified herein, all notices, instructions and advices with respect to security transactions (or any other matters) contemplated by this Agreement, shall be deemed duly given to or received by the appropriate party as of the date on which it is personally or electronically delivered (or, if mailed, on the third business day after the date on which it is deposited in the United States mail, postage prepaid) if delivered or mailed to the attention of the person at the address set forth below:

(a)    To the Trustees:

Board of Trustees
United Wire, Metal and Machine Pension Fund
10 East 15th Street
New York, New York 10003

Attn:  Mr. Steven Gilman
         Administrator

(b)    To the Custodian:

Prudential Securities, N.A.,
1185 Avenue of the Americas
24th Floor
New York, New York, 10036

Attn: Francine Asselta

(c)    To the Investment Manager:

Prudential Securities
405 Lexington Avenue
3rd Floor
New York, N.Y. 10174

Attn: Joseph Del Vecchio

or to such other address or addresses as any of the parties shall subsequently furnish to the other in writing.

16.    ENTIRE AGREEMENT. 16.  ENTIRE AGREEMENT.

20

This Agreement (including any agreements incorporated herein by reference) sets forth the entire understanding of the parties hereto and is intended to be the complete and exclusive statement of the terms hereof. This Agreement may not be modified or amended except by a writing signed by the parties hereto. This Agreement supersedes and cancels any and all prior agreements between the parties, whether written or oral, relating to investment management of assets of the Trust.

17.    CONSTRUCTION AND SEVERABILITY.17.    CONSTRUCTION AND SEVERABILITY.

If, at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement. Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the applicable provisions of the Plan, Trust Agreement, ERISA (or any regulations promulgated pursuant thereto), the Investment Advisers Act of 1940 (or any rule, regulation or order of the Securities and Exchange Commission). In the event of any inconsistency between this Agreement and the Trust Agreement, the provisions of the Trust Agreement shall govern.

18.    TITLES.18.    TITLES.

The titles set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect, nor shall they in any way affect the substance of any provisions contained in this Agreement.

19.    INUREMENT.19.    INUREMENT.

This Agreement shall inure to the benefit of the Trustees and their successors and assigns, and the participants and beneficiaries of the Plan.

20.    APPLICABLE LAW.20.    APPLICABLE LAW.

Except to the extent otherwise provided in ERISA, this Agreement shall be governed by, construed, and enforced in accordance with the internal laws of the State of New York applicable to contracts made and to be performed in the State of New York (without giving effect to the principles thereof relating to the conflict of laws).

*Reynolds Securities Ltd.*
*The Atrium, 45 Broadway*
*New York, NY 10006*



February 2, 2005

Mr. Joseph A. Del Vecchio
First Vice President & Sr. Portfolio Manager
Wachovia Securities, LLC
405 Lexington Avenue, 3rd Floor
New York NY 10174-0000

**Re:    United Wire, Metal & Machine Pension Fund**

Dear Joe,

I've enclosed a fully-executed copy of the Investment Guidelines and Objectives for the above-referenced Fund.

Also enclosed is a fully-executed copy of the Proxy Voting Guidelines and Procedures for your files.

Thank you for your cooperation.

Sincerely,

Thomas P. Reynolds
President

TPR:lc
Enclosures

*Member of National Association of Securities Dealers Inc.*
*Phone: 212-742-1616        Fax: 212-785-9377*

## UNITED WIRE, METAL & MACHINE PENSION FUND

Investment Guidelines and Objectives for
Investment Managers with "Equity" Portfolios

### Manager: Wachovia Securities, LLC

**I.    General**

1.    It is the intention of the Board of Trustees (the "Trustees") of the United Wire,
Metal & Machine Pension Fund (the "Fund") to allow each investment manager
(the "Manager") managing an "equity portfolio" for the Fund full discretion,
within the scope of these mutually agreed upon investment guidelines (the
"Guidelines"), to invest and reinvest the portion of the assets of the Fund assigned
to such Manager by the Trustees.

2.    The Trustees and the Manager agree that these Guidelines are hereby incorporated
into the investment management agreement between them and that the Manager
shall follow these Guidelines when investing the Fund's assets and that the
Manager will adhere to these Guidelines unless it provides the Trustees advance
written notice to the contrary and receives advance written approval by the
Trustees for deviation from these Guidelines. These Guidelines shall supersede
and control in the event of any directly conflicting provisions set forth in the
investment management agreement.

3.    The Manager must have completed, obtained or performed (and, when required,
will complete, obtain or perform) all registrations, filings, approvals,
authorizations, consents or examinations required by the laws of New York State
and New York City and any other applicable law (or any government or
governmental authority) for the performance of the acts contemplated by these

1

Guidelines and, during the terms of these Guidelines, it shall comply with all existing, new or amended statutes of the United States (and any other government or governmental authority) having jurisdiction over its activities which are applicable to its performance under these Guidelines.

4.    The Manager shall, by appropriate corporate (or other) action, duly authorize the execution and implementation of these Guidelines; such authorization or execution shall not violate any obligation by which the Manager is bound or any applicable law; and these Guidelines shall be executed on behalf of the Manager by a person (or persons) authorized to transact business on behalf of the Manager and shall be binding upon the Manager in accordance with its terms.

5.    The Manager shall discharge its responsibilities with respect to assets under its management in accordance with fiduciary responsibility provisions, including those set forth in the Investment Advisors Act of 1940, the Internal Revenue Code of 1986, as amended, Sections 403-408 of ERISA, and all final and proposed regulations promulgated thereunder.

6.    All transactions undertaken on behalf of the Fund shall be solely in the interest of the participants and beneficiaries and with reference to safeguards and diversification to which a prudent investor managing this Fund under known or foreseeable circumstances would adhere, and liquidity and current returns consistent with rationally anticipated cash flow requirements of the Fund, shall be present at all times.

7.    The Trustees will neither assume any obligation or responsibility for the direct management of assets allocated to the Manager nor be liable for any acts or omissions of the Manager that result in any loss with respect to the Fund's assets. These Guidelines are not intended to direct the Manager to purchase (or sell) any specific security or effect (or refrain from effecting) any specific investment transaction.

2

## II.    Basic Premises

1.    All investments shall be managed with the primary focus on total investment return with attention to the stability of returns from year to year. A distinction need not be made between realized and unrealized capital gains or losses. Fund assets are to be diversified by type of security, issuer and by industry so as to minimize the risk of large losses.

2.    It is appropriate to seek capital appreciation as a partial hedge against inflation. The Trustees recognize the possibility that losses may occur from time to time with such an investment approach. The Trustees will not regard such losses alone as evidence of imprudence, provided that the Manager's overall investment strategy is consistent with (i) the objectives set forth herein; and (ii) the investment style that the Manager was retained by the Trustees to pursue (as it may have been changed through written agreement with the Trustees). Wachovia Securities, LLC has been retained as a Large Cap Core Manager and the assets should invested accordingly.

3.    The Manager agrees to invest the assets of their portfolio in accordance with the style for which they were hired. Any blatant deviation from such strategy would constitute a review of the Manager.

## III.    Investment Goals, Restrictions and Limitations

A.    Equity Investments

1. Between 90% and 100% of the Managers' portfolio will be invested in equity securities.

3

2.  All equities in the account shall be readily marketable and DTC eligable (i.e., traded on the New York Stock Exchange, American Stock Exchange, NASDAQ National Market System).

3   Equity investments in any single company or affiliated group shall be limited at purchase to no more than 5% of the total equity assets under management by the Manager (at cost ).  In addition, equity investments in any single company or affiliated group must be less than 5% of each company's or affiliate's total outstanding equity (common stock and securities convertible into common stock).

4.  Annualized total equity investment returns are expected to meet or exceed similar returns of the S&P 500 Index during cumulative periods of three (3) years or more.

B.   Miscellaneous

5.  The Manager will be allowed a period of three months or as soon as practicable to remedy any instance in which the Fund assets, due to market appreciation or otherwise, exceed any of the percentage limitations set forth in these Guidelines by reducing the commitment prudently.  Should any violations of the limitations set forth in these Guidelines occur, it would constitute a reportable event.  The Manager must immediately notify, in writing, the Administrator, Trustees and the Investment Advisor of this violation and the reason it occurred.

6. Investments may be made in dollar denominated equity securities of foreign issuers in an amount not to exceed 15% of the cost value of the total equity assets under management by the Manager.  These holdings shall be limited to those listed on national exchanges or otherwise determined by the Manager to represent a prudent and appropriate investment for the Fund.

4

7. Investments may be made in Real Estate Investment Trusts (REITS) in an amount not to exceed 5% of the total equity assets under management by the Manager at cost value. These holdings shall be readily marketable and limited to those issues listed on national exchanges as listed in section III A, paragraph 3.

## IV.    **Prohibited Investments**

Except with the prior written consent of the Trustees, the Manager shall not purchase or otherwise invest Fund assets in any of the following investments or strategies:

1.    Securities of a participating employer, except to the extent permitted under ERISA; The Trustees will provide a list of participating employers, which are publicly traded companies, to the Manager in connection with the execution of these Guidelines and will promptly notify the Manager, in writing, of any changes to it.

2.    Securities of foreign issuers (except as provided for in Section III, Paragraph 6);

3.    No derivatives may be purchased for the Fund. However, investments in REITS and ADR's are acceptable but are held to those limitations provided for in Section III;

4.    Private placements or venture capital issues;

5.    Commodities;

6.    "Naked" option contracts, futures contracts, or repurchase agreements against securities that are not permitted by these Guidelines to be held in the portfolio;

7.    Short sales, margin transactions or other borrowings of money;

8.    Letter stocks and other unlisted or restricted securities; or

9.    Real or personal property.

5

      10.     Guaranteed Insurance Contracts

## V.    Short-Term Investments

All assets not otherwise invested in equity investments pursuant to these Guidelines
should be invested promptly in short term investments. For this account, the Trustees
have established an auto sweep of cash into the custodian's STIF Program. The Manager
shall not be responsible for investments made pursuant to this cash sweep vehicle.
Short-term investments are a permitted class of assets, subject to a maximum of 10% of
total assets under management, by the Manager. Should the cash and equivalent sector
exceed 15% of the assets under management by the Manager, this would be a reportable
event and the Manager must notify both the Board of Trustees and the Investment
Advisor with the reason for such a high cash position. Short term investments must fall
within one or more of the following categories:

      1.     U.S. Government securities (backed by the full faith and credit of the U.S.
             Government) and U.S. agency obligations.

      2.     Certificates of deposit, maturing within 12 months, of any domestic bank
             meeting the standards for a "well-capitalized" bank pursuant to the FDIC
             Improvements Act of 1991, provided that such certificates of deposit from
             any single institution shall not represent more than 5% of the assets of the
             short-term investment account of the particular Manager. Any CD's
             purchased should have a minimum rating of 3 stars as rated by the Bauer
             Financial Group.

      3.     Commercial paper, maturing within 9 months, of any domestic issuer,
             provided that such commercial paper shall be rated not less than A-1 by
             Standard & Poor's or P-1 by Moody's Investors Service.

      4.     The use of common, collective or pooled trusts or funds, or "money
             market" funds, is permissible only if, in the Manager's prudent opinion, the

securities held within such funds meet the general quality (and other)

constraints set forth in these Guidelines.

## VI.    **Brokerage**

1.  The Manager agrees to maintain records of its brokerage practices, including records
of the broker used on each transaction and the amount paid to each such broker. The
Manager agrees to disclose, in writing, such information to the Trustees when
requested.

2.  Except as provided in this paragraph, all trade execution must be done "away" from
the Managers and/or directly affiliated broker/dealers. This also prohibits the internal
crossing of securities within said investment firm. With the exception of in-house
trading, the Manager shall have complete discretion and authority in the selection of
broker-dealers to effectuate acquisitions or dispositions of Fund assets, and the terms
and conditions on which such acquisitions or dispositions shall be made, except as
otherwise instructed by the Trustees. A Manager may allocate brokerage transactions
to itself or its affiliate only if the Trustees, the Manager and its affiliate (if applicable)
have executed a written agreement permitting an affiliate of the Manager to perform
brokerage transactions and only if such allocation is consistent with any investment
management agreement between the Manager and the Trustees, any applicable
securities laws, and ERISA (and other rules and regulations thereunder).

3.  In placing portfolio transaction orders on behalf of the Fund, the Manager shall use its
best efforts to obtain "best execution" of orders through responsible brokerage firms
at the best prices and at reasonably competitive commission rates which, on an
average quarterly basis, shall not exceed six cents per share.

4.  The Manager shall instruct the broker-dealer or other appropriate party to promptly
furnish the Fund Office (if requested) and the custodian with confirmations or other
records of all transactions, and with monthly statements of the investment account
valued at fair market value.

7

**VII.    Proxy Voting and Corporate Governance**

    1.  The Manager or a third party hired by the Manager, not the Trustees, shall be responsible for and shall vote all proxies appurtenant to securities managed on behalf of the Plan.

    2.  The Manager or the Manager's proxy voting service shall also make available to the Trustees its internal policy statement of proxy voting and report to the Trustees all votes registered on the Fund's behalf, and the reasons for such votes, at least quarterly. Unless otherwise required by law, the Manager or the Manager's third party proxy voting service will vote all proxies in accordance with such statement.

    3.  The Manager will take such action, and render any advice, with respect to the voting of proxies regarding portfolio securities as are solely in the interest of the Fund, for the exclusive benefit of the Fund, prudent and otherwise consistent with ERISA.

    4.  Proxies will be voted in a timely manner and shall consider the recommendations made in the proxy voting guidelines drafted in form attached hereto as Exhibit A.

**VIII. Specific Investment Objectives**

    1.  Each Manager's performance will be reviewed on a periodic basis, generally no less frequently than quarterly.

    2.  Results shall be based on total rates of investment return (including both realized and unrealized capital gains and losses), calculated and reported both gross and net of investment management fees.

    3.  The Manager's overall investment performance results shall be compared with the results of a portfolio invested in each of the following:

        (i)  100% in the S&P 500 Index;

    4.  Because of the volatility of market values, in most cases such comparisons will emphasize experience over full market cycles, generally three years.

**IX.    Maintenance of Records and Reconciliation**

1. The Manager shall maintain records of all activity in the account and shall provide the Trustees quarterly statements of such activity and the assets in the account as soon as reasonably practical after the end of each quarter.

2. The Manager shall, on a monthly basis, reconcile its record of activity in the account with monthly reports from the custodian of the account. The Manager will notify the Trustees of any transactions which it has not been able to reconcile with the custodian, after reasonable efforts to do so.

## X.    Communications and Reporting

1. Each Manager shall issue a written report at least quarterly (or more frequently, if requested by the Trustees) reviewing the investment performance, progress, investment strategy, proxy voting record and other actions of the Manager on behalf of the Fund. In addition, the reports shall reflect any management fees, and disclose all brokerage commissions and to whom they were paid. An oral presentation will be made to the Board on an annual basis (or more frequently, if requested by the Trustees).

2. The report shall identify each and every security held under the account, organized by sector, and shall reflect the par value or number of shares of each such security, its cost value and its fair market value as of the last day of the month preceding the month in which the report is issued.

3. The report shall identify the investment performance against various market indices and the strategy and actions of the firm on behalf of the Fund.

4. The Trustees encourage each Manager to have open and frequent communication with the Trustees on all significant matters pertaining to investment policies, the management of the Fund's assets, and these Guidelines. The Manager is expected to meet with the Trustees to review the portfolio and to discuss the investment results in

9

the context of the goals, objectives and policies expressed herein, as often as the Trustees deem necessary.

5. Each Manager is specifically prohibited from accepting and acting upon instructions from anyone except the Trustees or their duly appointed representatives.

6. The Manager shall be responsible for reviewing these guidelines with the Investment Advisor and the Trustees at least annually to assure that they remain valid and relevant. Any recommendations by the Manager as to changes should be submitted to the Trustees in writing. Any changes proposed by the Trustees will be conveyed to the Manager in writing.

7. Notwithstanding the preceding paragraph, whenever a Manager believes that any portion of the Guidelines or the attached proxy voting guidelines should be modified, it is the Manager's responsibility to initiate communication immediately with the Investment Advisor and the Trustees. Such communication shall not await a formal meeting of the Board of Trustees, but shall immediately be directed to the Trustees.

8. Any modifications in these Guidelines proposed by the Trustees shall be conveyed promptly to the Manager.

9. The Manager agrees to provide the Trustees prompt written notice of any significant turnover in the Manager's senior level investment management personnel or the departure of the portfolio manager for the account.

10. The Manager will cooperate with Reynolds Securities, or such other Investment Advisor as may be selected by the Trustees, in the performance of its duties.

## XI.    **Implementation**

1. All monies invested for the Fund by the Manager, after the adoption of these Guidelines, shall conform to this statement.

The above Statement of Investment Guidelines is hereby found acceptable to both the Manager and the Board of Trustees.

Adopted this _____ day of _____, 2004.

**BOARD OF TRUSTEES OF:**
**UNITED WIRE, METAL & MACHINE PENSION FUND**

By: _____    By: _____
         Trustee                            Trustee

**INVESTMENT MANAGER**

By: _____

Title: _____First Vice President_____

         Investment Supervisory Group
Firm:    Wachovia Securities, LLC

11

# EXHIBIT E

INTERNATIONAL BROTHERHOOD OF TEAMSTERS
LOCAL 875
PENSION FUND

Investment Guidelines and Objectives for
Investment Managers with "Equity" Portfolios

Manager:  Prudential Securities

I.     General

1.     It is the intention of the Board of Trustees (the "Trustees") of the International
Brotherhood of Teamsters– Local 875 Pension Fund (the "Fund") to allow each
investment manager (the "Manager") managing an "equity portfolio" for the Fund
full discretion, within the scope of these mutually agreed upon investment
guidelines (the "Guidelines"), to invest and reinvest the portion of the assets of the
Fund assigned to such Manager by the Trustees.

2.     The Trustees and the Manager agree that these Guidelines are hereby incorporated
into the investment management agreement between them and that the Manager
shall consider these Guidelines when investing the Fund's assets under
management by the Manager and that the Manager will adhere to these Guidelines
unless it provides the Trustees advance written notice to the contrary and receives
advance written approval by the Trustees for deviation from these Guidelines.
These Guidelines shall supersede and control in the event of any directly conflicting
provisions set forth in the investment management agreement.

3.     The Manager must have completed, obtained or performed (and, when required, will
complete, obtain or perform) all registrations, filings, approvals, authorizations,
consents or examinations required by the laws of New York State and New York City
and any other applicable law (or any government or governmental authority) for

1

the performance of the acts contemplated by this Agreement and, during the terms of this Agreement, it shall comply with all existing, new or amended statutes of the United States (and any other government or governmental authority) having jurisdiction over its activities which are applicable to its performance under this Agreement.

4.    The Manager shall, by appropriate corporate (or other) action, duly authorize the execution and implementation of this Agreement; such authorization or execution shall not violate any obligation by which the Manager is bound or any applicable law; and this Agreement shall be executed on behalf of the Manager by a person (or persons) authorized to transact business on behalf of the Manager and shall be binding upon the Manager in accordance with its terms.

5.    The Manager shall discharge its responsibilities with respect to assets under its management in accordance with fiduciary responsibility provisions, including those set forth in the Investment Advisors Act of 1940, the Internal Revenue Code of 1986, as amended, Sections 403-408 of ERISA, and all final and proposed regulations promulgated thereunder. The Manager shall acknowledge in writing that it is a fiduciary of the Fund within the meaning of ERISA and shall not violate any of ERISA's "prohibited transaction" rules.

6.    All transactions undertaken on behalf of the Fund shall be solely in the interest of the participants and beneficiaries and with reference to safeguards and diversification to which a prudent investor managing this Fund under known or foreseeable circumstances would adhere, and liquidity and current returns consistent with rationally anticipated cash flow requirements of the Fund, shall be present at all times.

7.    The Trustees will neither assume any obligation or responsibility for the direct management of assets allocated to the Manager nor be liable for any acts or omissions of the Manager that result in any loss with respect to the Fund's assets

under management by the Manager. These Guidelines are not intended to direct the Manager to purchase (or sell) any specific security or effect (or refrain from effecting) any specific investment transaction. The parties understand and agree that in the event these Guidelines are violated, including amendments thereto as the Trustees may make from time to time, and the Fund sustains losses due to said unauthorized investments, the Manager will be 100% liable for all said losses (including attorney's fees), irrespective of when the breach is discovered.

8. The Manager shall maintain an Errors & Omissions Policy on itself in accordance with ERISA for a minimum of $10 million. The Manager shall provide the Trustees with a copy of such policy and will notify the Trustees if the policy is cancelled or is not renewed.

## II.   Basic Premises

1. All investments shall be managed with the primary focus on total investment return with attention to the stability of returns from year to year. A distinction need not be made between realized and unrealized capital gains or losses. Fund assets are to be diversified by type of security, issuer and by industry so as to minimize the risk of large losses. In the event that accumulated asset value losses exceed 10% in any quarter, the Manager shall notify immediately the Trustees and any Investment Consultant appointed by the Trustees.

2. It is appropriate to seek capital appreciation as a partial hedge against inflation. The Trustees recognize the possibility that losses may occur from time to time with such an investment approach. The Trustees will not regard such losses alone as evidence of imprudence, provided that the Manager's overall investment strategy is consistent with (i) the objectives set forth herein; and (ii) the investment style that the Manager was retained by the Trustees to pursue (as it may have been changed through written agreement with the Trustees).

3

3.  The Manager agrees to invest the assets under their management in accordance with the style for which they were hired.

III.  Investment Goals, Restrictions and Limitations

A.  Equity Investments

1.  Between 85% and 100% of the assets under management by the Manager will be invested in equity securities.

2.  The average capitalization of the equity portfolio under management by the Manager shall not be less than $3 billion.

3.  Securities of each company purchased having a market capitalization of less than $500 million at the time of purchase shall not exceed 15% at cost of the portfolio assets under management by the Manager. In addition, the market capitalization of each security purchased shall not be lower then $150 million.

4.  All equities in the account shall be readily marketable (i.e., traded on the New York Stock Exchange, American Stock Exchange, NASDAQ National Market System or liquid Over-the-Counter securities.)

5.  Equity investments in any single company or affiliated group shall be limited at purchase to no more than 5% of the total Plan assets under management by the Manager (at cost). In addition, equity investments in any single company or affiliated group must be less than 5% of each company's or affiliate's total outstanding equity (common stock and securities convertible into common stock).

6.  Annualized total equity investment returns are expected to exceed similar returns of the S&P 500 Stock Index and/or other applicable benchmarks (based on management style) during cumulative periods of three (3) years or more.

B.  Miscellaneous

4

7. The Manager will be allowed a period of three months or as soon as practicable to remedy any instance in which the Fund assets under management by the Manager, due to market appreciation exceed any of the percentage limitations set forth in these Guidelines by reducing the commitment prudently. Should any violations of the limitations set forth in these Guidelines occur, it would constitute a reportable event. The Manager must immediately notify, in writing, the Administrator, Trustees and the Investment Consultant of this violation and the reason it occurred.

8. Investments may be made in dollar denominated equity securities of foreign issuers in an amount not to exceed 15% of the cost value of the total assets under management by the Manager. These holdings shall be limited to those listed on national exchanges or otherwise determined by the Manager to represent a prudent and appropriate investment for the Fund.

9. Investments may be made in Real Estate Investment Trusts (REITS) in an amount not to exceed 5% of the total portfolio under management by the Manager at cost value. These holdings shall be readily marketable and limited to those issues listed on national exchanges as listed in section III A, paragraph 4.

IV. **Prohibited Investments**

Except with the prior written consent of the Trustees, the Manager shall not purchase or otherwise invest Fund assets in any of the following investments or strategies:

1. Securities of a participating employer, except to the extent permitted under ERISA; The Trustees will provide a list of participating employers, which are publicly traded companies, to the Manager in connection with the execution of these Guidelines and will promptly notify the manager, in writing, of any changes to it.

5

2.    Securities of foreign issuers [except as provided for in Section III, Paragraph 8];

3.    No derivatives may be purchased for the Fund such as securities that posses elements of leverage or risk characteristics beyond those of the underlying collateral, including, without limitation, "interest or principal only strips," "structured notes," "currency swaps," "inverse floaters," asset-backed securities," and "Z Bonds," or any derivative security whose potential duration is greater than 10 (i.e., a security whose price is expected to rise or fall as much as 10% in reaction to a corresponding decrease or increase of 1% in market interest rates). However, investments in REITS and ADR's are acceptable but are held to those limitations provided for in Section III;

4.    Private placements or venture capital issues;

5.    Commodities;

6.    "Naked" option contracts, futures contracts, or repurchase agreements against securities that are not permitted by these Guidelines to be held in the portfolio;

7.    Short sales, margin transactions or other borrowings of money;

8.    Letter stocks and other unlisted or restricted securities;

9.    Real or personal property;

10.   Warrants;

11.   Guaranteed Insurance Contracts;

12.   Loans of portfolio securities;

13.   Real Estate Mortgages;

14.   Any investment security or instrument not specifically addressed by these Guidelines;

V.    Short-Term Investments

All assets under management by the Manager not otherwise invested in equity investments pursuant to these Guidelines should be invested promptly in short term investments. For this account, the Trustees have established an auto sweep of cash into the Custodians STIF Program. The Manager shall not be responsible for investments made pursuant to this cash sweep vehicle. Short-term investments are a permitted class of assets, subject to a maximum of 15% of total Plan assets under management by the Manager. Should the cash and equivalent sector exceed 15% of the assets under management by the Manager, this would be a reportable event and the manager must notify both the Board of Trustees and the Investment Consultant with the reason for such a high cash position. Short term investments must fall within one or more of the following categories:

1.    U.S. Government securities (backed by the full faith and credit of the U.S. Government) and U.S. agency obligations.

2.    Certificates of deposit, maturing within 12 months, of any domestic bank meeting the standards for a "well-capitalized" bank pursuant to the FDIC Improvements Act of 1991, provided that such certificates of deposit from any single institution shall not represent more than 5% of the assets of the short-term investment account. Any CD's purchased should have a minimum rating of 3 stars as rated by the Bauer Financial Group.

3.    Commercial paper, maturing within 9 months, of any domestic issuer, provided that such commercial paper shall be rated not less than A-1 by Standard & Poor's or P-1 by Moody's Investors Service.

4.    The use of common, collective or pooled trusts or funds, or "money market" funds, is permissible only if, in the Manager's prudent opinion, the securities held within such funds meet the general quality (and other) constraints set forth in these Guidelines.

7

## VI.   Brokerage

1.  The Manager agrees to maintain records of its brokerage practices, including records of the broker used on each transaction and the amount paid to each such broker. The Manager agrees to disclose, in writing, such information to the Trustees when requested.

2.  All trade execution must be done "away" from the Manager and/or directly affiliated broker/dealers.  This also prohibits the internal crossing of securities within said investment firm.  With the exception of in-house trading, the Manager shall have complete discretion and authority in the selection of broker-dealers to effectuate acquisitions or dispositions of Fund Assets, and the terms and conditions on which such acquisitions or dispositions shall be made, except as otherwise instructed by the Trustees.  A Manager may allocate brokerage transactions to itself or its affiliate only if the Trustees, the Manager and its affiliate (if applicable) have executed a written agreement permitting an affiliate of the Manager to perform brokerage transactions and only if such allocation is consistent with any investment management agreement between the Manager and the Trustees, any applicable securities law and ERISA (and other rules and regulations thereunder).

3.  In placing portfolio transaction orders on behalf of the Fund, the Manager shall use its best efforts to obtain "best execution" of orders through responsible brokerage firms at the best prices and at reasonably competitive commission rates which, on an average quarterly basis, shall not exceed six cents per share.

4.  The Manager shall instruct the broker-dealer or other appropriate party to promptly furnish the Fund Office (if requested) and the Custodian with confirmations or other records of transactions conducted for the account.

## VII.   Proxy Voting and Corporate Governance

8

1. The Manager, not the Trustees, shall be responsible for and shall vote all proxies appurtenant to securities managed on behalf of the Plan. All proxies must be voted unless clearly prudent not to do so.

2. The Manager shall also make available to the Trustees its internal policy statement of proxy voting and report to the Trustees all votes registered on the Fund's behalf, and the reasons for such votes, at least quarterly. Unless otherwise required by law, the Manager will vote all proxies in accordance with such statement.

3. The Manager will take such action, and render any advice, with respect to the voting of proxies regarding portfolio securities as are solely in the interest of the Fund, for the exclusive benefit of the Fund, prudent and otherwise consistent with ERISA.

4. Proxies will be voted in a timely manner and shall consider the recommendations made in the proxy voting guidelines drafted in form attached hereto as Exhibit A.

## VIII. Specific Investment Objectives

1. Each Manager's performance will be reviewed on a periodic basis, generally no less frequently than quarterly.

2. Results shall be based on total rates of investment return (including both realized and unrealized capital gains and losses), calculated and reported both gross and net of investment management fees.

3. The Manager's overall investment performance results shall be compared with the results of a portfolio invested, as follows:

    (i) 100% in the S&P 500 Stock Index; and

4. Because of the volatility of market values, in most cases such comparisons will emphasize experience over full market cycles, generally three to five years.

## IX. Maintenance of Records and Reconciliation

9

1. The Manager shall maintain records of all activity in the account and shall provide the Trustees quarterly statements of such activity and the assets in the account as soon as reasonably practical after the end of each quarter.

2. The Manager shall, on a monthly basis, reconcile its record of activity in the account with monthly reports from the custodian of the account. The Manager will notify the Trustees of any transactions, which it has not been able to reconcile with the custodian, after reasonable efforts to do so.

X.  **Communications and Reporting**

1. Each Manager shall issue a written report at least quarterly (or more frequently, if requested by the Trustees) reviewing the investment performance, progress, investment strategy, proxy voting record and other actions of the Manager on behalf of the Fund. In addition, the reports shall reflect any management fees, and disclose all brokerage commissions and to whom they were paid. An oral presentation will be made to the Board on an annual basis (or more frequently, if requested by the Trustees).

2. The report shall identify each and every security held under the account, organized by sector, and shall reflect the par value or number of shares of each such security, its cost value and its fair market value as of the last day of the month preceding the month in which the report is issued.

3. The report shall identify the investment performance against various market indices and the strategy and actions of the firm on behalf of the Fund.

4. The Trustees encourage each Manager to have open and frequent communication with the Trustees on all significant matters pertaining to investment policies, the management of the Fund's assets under management by the Manager, and these Guidelines. The Manager is expected to meet with the Trustees to review the portfolio

and to discuss the investment results in the context of the goals, objectives and policies expressed herein, as often as the Trustees deem necessary.

5. Each Manager is specifically prohibited from accepting and acting upon instructions from anyone except the Trustees or their duly appointed representatives.

6. The Manager shall be responsible for reviewing these guidelines with the Investment Consultant and the Trustees at least annually to assure that they remain valid and relevant. Any recommendations by the Manager as to changes should be submitted to the Trustees in writing. Any changes proposed by the Trustees will be conveyed to the Manager in writing.

7. Notwithstanding the preceding paragraph, whenever a Manager believes that any portion of the Guidelines or the attached proxy voting guidelines should be modified, it is the Manager's responsibility to initiate communication immediately with the Investment Consultant and the Trustees. Such communication shall not await a formal meeting of the Board of Trustees, but shall immediately be directed to the Trustees.

8. Any modifications in these Guidelines proposed by the Trustees shall be conveyed promptly to the Manager.

9. The Manager agrees to provide the Trustees prompt written notice of any significant turnover in the Manager's senior level investment management personnel or the departure of the portfolio manager for the account.

10. The Manager will cooperate with Reynolds Securities, or such other Investment Consultant as may be selected by the Trustees, in the performance of its duties.


XI.  Implementation

1. All monies invested for the Fund by the Manager, after the adoption of these Guidelines, shall conform to this statement.

The above Statement of Investment Guidelines is hereby found acceptable to both the Manager and the Board of Trustees.

Adopted this _Feb_ day of _2_ , 19_99_.


BOARD OF TRUSTEES
IBT - LOCAL #875
PENSION FUND

By: _Louis Smith_        By: _Steven Gilman_
    Louis Smith - Trustee        Steven Gilman - Trustee


INVESTMENT MANAGER

By: _Joseph Leu Vecchio_

Title: _First Vice President_

Firm: _____
        **Prudential Securities**
        Investment Supervisory Group

12

## ADDENDUM TO INVESTMENT GUIDELINES & OBJECTIVES

Prudential Investment Supervisory Group may engage in the selling of covered equity calls, the purchase of equity puts, and the purchase of call and put options on the S&P 500 Index. Covered call writing is limited to writing calls on no more than 15% of the equities in the portfolio under management by Prudential. The purchase of call and put options on the S&P 500 Index will be limited to a dollar value not to exceed 0.005 (one half of one percent) of the value of the assets under management by Prudential. As stated in Section IV (Prohibited Investments), paragraph 6, selling naked options is prohibited.

The above addendum to the attached Investment Guidelines is hereby found acceptable to both the Manager and the Board of Trustees.

Adopted this _Feb_ day of _2_, 19 _99_.

BOARD OF TRUSTEES
IBT - LOCAL #875
PENSION FUND

By: _____          By: _____
      Louis Smith - Trustee                   Steven Gilman - Trustee

INVESTMENT MANAGER

By: _____

Title: _First Vice President_

Firm: _____
          **Prudential Securities**
      Investment Supervisory Group

13

EXHIBIT A

# PROXY VOTING
## GUIDELINES AND PROCEDURES

### I.   Basic Premise

  A.)  Responsibility

   1)  An integral part of the responsibility as an investment manager and plan
       fiduciary is the duty to vote proxies on behalf of your clients.  This
       responsibility may not be delegated, and may only be preempted upon the
       properly authorized written instructions of the trustees.

   2)  These Guidelines and procedures are not intended to direct the investment
       manager with respect to voting specific Fund proxies.

   3)  Whenever the investment manager believes that any portion of these Guidelines
       and procedures should be modified, it is the investment manager's
       responsibility to initiate communication immediately with the investment
       consultant and the Trustees.

  B.)  General Principles of Voting

   1)  Voting decisions must be prudent and consistent with the fiduciary standards
       of ERISA.  Such decisions must be solely in the interest of plan participants and
       their beneficiaries.  Proxies should be voted based upon a careful analysis of
       the impact of the vote on the ultimate economic value of the Fund's investment.

  C.)  Decisions Free of Outside Influences

   1)  Your firm alone must decide how to vote any proxy.  Any influence imposed
       upon your firm by a plan trustee, corporate officer or other individual who has
       a personal or financial interest is prohibited.

  D.)  Procedures & Record Keeping

1

1) The basis for each decision will be documented and retained, including whether the advice of any individual outside of your organization was acted upon.

2) A detailed record will be maintained indicating and cross referencing how proxies are voted.

3) Take reasonable steps/procedures to ensure that proxies for which your firm is responsible are received and properly voted.

4) Records must be sufficiently detailed to enable the Trustees to determine whether your firm is fulfilling its fiduciary obligations in investing plan assets in a manner justifying continuation of its appointment and to review your firm's voting procedure and actions taken in individual proxy voting situations.

## II. Guidelines

### A.) Election of Directors

Generally, if not contested, a vote should be made for the nominated directors. For each director, care must be taken to determine from the proxy statement each director's: attendance at meetings, investment in the company, status on inside or outside director, governance profile, compensation, etc. If the director's actions are questionable on any of these items, a vote may be made against the election of that director.

In a contested race, voting decisions should be based on the track record of both slates of candidates, an analysis of what each side is offering to shareholders, and a determination of the likelihood of each slate being able to accomplish their promise.

### B.) Appointment of Auditors

As long as the auditors are a reputable firm, a vote may be made for the proposed auditors. If the company is changing auditors, it should be investigated as to whether there was a problem with the financial statements that the prior auditors would not approve.

### C.) Director Accountability

As overseers of management for the shareholders, directors should be held accountable to shareholders. Therefore, a vote should be made AGAINST any proposal which would limit director liability.

D.) Terms of Directors

A vote may be cast against proposals to limit terms of directors because they may result in prohibiting the service of directors who significantly contribute to the company's success and represent shareholders' interests effectively. In general, the trustees support holding individual nominees to high standards when they seek election, and requiring annual elections of directors better advances shareholders' interest.

E.) Staggered Boards

A staggered Board is one in which directors are divided into three (sometimes five) year classes, each serving a three-year or five year term, and each class re-election occurring in a different year. A non-staggered Board serves a one-year term and Directors stand for re-election each year.

Proposals to adopt a staggered board amendment to the charter or bylaws usually are accompanied by provisions designed to protect the staggered board: super-majority vote requirements if shareholders wish to increase the number of directors or remove directors; provisions allowing shareholders to remove directors only for cause; provisions stipulating that any board vacancies occurring between elections be filled only by a vote of the remaining board members, not the shareholders; and lock-in provisions requiring a super-majority shareholder vote to alter the amendment itself, etc. All of these provisions reduce director accountability and undermine the principle that directors should be up for re-election on a frequent basis. Therefore, a vote should be made AGAINST such proposals.

E.) Proposals to Adopt Cumulative Voting

The voting fiduciary's analysis must consider that cumulative voting is a method of obtaining minority shareholder representation on a board and of achieving a measure of board independence from management control.

F.) Super-majority Voting Provisions

3

Many proxy proposals require only a majority vote from shareholders to be ratified. Super-majority provisions are those that require more than a majority. The standard super-majority vote requirements are usually 67% to 80% of the outstanding shares. These proposals generally provide that such a super-majority provision cannot be changed without the vote of the same percentage of shares outstanding. These provisions are usually intended to prevent any takeover of the company and to insulate insiders from shareholder pressure. Therefore, a vote should be made AGAINST such a proposal.

G.) Multiple Classes of Stocks

When voting, consideration must be given to the principle of one-share, one-vote, the impact of any dilution in shareholder voting rights and any decrease in share price likely to result from issuing a new class of stock with unequal voting rights.

H.) Poison Pills

Stock Purchase Rights Plans ("Poison Pills") generally take the form of rights or warrants issued to shareholders that are triggered by an outsider acquiring a predetermined quantity of stock in the corporation. When triggered, Poison Pills give shareholders the ability to purchase shares from or sell shares back to the company or, in the case of a hostile acquisition, to the potential acquirer at a price far out of line with their fair market value. The triggering event can either transfer a huge amount of wealth out of the target company or dilute the equity holdings of the potential acquirer's pre-existing shareholders. In both cases, the Poison Pill has the potential to act as a doomsday machine in the event of an unwanted control contest, providing a target's board with veto power over takeover bids, even if they are in the best interest of target shareholders.

Rights plans are promoted by management as a method of ensuring that a firm's potential acquirers do not give a two-tiered offer for a firm. This would have the effect of forcing a shareholder to tender shares against his/her will. Although there may be some truth to this argument, the bottom line is that they permit some shareholders to obtain stock at a discount while preventing others from doing so. They can discourage outsiders from taking a position in the firm because a certain

level of ownership would result in lost property rights. Insiders want to protect their position and reduce the influence of outsiders.

The voting fiduciary's analysis must consider whether a poison pill proposal by management requires management to submit the pill periodically to a shareholder vote. In evaluating any poison pill proposal, a consideration must be made as to the impact of acquisition attempts that may be detrimental to the long term economic best interests of plan participants and beneficiaries.

I.) Special Meetings of Shareholders

Any proposal which would limit or restrict the ability of shareholders to call a special meeting would limit their ability to exercise their rights as a shareholder. Since these proposals are contrary to shareholder interests, a vote should be made AGAINST any proposal which would place such limits.

J.) Stock Incentive Plans

Here the case is not black and white. Stock Incentive Plans usually permit a compensation committee to issue stock options to "key" personnel. These plans usually specify the maximum number of shares to be issued but don't specify under what conditions they would be issued. This is not necessarily a problem, as we wish to leave most compensation issues to management (unless someone is grossly overpaid), and we want management to own stock so that their interests will be more in line with shareholders. Consequently, one must examine the incentive plan carefully to see if it is an overly generous plan and consider whether there will be too much dilution of the stock. Therefore, any vote cast regarding Stock Incentive Plans should be determined on a case-by-case basis and must be justifiable.

K.) Confidential Voting

Confidential voting is the best way to guarantee confidentiality. Shareholders must be able to vote all proxies on the merits of each proposal. Open voting alters the concept of free choice in corporate elections and proxy proposals by providing management the opportunity to influence the vote outcome (they can see who has voted for or against proposals before the final vote is taken) and gives management the opportunity to resolicit those votes. It also gives management the opportunity to apply pressure to institutional shareholders, suppliers, customers,

5

and other shareholders with which it maintains a business relationship. Institutional holdings account for a majority position in most large companies; allowing a process that would give management the opportunity to coerce votes from its shareholders destroys the concept of management accountability. Therefore, a vote FOR Confidential Voting should be made.

L.) Greenmail

Targeted share repurchases by management (Greenmail) of company stock from an individual or select group seeking control of the company is abusive to shareholders' interests and often disruptive to management. Since only the hostile party receives payment, the practice is discriminatory to all other shareholders of the company.    With Greenmail, management transfers significant sums of corporate cash (not their own) to one entity for the sole purpose of saving their positions - cash that could be put to use for reinvestment in the company, payment of dividends, or to fund a public share repurchase, with shareholders participating on an equal basis.

By raising the specter of a change in control (whether he intended to follow through on it or not), the Greenmailer receives payment (usually at a substantial premium over the market value of his shares). Management is once again safe and sound and the shareholders and others dependent in some way on the company for their livelihood are left with an asset-depleted, often less competitive company.

Where the voting fiduciary concludes that the Greenmail payment lacks satisfactory long term business justification (such as stopping an acquisition attempt that would be detrimental to the long term economic best interests of the plan participants and beneficiaries), a vote should be cast AGAINST the proposal.

M.) Anti-Greenmail Proposals

Since greenmail is abusive to shareholders' interests and often disruptive to management, many companies propose anti-greenmail provisions. A vote should be made FOR proposals to adopt anti-greenmail charter or bylaw amendments or otherwise restrict a company's ability to pay greenmail. The voting fiduciary may review on a case by case basis anti-greenmail proposals when they are bundled with other charter or bylaw amendments.

**N.) Other**

When appropriate, your firm will take other action to enhance economic value, including without limitation, writing directors or making proposals for inclusion in proxies.

The above Statement of Proxy Voting Guidelines is hereby found acceptable to both the Manager and the Board of Trustees.

Adopted this _Feb_ day of _2_ , 19_99_ .

**BOARD OF TRUSTEES**
**IBT - LOCAL #875**
**PENSION FUND**

By: _____          By: _____
          Louis Smith                              Steven Gilman

**INVESTMENT MANAGER**

By: _____

Title: _First vice President_

Firm: _____
          **Prudential Securities**
    **Investment Supervisory Group**

8

# EXHIBIT F

## CONFIDENTIAL INVESTIGATION

## United Wire, Metal & Machine and Local 810 Affiliated Pensions

Edward A. H. Siedle, Esq.
President
Benchmark Financial Services, Inc.
March 8, 2006

{DWASERMA/209654.0001/N0596635_1}

## CONFIDENTIAL ATTORNEY CLIENT PRIVILEGED DOCUMENT

### Introductory Disclaimer

*The following report is based upon informal interviews with as many of the parties involved in the matters researched as possible and a review of material provided related to the issues. Given the difficulty of ensuring that all relevant information and documentation has been provided to us, we cannot be certain that the conclusions reached are indisputable. For example, we have not reviewed minutes of meetings of the Boards or the By-Laws of the United Wire, Metal & Machine Pension Fund, Local 875 Affiliated Pension Fund, or Local 810 Affiliated Pension Fund (collectively referred to herein as "the Funds"). The custodian of the Funds, Bank of America, and M&R Capital also declined to provide information requested. It is therefore imperative that as many parties as possible knowledgeable regarding the matters discussed herein review this report closely in order to determine whether it is accurate and whether there are any material omissions or misstatements.*

## Table of Contents

Executive Summary

A. Background...................................................................................    5

B. Prudential-United Wire Contract....................................................    6

C. Prudential Local 875 Contract.......................................................    7

D. M&R Local 810 Contract...............................................................    8

E. Fields Solicitation Agreement with Prudential................................    9

F. Market Capitalization Requirements Applicable
   To Large Cap Equity Managers......................................................    12

G. Nastech Investment.......................................................................    13
   1. Prudential Purchase for United Wire
   2. Prudential Purchase for Local 875
   3. M&R Purchase for Local 875
   4. Summary

H. Trading With Fields and Best Execution Analysis............................    16
   1. Prudential United Wire Account
   2. Prudential Local 875 Account
   3. M&R Local 810 Account
   4. Best Execution Analysis
   5. Summary

I. Smith Barney Management of United Wire and Local Accounts...............    22

J. Money Market Fund/Custodian Cash Sweep.....................................    24
   1. Excessive Money Market Fees
   2. Revenue-sharing Paid to Custodian

K. Conclusion...................................................................................    25

## Executive Summary

This investigation focused primarily upon the relationship between a registered representative (or securities broker) and two registered investment advisers hired by the Funds to manage assets. We examined the undisclosed arrangements these money managers had with this broker involving (1) the payment of a portion of one manager's asset management fee to him and (2) both managers directing 100% of the trades related to the Funds' accounts they managed to him.

Our conclusion is that the managers breached their fiduciary duty to the Funds by failing to disclose material information regarding their business dealings with the broker, as well as failing to seek "best execution" in trading assets of the Funds. As a result, the Boards of the Funds were unable to effectively monitor the Funds' asset management and brokerage costs and did not give their informed consent to such fees and costs.

Based upon our estimates, it appears the Funds may be entitled to recover approximately $1,241,364 in solicitation fees improperly paid to the broker. In addition, damages related to the secret arrangement involving the two money managers directing all securities trading to the broker were substantial. Based upon a preliminary review of only two years of the Funds' trading (2003 and 2004), it appears that the trading executions the Funds received, both in terms of explicit (commissions) and implicit (market impact) costs, were **significantly** higher than the median. It appears that the money managers did not effectively monitor "best execution" and that the brokerage involved did not provide it. The damages to the Funds related to failure to receive "best execution" in the two years under analysis amounted to approximately $924,000. Given the longstanding relationship between the Funds and one manager, it may be advisable to review trading since inception of the relationship (in 1990). Based upon the preliminary review of 2003 and 2004, we estimate damages related to the managers' failure to obtain "best execution" could exceed $6 million.

The Funds may also have a cause of action against their custodian, Bank of America, for excessive money market fund fees related to daily "sweeping" of the Funds' cash. The Funds' cash has been swept into higher cost retail money market funds, as opposed to lower cost institutional funds that Bank of America and other mutual fund families offer.

## A. Background

Apparently Alan Stuart Fields, Saul Eisenberg, Joseph Delvecchio and John Maloney all were employed at some point in their professional careers at Prudential Bache Securities. According to National Association of Securities Dealers, Inc. ("NASD") records, Fields was a registered representative at Prudential from 1974 through April 2000 and Eisenberg was registered at Prudential from 1984 through May 2004. Delvecchio was registered at Prudential from June 1999 through July 2003; Maloney, on the other hand, says he was employed at Prudential approximately 20 years ago and knew Fields and Eisenberg from that time.

All of the above individuals are currently registered as brokers with the NASD. (Maloney and Eisenberg are both employed by a money management firm, M&R Capital, but are also registered as brokers with Sanders Morris Harris ("SMH"). Apparently SMH has an office in the same building as M&R.) According to the NASD's public disclosure program, only Fields has a disciplinary record. (However, see The Siedle Directory of Securities Dealers 2002 for a discussion regarding underreporting of disciplinary matters in the NASD's public disclosure program.)

Fields' NASD disciplinary record indicates that in April 2005 he settled a churning and excessive commissions complaint for $80,000 and in July 26, 1996 he settled a suitability complaint for $111,000. Also, as disclosed in the NASD disciplinary data and further detailed in an article in The New York Post, apparently he was charged with Assault 2 felony for striking a 64 year old man in the garage of the building where he resides. Our limited investigation of his background indicates that, according to a January 10, 2002 New York Times article, he wrote a $1 million check as the final part of a down payment on a 106 foot yacht which he expected the final cost to be about $7.8 million. According to a June 1, 2000 On Wall Street article, he was a $1.2 million producer at Prudential when he moved to PaineWebber. (This is not a particularly impressive production amount for a senior broker at a major firm.) Apparently his wife is Anne Marie Fields who, according to an article regarding Advanced Biophotonics in forbes.com, was the principal of Fields Communications Consulting, a consultant for life science and medical technology companies from January 2001 to December 2003. The company address is the same as the Fields' residence, 220 East 65th Street, New York, New York. The article states "…she has more than 15 years experience in corporate communications and investor relations." We have been unable to verify any relationship between her and Nastech or Cell Pathways.

Apparently while employed at Prudential-Bache Securities, Alan Fields, a retail broker, played a significant role in securing an investment management contract between Prudential and the United Wire, Metal & Machine Pension Fund ("United Wire") in October 1990. Later, in January 1999, Fields again apparently played a significant role securing an investment management contract between Prudential Securities and Local 875 Affiliated Pension Fund ("Local 875"). Finally, in July 2002, Fields played a

significant role in securing an investment advisory contract between M&R Capital Management and Local 810 Affiliated Pension Fund ("Local 810"). As a result of his role in securing the contracts and his ongoing relationships with one or more decision-makers at the pensions Fields was compensated by the money management firms as described more fully below.

The extent of his role in securing the contracts initially is unclear, as is the degree to which he may have had ongoing relationships with decision-makers at the Funds. Apparently Fields did have a relationship with Dennis Silverman, a former President of the Union (now deceased) and a longstanding relationship with Steve Gilman, the former Administrator and Trustee of the United Wire plan and an administrator, Secretary Treasurer and Trustee of the Local 810 plan; whether he had a relationship with any other member(s) of the Boards (who may have voted upon the investment management contracts) is unknown.

Fields was not employed by either pension to provide advice regarding the selection of money managers. The Funds retained investment consultants pursuant to contracts to provide such advice. Fields role in the selection of money managers by the Funds was informal only. No advisory contract existed between Fields and the Funds. Nevertheless, the money managers were apparently convinced that Fields played a significant role in steering these contracts to them. Otherwise, presumably they would not have directed significant brokerage and asset management fee compensation to him.

## B. Prudential-United Wire Contract

On October 1, 1990, the United Wire plan entered into a Discretionary Account Investment Supervisory Agreement with the Investment Supervisory Group at Prudential-Bache Securities. The asset management fee schedule related to the contract was .50 on the first $5 million; .40 on the next $5 million and .30 thereafter for equities; a flat fee of .25 applied to fixed income assets. Saul Eisenberg and Linda Krouner were the original portfolio managers for the account. Apparently Krouner was later replaced by Mary Lee Duff; Joseph Delvecchio replaced Duff as the second portfolio manager under Eisenberg in 1999. The contract with Prudential does not expressly state the manager's investment mandate. According to Delvecchio, the original investment mandate was for a balanced account, including both stocks and bonds. Later the mandate was changed to predominantly large cap equities. Delvecchio referred to an undated document he possesses which he believes was created in 1994 indicating that the account was to be invested primarily in equities and primarily large cap equities. There apparently was, however, latitude to invest in small cap and fixed income assets.

Prudential managed the United Wire account (which grew in value to approximately $80 million) from October 1990 through May 2005. According to our Benchmark Financial Services 2003 "Actual" Investment Advisory Fee Survey of 100 Pensions, the effective investment advisory fee paid to Prudential was competitive, indeed below average for a large cap account of this size.

The entity managing the assets was the Investment Supervisory Group of Prudential Bache Securities. Apparently this Group at Prudential-Bache originated in the 1940s initially managing Bache partner capital and assets for "friends of the firm." Later one of the founding partners of the Group, James Roosevelt, a son of FDR, is said to have spearheaded the firm's focus on Taft Hartley accounts and established Bache as a union money management powerhouse. By the late 1990s, Delvecchio indicated that total assets under management by the Group amounted to only approximately $400 million. Thus, the United Wire and Local 875 accounts represented a significant portion of the Group's assets under management.

The brokers serving as marketers within the Group were compensated using retail broker compensation schedules, as opposed to those compensation schemes subsequently developed for use in institutional asset management marketing.

Fields received 45% of the asset management fees paid to Prudential by United Wire in perpetuity. Institutional asset management marketers' commissions related to new accounts typically are 15-20% in the first year; then are reduced to 10% in the second year and 5% in the third year and terminate thereafter. (Some more generous firms may continue the 5% trail commission for an additional two years.) Institutional asset management marketers do not receive asset management fee commissions in perpetuity. (After all, such arrangements result in marketers essentially owning 45% of the investment manager's business.) Also, in the institutional asset management context the salesman would not receive a payout related to the trading of the account, since generally trades are executed at unaffiliated brokerages. Soon after Wachovia acquired Prudential, according to Delvecchio, Wachovia "withdrew its support" for the Group in February 2005 and it was disbanded.

For his marketing efforts Prudential paid Fields an amount equal to 45% of the investment advisory fees related to the United Wire account in perpetuity, as well as a percentage of all the commissions related to the account. Apparently all trades for the account were executed at Prudential at a commission rate of six cents per share while Fields was employed at Prudential. Fields may have received the same percentage of the trading commissions (45%) as he did the asset management fee. This percentage is a common maximum payout for retail brokers. Once Fields left Prudential and moved to PaineWebber, all trades were executed at PaineWebber at six cents per share and the Solicitation Agreement described below was executed to continue compensating Fields in the amount of 45% of Prudential's investment management fees.

## C. Prudential Local 875 Contract

On January 28, 1999 the Local 875 plan entered into a Discretionary Account Investment Supervisory Agreement with the Investment Supervisory Group at Prudential Securities to manage an approximately $16 million large cap equity account that it also managed until February 2005. (Neither the Investment Guidelines document nor the contract with Prudential expressly states the manager's investment mandate.) The investment advisory fee schedule related to this contract was a flat .45 which was substantially similar to the

United Wire contract fee. Fields was also paid 45% of the investment advisory fees related to this account, again apparently as compensation for his marketing efforts, as well as all trades related to the account.

## D. M&R Local 810 Contract

The Local 810 plan hired M&R Capital Management to manage an approximately $13 million account on July 9, 2002. (The Investment Guidelines related to the account expressly stated the firm was retained as a large cap value manager.) M&R was terminated by the Fund in May 2005. According to Maloney, M&R manages approximately $600 million in assets.

The investment advisory fee related to the account was a flat .50 or slightly higher than the effective fee paid to Prudential. The Fee Schedule included a "most favored nation's" clause indicating that the client received the lowest fee the manager offered similar size accounts. (Our investigations reveal these "most favored nation's" provisions generally provide only illusory protection to pensions; managers are very adept at finding ways of circumventing their limitations.) Nevertheless, according to our 2003 "Actual" Fee Survey of 100 Pensions, the contract fee is competitive for a large cap value account of this size.

According to Maloney, he was always the portfolio manager handling the account despite the fact that Eisenberg, who had been the lead portfolio manager on the account while at Prudential, apparently joined M&R in May 2004.

According to Maloney, when he initially began talking to Fields about managing assets for the Local 810 plan, he told Fields that, due to his limited portfolio turnover (35%), Fields could not expect to receive significant equity commissions related to any account M&R might manage for the Fund. Maloney said he told Fields he was willing to pay him a portion of the asset management fee M&R would receive from the Fund to serve as a solicitor with respect to the account, provided the client would agree to the arrangement and sign the necessary disclosure statements. Apparently Fields did not wish to pursue such a disclosed arrangement. (Delvecchio, on the other hand, says Fields believed he had a prior understanding with Maloney that he would receive a portion of M&R's investment advisory fee and was not pleased that once M&R was hired, Maloney reneged on their agreement.) In conclusion, Maloney stated that there was no solicitation agreement between M&R and Fields related to the Local 810 account. Fields did not receive any portion of M&R's investment management fee, according to Maloney.

Fields, who at the time M&R was hired was registered at PaineWebber received all trades related to the account at six cents per share. However, given the size of the account and the low portfolio turnover associated with the manager's investment style (value), total commissions related to the account amounted to only approximately $13,000 annually, according to Maloney.

## E. Fields Solicitation Agreement with Prudential

Generally when a marketer leaves one firm for another, he no longer continues to receive asset management fee compensation related to accounts he originated while at the previous employer. However, according to Delvecchio, Fields' departure led Eisenberg at Prudential to be concerned that unless Prudential continued to compensate Fields for the United Wire and Local 875 accounts, the firm would lose them. Apparently at this time retention of these two accounts was viewed as critical because they represented a significant portion of the Group's assets under management.

Once Fields left Prudential Bache and joined PaineWebber in 2000, a Solicitation Agreement was executed between Prudential and PaineWebber in order to provide that Fields would continue to receive the asset management fee compensation related to the United Wire and Local 875 accounts managed by Prudential.

According to a Solicitation Agreement executed August 1, 2000 between Prudential and PaineWebber, while Fields was employed at Prudential he was compensated by Prudential for referring the United Wire and Local 875 accounts in the amount of 45% of the investment management fee charged to the accounts. The Solicitation Agreement states that Fields joined PaineWebber on April 28, 2000 and that in order for Prudential to continue to compensate Fields, the parties entered into the Agreement (approximately three months later). The Agreement states that the compensation payable therein covers only the solicitation and referral of the clients to Prudential. Neither PaineWebber nor Fields will provide additional services to Prudential under the Agreement. The Agreement provides that PaineWebber shall provide each client with a form of Disclosure Statement annexed to the Agreement as Exhibit A and shall provide an executed copy of the Disclosure Statement to Prudential.

Gilman signed as a Trustee the Exhibit A Disclosure Statement referred to in the Solicitation Agreement on behalf of United Wire on August 15, 2000. A separate Disclosure Statement was provided for Local 875 and was also signed by Gilman as a Trustee on the same date.

The United Wire and Local 875 Exhibit A Disclosure Statements each state that the accounts were originally referred to Prudential by Fields, a former employee of Prudential and a current employee of PaineWebber. Each Disclosure Statement further states, "*As you have been aware* (emphasis added), as compensation for that referral Prudential paid Fields ...45% of the total asset management fee charged to your account(s)."

The issue as to the effectiveness and timing of disclosure of the Prudential/Fields asset management fee arrangement to the full Boards of the two pensions is complex. Prior to 2000, while Fields was still employed at Prudential, presumably the firm's internal compensation arrangements with its employees were not disclosed to clients. Yet the "as you have been aware" language from the Exhibit A Disclosure Statements quoted above suggests that at least someone at the two pensions was aware of Fields' asset management fee compensation while employed at Prudential and previous to the signing

of the Disclosure Statements. Apparently Fields and Gilman had a longstanding friendship and it may be that Gilman always knew, or knew before 2000, that Fields was receiving 45% of Prudential's asset management fee.

Apparently if Gilman did know of the arrangement before 2000, he did not disclose it to other members of the Boards. If Gilman knew of the arrangement before 2000 but did not disclose it to the Boards, then Fields may have been aware of the non-disclosure or even conspired with Gilman to conceal the arrangement. After 2000, there was written disclosure to Gilman of the 45% fee paid to Fields at PaineWebber in connection with Prudential's management of the United Wire and Local 875 accounts.

Harvey Morgan has indicated that the Boards of the two pensions never authorized the signing of the Disclosure Statements and that the Disclosure Statements were not kept with the records of the Funds. Apparently the Boards only learned of the executed Disclosure Statements years later.

In order to protect themselves from this not uncommon problem, some money managers require copies of the relevant portions of a pension's By-Laws to establish that an investment advisory contract has been duly executed by the fund.

Rule 206(4)-3(a) and (b) under the Investment Advisers Act of 1940 establishes requirements that investment advisors must follow with respect to lawful payments to solicitors. Most relevant, the cash solicitation fee must be paid pursuant to a written agreement between the adviser and the solicitor and the solicitor must provide the client with a current copy of the adviser's written disclosure statement and a separate disclosure document of the solicitor. A signed and dated acknowledgement of receipt of the investment adviser's written disclosure statement and the solicitor's written disclosure is required to be maintained in the adviser's records. Rule 206(4)-3(b) requires that the separate written disclosure document required to be furnished by the solicitor to the client contain a variety of information including the nature of the relationship between the solicitor and the investment adviser; the terms of the compensation agreement, including a description of the compensation to be paid; and the amount, if any, of the cost of obtaining his account the client will be charged in addition to the advisory fee, and the differential, if any, among clients with respect to the amount or level of advisory fees charged if the differential is attributable to the agreement with the solicitor.

It appears that the information contained in the Prudential and PaineWebber Solicitation Agreement and Disclosure Statements related to Fields' role as a solicitor meets the requirements of the applicable rule. The fee paid to Fields is disclosed and Prudential represents that the entire amount of Fields' compensation will be paid by Prudential. The Disclosure Statement further states "…no additional fees or other amounts will be added to the normal fees, expenses and other costs of your investment program with PSI as a result of PaineWebber's involvement."

However, there are arguments that the disclosure was incomplete or insufficient, as well as delinquent. First, with respect to the United Wire account (where the majority of the

assets were held) Prudential only disclosed the 45% solicitation fee (i.e., in writing) approximately 10 years after inception of the relationship. (Prior to that date apparently only Gilman may have been told of the arrangement.) Since Prudential was paying 45% of its asset management fee to Fields from inception of the relationship, then presumably the true cost of the service Prudential provided was 45% less than the fees the Fund paid over the period. With respect to the Local 810 account, this account was much smaller and disclosure was made within approximately a year of inception of the relationship.

Second, there is an issue as to whether the disclosure and consent to the arrangement by Gilman was sufficient. Apparently disclosure to the full Board of either Fund may never have occurred and more than one Trustees' signature may have been required. Unanswered questions include: Did Gilman know, even prior to the time Fields left Prudential that Fields received 45% of Prudential's asset management fee, as suggested by the words "as you are aware" in the Disclosure Statements? Did Gilman and Fields conspire to keep the Boards in the dark about Fields' compensation?

Finally, the representation regarding no additional fees, expenses or costs as a result of PaineWebber's involvement in the Disclosure Statement is incorrect. Prudential had always agreed to execute all trades with Fields at six cents per share and this was always part of the total compensation arrangement between Prudential and Fields. Since the Funds could have obtained superior execution had the brokerage related to these accounts not been committed to Fields (see Best Execution Analysis below) there were additional risks, as well as undisclosed costs as a result of Prudential's arrangement with Fields/PaineWebber.

In speaking with Gene Golkhe of the Division of Investment Management of the SEC in Washington, he indicated that the Staff has generally viewed the cash solicitation rule as being applicable only to cash payments and not brokerage arrangements. However, the language in the Disclosure Statements discussed above is not limited to cash payments.

In summary, if the Boards did not delegate authority to Gilman to be the sole signatory on these Disclosure Statements and the Trust agreements provide that no single trustee has authority to bind the plans absent such delegation, then the Funds can argue that these documents are null and void and that Prudential and/or PaineWebber owes the Funds the investment advisory amounts paid to Fields pursuant to these documents.

With respect to the investment advisory fee payments to Fields while he was employed at Prudential, while there generally is no obligation that a money manager disclose the internal compensation arrangements it has with its employees to clients, here the asset management fee arrangement was part of a larger secret scheme (involving brokerage as well) that exposed the Funds to unnecessary risks and undermined the Boards' ability to fulfill their fiduciary duties regarding monitoring fees and commissions.

The Boards, lacking material information regarding a secret arrangement Prudential had with Fields since 1990 involving 45% of the asset management fee (and 100% of the

accounts' brokerage as discussed more fully below), were unable to effectively monitor these costs and cannot be said to have given their informed consent.

Apparently neither the Funds nor their custodian have records related to total asset management fees paid to Prudential since 1990. Delvecchio provided the following fee information for the years indicated. From 1992 through 1999 United Wire paid total asset management fees to Prudential of $1,156,558; 45% of this amount or $520,451 was paid to Fields. Total solicitation fees paid to Fields at PaineWebber from 2000 through 2004 amounted to $630,913. Total solicitation fees paid to Fields from 1992 through 2004 amounted to $1,151,364. We do not have information for 1990 and 1991 but based upon the 1992 through 1996 fee data, a reasonable estimate would be that Fields was paid approximately $45,000 in each year or an additional $90,000.

## F. Market Capitalization Requirements Applicable to Large Cap Equity Managers

Alicia Cabouli of Smith Barney Consulting served as the consultant for United Wire in the 1990s until terminated and replaced by a new consultant, Reynolds Securities in September 2004. During the period Smith Barney served as the consultant to United Wire, the plan utilized a Statement of Investment Policy, Objectives and Guidelines apparently drafted by Smith Barney. We have reviewed only the Statement amended April 12, 2002. This Statement did not include any market capitalization requirements applicable to equities. (As mentioned earlier, apparently this account began as a balanced account and migrated overtime to a large cap equity account.)

Reynolds has been the consultant for the Local 875 pension (later renamed Local 810), from January 1999 through today. This Fund apparently has had several capitalization requirements applicable to equities included within its Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios. Apparently these Guidelines were drafted by Reynolds and, according to Reynolds, adopted over time on a manager-by-manager basis.

It is unclear whether after Reynolds became consultant to United Wire in 2004, the market capitalization requirements included within the Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios drafted by Reynolds and utilized in connection with the Local plan, was adopted for usage by each of the United Wire plan's equity managers. The United Wire Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios document signed by Wachovia dated February 2005 naming Reynolds as the consultant and apparently drafted by Reynolds contained no market capitalization requirement. Wachovia was terminated soon thereafter.

Thus, the account Prudential managed for United Wire (which migrated overtime to large cap equity) apparently was not subject to any market capitalization requirements. On the other hand, the large cap account Prudential managed for Local 875 appears to have been. In addition, the large cap value equity account managed by M&R for Local 875 would have been subject to market capitalization requirements.

Since we have the custodian's statements for the Local 875 accounts managed by M & R and Prudential/Wachovia from 2001 through 2004, we could research whether all stocks held in these accounts met any investment restrictions applicable to individual securities, e.g. the market capitalization of each security purchased was not less than $150 million, as well as whether the portfolios met any other restrictions applicable to each account. We have not been asked to undertake this analysis. Rather, we have been asked to focus exclusively upon whether Nastech Pharmaceutical Company, Inc. was a permissible investment and, if not, whether the managers' investments in Nastech resulted in a loss to either Fund.

## G. Nastech Investment

Both Maloney, the portfolio manager at M & R and Delvecchio, the portfolio manager at Prudential acknowledge that Fields introduced them to and recommended Nastech. Maloney indicated that he also personally invested in Nastech because he strongly believed in the company's prospects. (Personal investing by portfolio managers raises additional issues, such as "front-running." We have not been asked to research these issues in connection with this matter. We do not know whether Maloney personally profited as a result of his clients' investments in Nastech.)

Delvecchio indicated that he did not personally invest in Nastech. Further, while he purchased significantly greater Nastech shares (96,000 shares) than M & R (15,000 shares) he admitted he would not have purchased Nastech shares had Fields not been so persistent. Delvecchio does not have strong convictions regarding Nastech's future prospects, however, he believes the Nastech investment did not result in any loss to the Funds' accounts he managed.

The extent of Fields' involvement with Nastech is unclear. In his initial letter dated August 1, 2005, Rick Iaccarino suggested that Fields' wife may have owned shares of Nastech and a document entitled "Outline for Meeting with DOL" dated June 16, 2005 containing allegations told to Neal Schelberg states that she was the principal of a biotechnology company called Nastech. The same document also states that (Alan) Fields and Gilman personally owned stock in Nastech. We have been unable to verify any of these allegations regarding Field's wife or Gilman. However, Ed Bell, Senior Investor Relations Manager for Nastech, says that Fields was an early investor in Nastech but neither he nor his wife were ever employed by the company. (We do not know whether Fields may have personally profited as a result of persuading money managers to purchase Nastech.)

Alan Fields does appear in several transcripts of the company's quarterly earnings conference calls as a "UBS Analyst." In an October 26, 2004 third Quarter 2004 conference call Dr. Steven Quay, Nastech's Chairman and CEO concludes his response to a question by Fields by stating "I appreciate your support, your longstanding support for Nastech." It may very well be that Fields is or has been a significant investor in

Nastech and he and/or his wife may have been significantly involved in promoting the stock.

Both Maloney and Delvecchio maintain that the Funds were aware of their purchases of Nastech and that such purchases were authorized investments.

### 1. Prudential Purchase for United Wire

According to Delvecchio at Prudential (and as confirmed by our investigation) apparently there was no minimum capitalization requirement with respect to the United Wire account he co-managed while Smith Barney was the consultant. (Indeed, the account was not limited to equities originally.) As mentioned earlier, apparently after Reynolds became the consultant to United Wire, a minimum capitalization requirement was not adopted. Further, in two letters between Delvecchio and Cabouli, the Fund's Smith Barney consultant, dated December 26, 2002 (in response to her letter of December 22, 2002 concerning the United Wire Policy Objectives and Guidelines) and May 6, 2003, (in response to her letter dated April 14, 2003 concerning the Fund's Policy Objective and Guidelines) Delvecchio discussed the Nastech holding. Apparently Cabouli's letters to Delvecchio regarding Nastech were written to inquire as to whether any security in the portfolio had declined 35% or more below the original purchase price. (The Statement of Investment Policy Objectives and Guidelines Amended April 12, 2002 provided that the manager was required to notify the Board and consultant, in writing, of any such decline and proposed action.) At the time of her letters, Nastech's value had declined to approximately 50% below certain of the account's original purchase prices.

The custodial records indicate that the United Wire account managed by Prudential had realized gains of approximately $27,000 at December 31, 2004 related to its Nastech holdings. However, inclusion of unrealized losses results in a $95,000 loss at that date. Apparently, any possible losses related to Nastech holdings in this account would have been realized by the Fund after Prudential was terminated and was no longer managing the account.

### 2. Prudential Purchase for Local 875

The Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios applicable to this account, Section III Investment Goals, Restrictions and Limitations states that the market capitalization of each security purchased by Prudential shall not be lower than $150 million.

The custodial records indicate that Local 875 account managed by Prudential had realized gains of approximately $32,438 at December 31, 2004 related to its Nastech holdings. However, inclusion of unrealized losses results in a $19,414 loss at that date.

Delvecchio does not recall asking for permission to purchase Nastech for this account. He does not know if Eisenberg wrote the consultant or Board for permission.

According to the custodian statements, Prudential originally purchased 3,000 shares of Nastech on October 24, 2001 at approximately $9.10 per share. Prudential purchased another 2,000 shares on November 15, 2001 at $10.10 per share. These shares were sold within 60 days for a total gain of $32,432. At this time Nastech's market capitalization was below the $150 million minimum but there were no losses resulting to the fund.

The remaining 21,000 Nastech shares purchased by Prudential were not sold by Prudential prior to its termination from managing the account. We were not provided with information regarding the price realized by the Fund from the sale of the remaining Nastech holdings in this account following termination of Prudential.

Another 3000 shares were purchased on November 15, 2001 and December 13, 2001 at prices between $10.10 and $12.70. It appears all these trades occurred at a time when Nastech market capitalization was below $150 million. However, these trades showed an unrealized gain of $686 at December 31, 2004.

From January 3, 2002 through March 26, 2002 Prudential purchased an additional 17,000 shares at approximately $15.00 per share. It appears that Nastech's market capitalization was at or slightly above the $150 million minimum throughout this period. Thus, any losses related to these shares (approximately $52,668 unrealized at December 31, 2004) may be non-actionable. Finally, an additional 1,000 shares were purchased in May 27, 2004 at $11.91 that showed an unrealized gain of $130 at December 31, 2004.

### 3. M&R Purchase for Local 875

As mentioned earlier, apparently the Local 875 account managed by M&R was subject to market capitalization requirements. According to the custodial statements, on November 24, 2003 and January 15, 2004 M&R purchased a total of 10,000 shares of Nastech at an average price of approximately $10.16 a share. It appears that at the time of these purchases Nastech did not meet the Fund's market capitalization requirements.

Apparently some time later, Maloney discussed the purchase of Nastech for the account he managed with Tom Reynolds, the Fund's consultant, and sent a letter to him detailing their discussion. In a letter dated March 17, 2004 addressed to Reynolds, Maloney stated:

"Pursuant to our phone conversation today, I am writing to inform you that I have purchased 10,000 shares of Nastech... for the Local 810 Pension Fund at an average cost of $10.23/share (current price is $13/share). Our current position in Nastech represents .8% of the assets M&R Capital manages for the Local 810 Pension Plan, and is thus a very modest investment relative to our more normal 2-3% commitment to other stocks.

I am also considering purchasing an additional 5000 shares of Nastech, whose growth prospects look quite strong, which purchase would bring the total commitment to 1.2% of portfolio value. However, given the company's small size (market capitalization is barely above our minimum in the Investment Guidelines of $150 million) I felt I should submit this to you, and possibly the Board for its consideration."

According to Reynolds, the prior and proposed investments in Nastech were discussed and approved at a subsequent Board meeting. M&R subsequently purchased 2,400 shares on March 30, 2004 at $12.49, 1,000 shares on April 14, 2004 at $13.95 and 1,600 shares on April 26, 2004 at $13.98. None of the Nastech shares were sold by M&R. At December 31, 2004, this account had an unrealized gain of $12,629 related to the Nastech holdings.

We were not provided with complete information regarding the price realized by the Fund from the sale of the remaining Nastech holdings in this account following termination of M&R.

## 4. Summary

We do not have adequate information to determine whether either Fund's investments in Nastech resulted in net losses or gains. The Funds' custodian should have the answer. The Funds' consultant, Tom Reynolds, believes there were no losses.

According to Reynolds, following termination of Prudential, United Wire sold 11,700 Nastech shares at $13.18 and 13,300 at $13.21 on September 28, 2005 and September 29, 2005 respectively. We do not know the prices at which the remaining 40,000 shares purchased by Prudential for United Wire were sold.

According to Reynolds, following termination of M&R and Prudential, Local 810 sold 15,000 Nastech shares at $11.47 on May 19, 2005, 3,300 shares at $13.18 on September 28, 2005 and 3,700 shares at $13.21 on September 29, 2005. We do not know at what prices the remaining 14,000 shares purchased by Prudential and M&R for Local 810 were sold.

With respect to the United Wire account managed by Prudential, it appears that the investment guidelines permitted an investment in Nastech. Further, the Fund's Smith Barney consultant knew about the investment, as evidenced by correspondence between her and Prudential. Prudential's purchases of Nastech for the Local 810 account, to the extent that they may have violated the Fund's investment guidelines, apparently resulted in gains. Finally, M&R obtained Board approval for its purchases of Nastech. Neither manager ever sold Nastech at a loss. In conclusion, based upon the information we have reviewed, it appears there is no basis for pursuing any recovery related to either Fund's investments in Nastech.

## H. Trading With Fields and Best Execution Analysis

Under the federal securities laws money managers are required to seek "best execution" when trading securities for client accounts. A generally accepted working definition of "best execution" is lowest net price, taking into consideration factors such as size and difficulty of the order, time of the trade, market conditions, and commission rates. In part as a result of the complexity of determining "best execution," managers are permitted considerable latitude in selecting brokers to execute their trades, as well as in determining

commission rates. Managers generally are not required to seek the lowest commission rates. Some managers pay brokers a penny a share or less on some trades and eight cents a share or more on others. However, there are limits upon manager brokerage practices and acceptable practices have changed over time.

The recent mutual fund scandals and the related focus upon directed brokerage practices of mutual fund money managers, where managers use client commissions to compensate brokers for marketing mutual fund shares, have raised awareness of manager brokerage abuses.

Investment managers, as fiduciaries are required to discharge their duties solely in the interest of, and for the exclusive benefit of clients. Generally, where money managers use client commission dollars to derive an undisclosed benefit, such as marketing assistance, a breach of fiduciary duty may exist.

However, it is common industry practice for money managers to reward brokers who bring them assets to manage with all of the brokerage related to the account. Generally such trading occurs at commission rates which are greater than the manager could obtain for "execution only" trading or at commission rates that are not the lowest available. The difference between the "execution only" rate, e.g. 1-2 cents and the commission rate the broker is paid, e.g. 4-8 cents, is, in reality, marketing costs paid with client funds.

Regulators have not aggressively pursued such abuses and generally only question money managers regarding significant differences in the commission rates they charge similarly situated clients or some other suspect behavior. Managers, as a part of their routine compliance duties, are required to review their brokerage practices carefully and be prepared to defend their brokerage practices as being in the best interests of clients. While most managers are skilled at devising brokerage programs that survive regulatory scrutiny, such programs often are not necessarily established with the clients' best interests solely in mind. Managers' responses to regulatory concerns regarding brokerage practices may, in fact, result in keeping commissions higher than necessary and uniform to conceal the marketing component involved. In other words, a manager who executes all or substantially all client orders at six cents per share may be questioned less by regulators than a manager who executes all mutual fund orders at six cents and all institutional separately managed accounts at three cents.

Managers disclose or allude to the practice of using client commissions for marketing to varying degrees in their prospectuses and Forms ADV and generally maintain it is not harmful to clients because (1) the trades have to be done by some firm at some commission rate; and (2) the commission rate paid the firm that has assisted in marketing, inclusive of the marketing component, is not clearly excessive, i.e., the rate is within industry norms.

It is our understanding that no written instructions were ever sent to the managers directing all trades to Fields, Prudential or PaineWebber at six cents per share. Yet substantially all Prudential and M&R trades were executed by Fields at Prudential and

later PaineWebber and at a six cents per share commission rate. Thus, it appears managers engaged in no negotiation as to the commission rates on individual trades and there was never any differentiation of commission rates on orders, i.e., difficult orders were not executed at higher rates than easy orders. Finally, with respect to every trade for these accounts the managers apparently determined that the brokerage firm employing Fields or Fields himself always provided "best execution." We do not know the commission rates these managers pay in connection with the other accounts they manage. However, given the size of these two asset management firms (each firm had approximately $500 million under management) and the nature of their businesses (dependent upon retail brokers), it is less likely that they aggressively negotiate commission rates on behalf of their clients. That is, it is more likely that these firms use client commission dollars to reward brokers who bring them assets to manage or to fund their marketing.

Since Prudential and M&R were large cap managers, virtually all of their securities trades should have involved large cap stocks that were highly liquid. Delvecchio of Prudential indicated that his virtually all of his orders were "market orders" involving listed stocks requiring little judgment or skill on the part of the broker; Maloney at M&R indicated virtually all his orders were "limit" orders involving listed stocks and, as a result, Fields could only execute his trades at prices he specified.

According to Delvecchio (who only joined Prudential in 1999), while Fields was at Prudential, trades were directed to Prudential's trading desk and credited to Fields. Direction of orders to the firm's trading desk may reduce the likelihood a single individual's lack of trading skills could have adversely effected the quality of execution. Once Fields left Prudential, apparently the trades were called into Fields at PaineWebber personally by Prudential. We were unable to discuss the routing of trades with M&R but since M&R was hired after Fields left Prudential presumably M & R also traded directly with Fields at PaineWebber.

Apparently the managers entered into an unwritten agreement with Fields that he would receive all trades related to the various accounts as compensation for his marketing assistance. Delvecchio and Maloney both admitted there was an unwritten agreement to direct all trades to Fields and, as discussed below, Eisenberg at Prudential in a August 2000 note to Fleet apparently acknowledges his intent to direct all trades to Fields, despite the lack of client direction.

## 1. Prudential United Wire Account

The October 1990 contract between the Fund and Prudential contains language related to brokerage that is confusing. It appears to apply only to circumstances where the client designates that all trades are to be executed by Prudential (which is not the case here). The section in the contract related to principal and agency cross transactions has been crossed through apparently indicating the manager is not permitted such dealings.

The Statement of Investment Policy, Objectives & Guidelines related to the account and apparently drafted by Smith Barney amended April 12, 2002 (undated and unsigned) provided by Delvecchio does not address brokerage matters.

An Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios agreement between United Wire and Wachovia Securities that was apparently drafted by Reynolds is dated February 25, 2005. The year 2004 is printed on the agreement but it has been manually altered to indicate 2005. (Delvecchio states Wachovia was terminated February 28, 2005 and he believes the aforementioned agreement may have been executed some time earlier. However, Reynolds apparently did not become the consultant to the Fund until September 2004. Thus, this agreement could not have executed a year earlier.) This agreement (VI. Brokerage 2) states "all trade execution must be done "away" from the Managers and/or affiliated broker/dealers." It further states "A Manager may allocate brokerage transactions to itself or its affiliate only if the Trustees, the Manager and its affiliate (if applicable) have executed a written agreement permitting an affiliate of the Manager to perform brokerage transactions and only if such allocation is consistent with any investment management agreement between the Manager and the Trustees, any applicable securities laws, and ERISA..."

Item 3 states "In placing portfolio transaction orders, the Manager shall use its best efforts to obtain "best execution" of orders through responsible brokerage firms at the best prices and at reasonably competitive commission rates which, on an average quarterly basis, shall not exceed six cents per share."

In summary, it appears that with respect to the United Wire account managed by Prudential from 1990, there existed no specific contractual requirements regarding brokerage until February 25, 2005. As of that date, no brokerage with an affiliated firm was permitted and an average six cents per share quarterly maximum applied.

Finally, on August 2, 2000 Eisenberg of Prudential sent a note to Celeste Cooper of Fleet Bank, the funds' custodian, stating, "Please consider this your authorization to take instruction regarding the United Wire...account and the Local 875 account from Alan Fields and/or his assistant Ann Woods at Paine Webber... All clearing is now taking place through Paine Webber." This note was sent within a few months of Fields' departure from Prudential to PaineWebber.

Technically, "clearing" and execution of trades are separate functions and the clearing function involves minimal compensation. One firm can clear all trades executed by multiple brokerages and the executing brokers earn the vast majority of the related commissions. However, here it appears that Eisenberg was communicating his intention (as was indeed the case) that PaineWebber was to execute and clear all trades at six cents per share.

### 2. Prudential Local 875 Account

With respect to this account, the Discretionary Account Investment Supervisory Agreement between the Investment Supervisory Group of Prudential Securities and the Fund dated January 28, 1999 contains a similar but more elaborate (than the 1990 agreement between United Wire and Prudential Bache) provision regarding brokerage. The language regarding negotiation of commission rates appears to be limited to circumstances where the client directs trading (which was not the case here.) The section regarding agency cross-transactions has not been deleted.

However, the Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios apparently drafted by Reynolds between Prudential Securities and the Fund (signed but undated) requires all trades be done "away" from the manager and any directly affiliated brokerage at rates not to exceed six cents per share. (Delvecchio believes this agreement was signed in early 1999.) Thus, it appears that with respect to this account, any trades executed by Prudential were unauthorized. However, trading with PaineWebber (where apparently all trades were executed at six cents a share after Fields became registered at the firm approximately 15 months later) would have been permissible. Finally, the August 2000 Eisenberg letter of instruction described above also referred to this account and stipulated that all trading or clearing would be taking place through PaineWebber.

### 3. M&R Local 810 Account

We have reviewed an executed but undated Discretionary Investment Management Agreement between the Local 810 plan and M&R Capital Management, Inc. It appears that the document was created June 27, 2002. Page 6 of the contract states that the investment manager shall have complete discretion in the selection of broker-dealers and that the primary objective of the investment manager shall be to obtain best execution taking into account such relevant factors as the price, fees and/or commission, as well as the brokerage's ability to effect the transaction.

The Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios apparently drafted by Reynolds and executed between M&R Capital and the fund July 9, 2002 requires all trades be allocated on a "best execution" basis at rates not to exceed six cents per share.

### 4. Best execution analysis

Based upon a preliminary review of only two years of the Funds' trading (2003 and 2004) conducted by Abel Noser (under our direction and using an agreed upon methodology), it appears that the trading executions the Funds received, both in terms of explicit (commissions) and implicit (market impact) costs, were **significantly** higher than the median. That is, the implicit costs were worst than 95% of Abel Noser's universe (which includes approximately 500 institutions and $3.5 trillion in principal) and the explicit costs were worst than 75%. While median implicit cost is negative 2.5 basis points, the Funds' implicit cost is 24.1, or almost ten times as great. While median explicit cost is

12.96 basis points, the Funds' explicit cost is 18.27, or almost 30% higher. $335 million out of $346 million in trades were analyzed for the two years.

In summary, it appears that the money managers did not effectively monitor best execution and that the brokerage involved did not provide it. It is possible that since UBS knew the trading was essentially "captive" (due to Fields' relationship with the Funds) the firm's traders believed competitive execution was not required. Traders may have sought to maximize firm proprietary trading profits related to these orders. (The trading information provided by UBS did not indicate whether the orders were executed on an "agency" or principal" basis and also did not indicate the order instruction, i.e., limit, market, etc.) The damages related to failure to obtain best execution in the two years under analysis amounted to approximately $924,000.

Given the longstanding relationship between the Funds and one manager, it may be advisable to review trading since inception of the relationship (in 1990). Damages related to the managers' failure to obtain "best execution" could exceed $6 million.

## 5. Summary

In summary, it appears that Prudential and M&R entered into an unwritten agreement with Fields that he would receive 100% of the Funds' trades at six cents per share, as compensation for his marketing efforts. It appears there was neither client direction nor consent to this informal arrangement. In other words, trading with respect to these accounts was determined by the marketing benefit conferred upon the managers by the broker and what was best for the broker, as opposed to what was in the best interests of the pensions.

With respect to the United Wire account managed by Prudential, while Fields was at Prudential all trades were undertaken by Prudential at six cents and credited to Fields. There was no negotiation of commissions and no differentiation in the commission rates related to different orders. (We do not know the commission rates other clients of Prudential paid for trades.) Substantially all trades were "market" orders involving highly liquid, large cap securities. Clearly, a substantial portion of these trades could have been executed at substantially lower commission rates, either at the firm employing Fields or another firm. Eisenberg's August 2000 note indicates that Prudential did not intend to ever utilize other brokerage firms in trading the account. With respect to the Local 875 account managed by Prudential, there was an absolute prohibition against Prudential participating in any of the account's trading.

Once Fields left Prudential for PaineWebber and all trades were directed by Prudential and M&R to him there, the Abel Noser preliminary analysis indicates that "best execution" was not obtained with respect to these trades.

The managers may argue that the Boards of the Funds were aware that all trades were executed by Prudential and, later, PaineWebber. The Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios related to the Local

accounts managed by Prudential and M&R state that the manager will instruct the brokerage executing trades for the accounts to furnish the Fund Office (if requested) and the custodian with confirmations of trades. In addition, on a quarterly basis the managers are required to disclose all commissions and to whom they are paid.

However, the Boards were not aware that the managers had secretly agreed to direct all trades to these brokerages at six cents per share to compensate Fields for marketing assistance, without regard to "best execution" and in breach of their fiduciary duty. In addition, lacking sufficiently detailed disclosure regarding the relationship between brokerage and marketing and the related conflicts of interest ("best execution"), the Trustees were deprived of information material to evaluating the Funds' trading costs and cannot be said to have given their informed consent.

We were unable to obtain information from the Funds' custodian regarding total commissions related to the accounts managed by Prudential and M&R paid to Fields. Delvecchio states that Prudential commissions directed to Fields in 2004 in connection with the United Wire account amounted to $182,507 and $37,000 in connection with the Local 810 account. In 2003, Prudential commissions directed to Fields amounted to $276,322 (United Wire) and $73,302 (Local 810). Total commissions directed to Fields over time should be available through the Funds' custodian. However, due to the significant implicit costs related to these managers' failure to seek best execution, damages resulting to the Funds appear to be significantly greater than the excessive explicit (commission) costs.

## I. Money Market Fund/Custodian Cash Sweep

The Funds custody their assets at Bank of America. Cash within any of the Funds' separate accounts managed by various money managers hired by the Funds has been swept into Galaxy money market funds for short-term investment. (The adviser to the Galaxy funds is a subsidiary of Fleet/Bank of America.) In December 2005 the Galaxy family of funds were merged into the Columbia family of funds (the adviser of which is owned by Bank of America, Fleet's owner) and now the cash of the Funds is being swept into various Columbia money market funds.

## 1. Excessive money market fees

At the outset of this investigation, in response to an inquiry regarding which Fleet Galaxy money market fund the Funds' assets that were previously managed by Prudential and M&R are swept into and the related charges, Wanda Niola of Bank of America sent the prospectus of the Galaxy Institutional Shares of the Galaxy Fund. This money market fund includes the Galaxy Institutional Money Market Fund and the Galaxy Institutional Treasury Money Market Fund. The total fees and expenses of each of these funds are 28 basis points for the Institutional Money Market Fund (18 basis points as a result of a temporary advisory fee waiver) and 28 basis points for the Treasury Money Market Fund. However, Jim Leechan of Bank of America subsequently indicated that the Funds' cash is not swept into these institutional funds. Rather, account 41222228554302 (Trevor,

Stewart) is swept into the Galaxy Treasury Money Market Fund that has total fees and expenses of 48 basis points. Accounts 41222228512544 (Trevor, Stewart) and 41222228507425 (Stacey) are both swept into the Galaxy Money Market Fund (Trust Class) that has a total fees and expenses of 52 basis points (48 basis points as a result of a temporary management fee waiver).

As a result of sweeping cash into the non-institutional money market funds, it appears that the Funds may have been paying approximately 30 basis points more to have their cash managed in a Galaxy money market fund than is necessary. Furthermore, the Funds could potentially realize even greater savings by utilizing an institutional money market fund not affiliated with the custodian. For example, Vanguard offers a Prime Money Market Fund Institutional Shares with total fees and expenses of 9 basis points, i.e., 39 basis points less than the Funds have been paying.

While cash management is generally far easier (and less expensive) than bond or equity management, it appears that the Funds have been paying more to have their cash managed than their bonds or equities. Assuming the Funds have $340 million in assets and average approximately 5% cash ($17 million) at any given time and that all of the accounts of the Funds are swept into one or the other of these two money market funds, the Funds may be paying $66,300 annually in excessive money market fees and expenses.

The above discussion assumes that the Boards of the Funds were not responsible for selecting the higher cost bank-affiliated money market funds and that the institutional and non-institutional money market funds are similarly managed—which they appear to be. There exists language in the Investment Guidelines and Objectives for Investment Managers with "Equity" Portfolios for the Funds (drafted by Reynolds) under "Short Term Investments" stating "the Trustees have established an auto sweep of cash into the Custodian's STIF Program. The manager shall not be responsible for investments made pursuant to this cash sweep vehicle." It seems unlikely the Boards would knowingly select retail money market funds substantially more expensive than otherwise available.

It appears the custodian bank selected the higher cost money market funds because these funds resulted in higher compensation to the bank, even though it was not necessarily in the Funds' best interests. The standard of care provision of the Custody Contract between United Wire and Bank of America dated December 15, 1996 acknowledges that the custodian shall be held to a prudent man standard, however the custodian denies it is a fiduciary to the Fund.

On February 7, 2006 Wanda Niola stated, in response to our inquiry, that the Funds' cash is now being swept into the Columbia Government Reserves Class G shares and the Columbia Money Market Reserves Class G shares. She stated that the fees related to both money market funds were .12. She indicated that no prospectuses had been delivered to the United Wire or Local 810 Boards and none were available because they were being reprinted due to the recent merger of the Galaxy and Columbia families of funds. A Columbia Funds telephone representative stated that the total expenses of each fund are

.20. In response to Niola's e-mail I asked her to confirm that until the recent switch to the Columbia funds, the United Wire and Local 810 accounts were paying 48 basis points for their money market sweep or .28 more than they are now paying. She declined to respond to my e-mail.

## 2. Revenue-sharing Paid to Custodian

Given the higher fees related to the money market funds in which the Funds have been invested and a provision in the applicable money market funds' prospectuses referring to revenue-sharing we inquired as to whether the custodian had received any revenue sharing payments from the affiliated investment advisory subsidiary. Jim Leechan indicated there were no revenue sharing payments made to the custodian by the affiliated money market funds manager, however, it is unclear whether he fully understood the question. The Custodial Agreement between United Wire and Fleet Bank states in Section 4.6 Custodian Compensation that the sole compensation to the custodian for its services will be as set forth in Exhibit A. This Exhibit states that the annual fee will be 6 basis points with breakpoints. If the custodian has received any additional compensation, such as revenue sharing payments, this provision in the custody agreement may have been breached.

We have not reviewed the Local 810 Custodial Agreement.

## J. Smith Barney Management of United Wire and Local Accounts

On December 30, 2004 Delvecchio wrote to Tom Reynolds, the consultant to the United Wire and Local 810 pension accounts Wachovia Securities managed and Steve Gilman at United Wire informing them that Wachovia would no longer offer advisory services through the legacy Prudential Securities platform called the Investment Supervisory Group, effective February 1, 2005. He stated that pursuant to the agreement between the Group and the Funds, it would continue to provide advisory services to the accounts through January 31, 2005.

On February 10, 2005, Tom Reynolds wrote to Delvecchio, addressing his letter to Delvecchio's Smith Barney Citigroup office, regarding the United Wire and Local 810 accounts he had been managing while at Wachovia. Reynolds stated he had received a copy of Delvecchio's letter to Gilman indicating that effective February 11, 2005 he would be moving to Smith Barney. (We have not reviewed this letter and Delvecchio believes the February 11th moving date referred to therein may be a typo since he left Wachovia effective February 1st.) Reynolds wrote, "When I spoke to you yesterday and inquired about the assets after your departure. You said that they would, in effect, be unmanaged. Mr. Gilman said that was unacceptable and I agree. So, as your letter indicated, you will continue to manage the portfolio until we conduct a Due Diligence for both funds." The letter goes on to require some information and documentation from Delvecchio's new group, including an Investment Manager Agreement and a letter indicating that the firm would accept fiduciary responsibility through Delvecchio as an agent.

Delvecchio, now at Smith Barney Citigroup, continued to manage the accounts apparently through April 30, 2005. Delvecchio has provided copies of original time-stamped trade tickets dated April 27, 2005 that Smith Barney executed delivery-versus-payment at the custodian. He believes these were the final trades he undertook on behalf of the accounts. While no investment advisory contract was ever executed with Smith Barney, apparently the custodian of the Funds' assets permitted Delvecchio to continue to manage the accounts. The custodian, Bank of America, has not provided any documentation indicating that Delvecchio was authorized to manage the accounts.

On March 31, 2005, Tom Reynolds wrote to Steve Gilman, as Administrator of Local 810 (a position apparently Gilman never had), indicating that his firm had conducted the Due Diligence referred to in its February 11, 2005 letter. Reynolds had a face-to-face meeting with Delvecchio at Smith Barney Management Group of Citigroup Global Markets and had obtained the documents he had previously requested, including an investment contract and a letter from Michael Lee authorized to sign (presumably as a fiduciary) on behalf of Smith Barney. Reynolds' conclusions were: (1) the group that Delvecchio worked with was not the institutional group at Smith Barney. They were a small group of brokers who collectively managed approximately $400 million. Reynolds suggested that if Smith Barney was to be used the money should be managed by an institutional group; (2) the proposed contract should be changed to a more institutional style document, as opposed to a .67 wrap fee; (3) fees should be negotiated on an institutional basis; (4) the trustees should review other managers before selecting a finalist. Tom Reynolds has indicated that in May 2005 the accounts were taken from Smith Barney and that performance of the accounts for the period was −3.98 versus −4.01 for the S&P Index. Delvecchio has indicated that Smith Barney was not paid an asset management fee for the period ending in April 30, 2005.

Delvecchio has provided additional correspondence related to the accounts. On April 26, 2005 he was copied on two letters from Gilman, one as Trustee of Local 810 and another as Administrator of United Wire to Wanda Niola at Fleet Bank transferring funds. In early May 2005 Laureen Bernardes and Jim Cody at Reynolds sent faxes to Delvecchio requesting performance information.

In conclusion it appears that while Smith Barney's management of the accounts without a fully executed investment advisory agreement violated the federal securities laws, the Funds' consultant, custodian and at least one Administrator and Trustee (Gilman) knew about the informal arrangement. Most important, apparently there were no damages and no fees were paid to Smith Barney.

## K. Conclusion

Apparent violations of the Funds' investment guidelines by Prudential and M&R related to purchasing Nastech shares upon further investigation do not appear to be problematic, either due to Nastech meeting any market capitalization minimum applicable at the time of purchase or consent of the appropriate Board to the purchase having been obtained by the manager. Further it appears that the Nastech purchases did not result in losses to either Fund. Smith Barney's serving as an investment manager to the Funds without a

written investment advisory agreement, while clearly a violation of the federal securities laws, apparently also resulted in no harm to the Funds. These conclusions are based upon the information we were provided which was incomplete and may be disputed by additional definitive information regarding Nastech gains and losses, as well as Smith Barney investment performance.

On the other hand, Prudential's payment of 45% of its asset management fee to Fields without adequate disclosure to the Funds appears actionable. A claim for recovery of the 45% fee paid to Fields since 1990 (i.e. including the period when Fields was employed at Prudential) may be less straightforward. The undisclosed agreement Prudential and M&R had to direct 100% of the trades related to the Funds' accounts they managed to Fields, based upon preliminary review appears to have violated the managers' fiduciary duty to seek best execution (as well as the broker's duty to provide it) and resulted in significant damages.

Finally, the Funds may also have a cause of action against their custodian, Bank of America, for excessive money market fund fees related to daily "sweeping" of the Funds' cash. The Funds' cash has been swept into higher cost retail money market funds, as opposed to lower cost institutional funds that Bank of America and other mutual fund families offer.

# EXHIBIT G

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

────────

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

ª Also Admitted in PA
*º Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Road
Elmsford, New York 105
(914) 592-5740
Fax: (914) 592-3215

111 Broadway
Trinity Centre
Suite 1403
New York, New York 10(
(212) 943-9080
Fax: (212) 943-9082

────────

OF COUNSEL:
Albert Rodrigues, Esq

April 25, 2006

Mr. G. Kennedy Thompson
Wachovia Corp.
One Wachovia Center
Charlotte, NC 28288

Re:    United Wire Metal and Machine Pension Fund
       Local 810 Affiliated Pension Fund

Dear Mr. Thompson:

This firm is co-counsel to the above named Funds and I am writing in regard to your company's financial arrangements with the Funds.

The Trustees directed my firm to conduct an investigation regarding payments made to your company and a registered representative or securities broker regarding the management of assets. My firm retained Benchmark Financial Services, Inc. to conduct an investigation of these matters. The major results of the investigation were as follows:

1.  Your company paid 45% of your investment management fees to a broker without disclosure to the Board of Trustees.

2.  Your company directed 100% of the Fund's trades to a single broker at a set price and without regard to your fiduciary obligation to seek best price/best execution.

3.  There were several instances in which your company purchased securities outside the scope of the Fund's investment policy at the direction of the broker.

Based upon an analysis of the improperly paid solicitation fees and an analysis of the lost income due to the failure to receive the best execution, we believe the damages incurred by the Funds to be at least $16 Million. These are our preliminary conclusions. Upon further investigation, there may be other violations.

This matter is currently being investigated by the Department of Labor and the U.S. Department of Justice. The Trustees have requested that I attempt to resolve this matter by having your company make the Funds whole for any losses sustained including interest, cost of the investigation and legal fees. If we are unable to reach an agreement, the Trustees have directed that I file a civil RICO suit seeking in addition to the above, treble damages.

Accordingly, I would request that you contact me so that we can make arrangements to meet to discuss this matter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees
       Benchmark Financial Services, Inc.

-2-

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Road
Elmsford, New York 105!
(914) 592-6740
Fax: (914) 592-3213

111 Broadway
Trinity Centre
Suite 1403
New York, New York 100
(212) 943-9080
Fax: (212) 943-9082

OF COUNSEL:
Albert Rodriguez, Esq

April 25, 2006

William R. Rhodes, Sr. Vice Chairman
Citigroup, Inc.
399 Park Avenue
New York, NY 10043

Re:   United Wire Metal and Machine Pension Fund
      Local 810 Affiliated Pension Fund

Dear Mr. Rhodes:

This firm is co-counsel to the above named Funds and I am writing in regard to your company's financial arrangements with the Funds.

The Trustees directed my firm to conduct an investigation regarding payments made to your company and a registered representative or securities broker regarding the management of assets. My firm retained Benchmark Financial Services, Inc. to conduct an investigation of these matters. The major results of the investigation were as follows:

1. Your company directed 100% of the Fund's trades to a single broker at a set price and without regard to your fiduciary obligation to seek best price/best execution.

2. Your company actively managed assets of the Fund after being terminated and without any contract or authority.

Based upon an analysis of the lost income due to the failure to receive the best execution, and the losses sustained by the Fund during the period in which the assets were managed without authority, we believe the damages incurred by the Funds to be at least $5 Million. These are our preliminary conclusions. Upon further investigation, there may be other violations.

This matter is currently being investigated by the Department of Labor and the U.S. Department of Justice. The Trustees have requested that I attempt to resolve this matter by having your company make the Funds whole for any losses sustained including interest, cost of the investigation and legal fees. If we are unable to reach an agreement, the Trustees have directed that I file a civil RICO suit seeking in addition to the above, treble damages.

Accordingly, I would request that you contact me so that we can make arrangements to meet to discuss this matter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees
       Benchmark Financial Services, Inc.

-2-

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

_____

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE‡
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
‡ Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Roa
Elmsford, New York 105
(914) 592-5740
Fax: (914) 592-3213

113 Broadway
Trinity Centre
Suite 1403
New York, New York 100
(212) 943-9080
Fax: (212) 943-9082

_____

OF COUNSEL:
Albert Rodriguez, Esq

April 10, 2006

Ms. Francine Asselta
Bank of America
1185 Avenue of the Americas, 24th Floor
New York, NY 10036

Re:    United Wire Metal and Machine Pension and Welfare Funds
       Local 810 Affiliated Pension Fund

Dear Francine:

This firm is co-counsel to the above named Funds and I am writing in regard to your fees received as custodian for the Fund's assets.

During the course of an investigation, Benchmark Financial Services, Inc. discovered that the Money Market Fund fees related to the daily "sweeping" of the Fund's cash, were improper due to the fact that they were placed in a retail Money Market Fund as opposed to an Institutional Fund.

Benchmark Financial Services, Inc. believes that the improper Money Market Fund fees may have cost the Funds at least $600,000 over the past 10 years.

The Trustees have requested that I attempt to resolve this matter by having your company make the Funds whole for any losses sustained including interest, cost of the investigation and legal fees.

Accordingly, I would request that you contact me so that we can make arrangements to meet to discuss this matter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees
       Benchmark Financial Services, Inc.

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE‡
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Road
Elmsford, New York 105
(914) 592-5740
Fax (914) 592-5213

111 Broadway
Trinity Centre
Suite 1403
New York, New York 100
(212) 943-9080
Fax (212) 943-9082

OF COUNSEL:
Albert Rodrigues, Esq.

April 25, 2006

Mr. John Maloney
M&R Capital Management, Inc.
40 Fulton Street, 21st Floor
New York, NY 10038

Re:    United Wire Metal and Machine Pension Fund
       Local 810 Affiliated Pension Fund

Dear Mr. Maloney:

This firm is co-counsel to the above named Funds and I am writing in regard to your company's financial arrangements with the Funds.

The Trustees directed my firm to conduct an investigation regarding payments made to your company and a registered representative or securities broker regarding the management of assets. My firm retained Benchmark Financial Services, Inc. to conduct an investigation of these matters. The major results of the investigation were as follows:

1. Your company directed 100% of the Fund's trades to a single broker at a set price and without regard to your fiduciary obligation to seek best price/best execution.

2. There were several instances in which your company purchased securities outside the scope of the Fund's investment policy at the direction of the broker.

Based upon an analysis of the lost income due to the failure to receive the best execution, we believe the damages incurred by the Funds to be at least $12 Million. These are our preliminary conclusions. Upon further investigation, there may be other violations.

This matter is currently being investigated by the Department of Labor and the U.S. Department of Justice. The Trustees have requested that I attempt to resolve this matter by having your company make the Funds whole for any losses sustained including interest, cost of the investigation and legal fees. If we are unable to reach an agreement, the Trustees have directed that I file a civil RICO suit seeking in addition to the above, treble damages.

Accordingly, I would request that you contact me so that we can make arrangements to meet to discuss this matter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees
       Benchmark Financial Services, Inc.

-2-

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

————————

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Road
Elmsford, New York 1059
(914) 592-5740
Fax: (914) 592-5213

111 Broadway
Trinity Centre
Suite 1403
New York, New York 100
(212) 943-8080
Fax: (212) 943-9082

————————

OF COUNSEL:
Albert Rodrigues, Esq

April 25, 2006

Arthur F. Ryan, President, CEO
Prudential Financial Inc.
751 Broad Street
Prudential Plaza
Newark, NJ 07102

Re:   United Wire Metal and Machine Pension Fund
      Local 810 Affiliated Pension Fund

Dear Mr. Ryan:

This firm is co-counsel to the above named Funds and I am writing in regard to your company's financial arrangements with the Funds.

The Trustees directed my firm to conduct an investigation regarding payments made to your company and a registered representative or securities broker regarding the management of assets. My firm retained Benchmark Financial Services, Inc. to conduct an investigation of these matters. The major results of the investigation were as follows:

1. Your company paid 45% of your investment management fees to a broker without disclosure to the Board of Trustees.

2. Your company directed 100% of the Fund's trades to a single broker at a set price and without regard to your fiduciary obligation to seek best price/best execution.

3. There were several instances in which your company purchased securities outside the scope of the Fund's investment policy at the direction of the broker.

Based upon an analysis of the improperly paid solicitation fees and an analysis of the lost income due to the failure to receive the best execution, we believe the damages incurred by the Funds to be at least $16 Million. These are our preliminary conclusions. Upon further investigation, there may be other violations.

This matter is currently being investigated by the Department of Labor and the U.S. Department of Justice. The Trustees have requested that I attempt to resolve this matter by having your company make the Funds whole for any losses sustained including interest, cost of the investigation and legal fees. If we are unable to reach an agreement, the Trustees have directed that I file a civil RICO suit seeking in addition to the above, treble damages.

Accordingly, I would request that you contact me so that we can make arrangements to meet to discuss this matter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees
       Benchmark Financial Services, Inc.

-2-

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

————————

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE†
STEVEN KERN†
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River R
Elmsford, New York 1
(914) 592-5740
Fax: (914) 592-32

111 Broadway
Trinity Centre
Suite 1403
New York, New York
(212) 943-9080
Fax: (212) 943-90

————————

OF COUNSEL:
Albert Rodrigues, I

April 25, 2006

Ms. Debora A. Siringo
UBS International
1285 Avenue of the Americas
New York, NY 10019

Re:    United Wire Metal and Machine Pension Fund
       Local 810 Affiliated Pension Fund

Dear Ms. Siringo:

This firm is co-counsel to the above named Funds and I am writing in regard to your company's financial arrangements with the Funds.

The Trustees directed my firm to conduct an investigation regarding payments made to your company and a registered representative or securities broker regarding the management of assets. My firm retained Benchmark Financial Services, Inc. to conduct an investigation of these matters. The major results of the investigation were as follows:

1.  A broker for your company received solicitation fees amounting to 45% of the investment management fees paid to an investment management company without disclosure to the Board of Trustees.

2.  Your company directed 100% of the Fund's trades to a single broker at a set price and without regard to your fiduciary obligation to seek best price/best execution.

3.  There were several instances in which your company purchased securities outside the scope of the Fund's investment policy at the direction of the broker.

Based upon an analysis of the improperly paid solicitation fees and an analysis of the lost income due to the failure to receive the best execution, we believe the damages incurred by the Funds to be at least $16 Million. These are our preliminary conclusions. Upon further investigation, there may be other violations.

This matter is currently being investigated by the Department of Labor and the U.S. Department of Justice. The Trustees have requested that I attempt to resolve this matter by having your company make the Funds whole for any losses sustained including interest, cost of the investigation and legal fees. If we are unable to reach an agreement, the Trustees have directed that I file a civil RICO suit seeking in addition to the above, treble damages.

Accordingly, I would request that you contact me so that we can make arrangements to meet to discuss this matter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:     Board of Trustees
        Benchmark Financial Services, Inc.
        Ricardo Gonzales
        Scott Noah

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC
## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

————————

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Road
Elmsford, New York 10523
(914) 592-5740
Fax: (914) 592-3213

111 Broadway
Trinity Centre
Suite 1403
New York, New York 10
(212) 943-9080
Fax: (212) 943-9082

————————

OF COUNSEL:
Albert Rodrigues, Esq

July 14, 2006

Arthur Young III, Esq.
Legal Department
Bank of America
One Federal Street
Boston, MA 02110

Re:    United Wire Metal and Machine Pension and Welfare Funds
        Local 810 Affiliated Pension Fund

Dear Mr. Young:

Thank you for your letter dated April 27, 2006 in the above matter.

Based upon the representation in your letter that you "expect to have a substantive response to your shortly", the Trustees have withheld from any further action. However, as we have not received any further response to date, the Trustees are prepared to finalize the analysis of the damages and take any necessary action.

If you wish to resolve this in an amicable fashion, please contact me within ten (10) days.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC

## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

—————

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN GHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

256 Saw Mill River Rd
Elmsford, New York 105
(914) 592-5740
Fax: (914) 592-3215

111 Broadway
Trinity Centre
Suite 1405
New York, New York 10
(212) 943-9080
Fax: (212) 943-9082

—————

OF COUNSEL:
Albert Rodrigues, Es

July 14, 2006

Jane Rushton, Esq.
VP Corporate Counsel
Prudential Equity Group, 16th Floor
One New York Plaza
New York, NY 10292

Re:     United Wire Metal and Machine Pension Fund
        Local 810 Affiliated Pension Fund

Dear Ms. Rushton:

Thank you for your response in the above matter.

As my original letter in this matter was dated April 25, 2006, I would appreciate a written update of your client's investigation and position. The Trustees wish to resolve this matter in an amicable fashion; however, they are prepared to finalize the analysis of the damages and take any necessary action.

Please contact me within ten (10) days of the date of this letter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:     Board of Trustees

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC

## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN CHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Rc
Elmsford, New York 1(
(914) 592-5740
Fax (914) 592-521!

111 Broadway
Trinity Centre
Suite 1403
New York, New York 1
(212) 943-9080
Fax (212) 943-908

OF COUNSEL:
Albert Rodrigues, E

July 14, 2006

Mr. Rudolph Aragon
White & Case, LLP
Wachovia Financial Center
Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131-2352

Re:    United Wire Metal and Machine Pension Fund
       Local 810 Affiliated Pension Fund

Dear Mr. Aragon:

Thank you for your response in the above matter.

As my original letter in this matter was dated April 25, 2006, I would appreciate a written update of your client's investigation and position. The Trustees wish to resolve this matter in an amicable fashion; however, they are prepared to finalize the analysis of the damages and take any necessary action.

Please contact me within ten (10) days of the date of this letter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees

# Barnes, Iaccarino, Virginia, Ambinder & Shepherd, PLLC

## ATTORNEYS AT LAW

ROY BARNES*
RICCARDO IACCARINO
CHARLES R. VIRGINIA**
LLOYD R. AMBINDER**
WENDELL V. SHEPHERD

MICHELLE BAGINSKI
DENNIS M. CARIELLO
DANIELLE M. CARNEY
SUSAN CHIM
DANA HENKE†
STEVEN KERN††
JUDY S. WONG
KARIN ARROSPIDE
SCOTT AURNOU
YONGMIN OH

* Also Admitted in PA
** Also Admitted in NJ
† Also Admitted in DC
†† Also Admitted in CT

3 Surrey Lane
Hempstead, New York 11550
(516) 483-2990
Fax: (516) 483-0566

258 Saw Mill River Rd
Elmsford, New York 10
(914) 592-5740
Fax: (914) 592-5213

111 Broadway
Trinity Centre
Suite 1405
New York, New York 1
(212) 943-9080
Fax: (212) 943-908

OF COUNSEL:
Albert Rodriguez, Es

July 14, 2006

Ms. Debora A. Siringo
UBS International
1285 Avenue of the Americas
New York, NY 10019

Re:    United Wire Metal and Machine Pension and Welfare Funds
       Local 810 Affiliated Pension Fund

Dear Ms. Siringo:

This firm is co-counsel to the above named Funds and I am writing in furtherance of my enclosed letter to you dated April 25, 2006.

It was the Trustees desire to resolve this matter in an amicable fashion; however, as you have chosen not to respond to my letter, they are prepared to finalize the analysis of damages and take any necessary action.

Should you wish to attempt to resolve this matter please contact me within ten (10) days of the date of this letter.

Sincerely,

Riccardo Iaccarino, Esq.

RI:jp

cc:    Board of Trustees